# EXHIBIT A

# EXHIBIT A

# CIVIL COVER SHEET

Clark County, Nevada

Case No. _____
*(Assigned by Clerk's Office)*

A-11-636068-C

XXVI

## I. Party Information

Plaintiff(s) (name/address/phone): THE CRYSTALS AT CITYCENTER, LLC, a domestic limited liability company

Defendant(s) (name/address/phone): ELYSIUM RESORTS, INC., a domestic corporation; JACKIE ROBINSON, an individual, and MICHAEL BELLON, an individual

Attorney (name/address/phone):
Patrick Byrne, Esq., Justin Carley, Esq., Snell & Wilmer L.L.P., 3883 Howard Hughes Pkwy. , #1100, Las Vegas, NV 89169, (702) 784-5200

Attorney (name/address/phone):

## II. Nature of Controversy (Please check applicable bold category and applicable subcategory, if appropriate)

☐ **Arbitration Requested**

### Civil Cases

| Real Property | Torts |
|---|---|

**Real Property**

☐ **Landlord/Tenant**
  ☐ Unlawful Detainer
☐ **Title to Property**
  ☐ Foreclosure
  ☐ Liens
  ☐ Quiet Title
  ☐ Specific Performance
☐ **Condemnation/Eminent Domain**
☐ **Other Real Property**
  ☐ Partition
  ☐ Planning/Zoning

**Torts**

Negligence
☐ **Negligence – Auto**
☐ **Negligence -- Medical/Dental**
☐ **Negligence – Premises Liability**
  (Slip/Fall)
☐ **Negligence – Other**

☐ **Product Liability**
  ☐ Product Liability/Motor Vehicle
  ☐ Other Torts/Product Liability
☐ **Intentional Misconduct**
  ☐ Torts/Defamation (Libel/Slander)
  ☐ Interfere with Contract Rights
☐ **Employment Torts** (Wrongful termination)
☐ **Other Torts**
  ☐ Anti-trust
  ☐ Fraud/Misrepresentation
  ☐ Insurance
  ☐ Legal Tort
  ☐ Unfair Competition

| Probate | Other Civil Filing Types |
|---|---|

**Probate**

Estimated Estate Value: _____

☐ **Summary Administration**
☐ **General Administration**
☐ **Special Administration**
☐ **Set Aside Estates**
☐ **Trust/Conservatorships**
  ☐ Individual Trustee
  ☐ Corporate Trustee
☐ **Other Probate**

**Other Civil Filing Types**

☐ **Construction Defect**
  ☐ Chapter 40
  ☐ General
☒ **Breach of Contract**
  ☐ Building & Construction
  ☐ Insurance Carrier
  ☐ Commercial Instrument
  ☒ Other Contracts/Acct/Judgment
  ☐ Collection of Actions
  ☐ Employment Contract
  ☒ Guarantee
  ☐ Sale Contract
  ☐ Uniform Commercial Code
☐ **Civil Petition for Judicial Review**
  ☐ Foreclosure Mediation
  ☐ Other Administrative Law
  ☐ Department of Motor Vehicles
  ☐ Worker's Compensation Appeal

☐ **Appeal from Lower Court** *(also check applicable civil case box)*
  ☐ Transfer from Justice Court
  ☐ Justice Court Civil Appeal
☐ **Civil Writ**
  ☐ Other Special Proceeding
☐ **Other Civil Filing**
  ☐ Compromise of Minor's Claim
  ☐ Conversion of Property
  ☐ Damage to Property
  ☐ Employment Security
  ☐ Enforcement of Judgment
  ☐ Foreign Judgment – Civil
  ☐ Other Personal Property
  ☐ Recovery of Property
  ☐ Stockholder Suit
  ☐ Other Civil Matters

## III. Business Court Requested (Please check applicable category; *for Clark or Washoe Counties only.*)

☐ NRS Chapters 78-88
☐ Commodities (NRS 90)
☐ Securities (NRS 90)

☐ Investments (NRS 104 Art. 8)
☐ Deceptive Trade Practices (NRS 598)
☐ Trademarks (NRS 600A)

☐ Enhanced Case Mgmt/Business
☐ Other Business Court Matters

March 2, 2011
Date

Signature of initiating party or representative

Electronically Filed
03/02/2011 10:47:26 AM

**COMP**
Patrick Byrne, Esq.
Nevada Bar No. 7636
Justin Carley, Esq.
Nevada Bar No. 9994
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Tel.(702) 784-5200
Fax. (702) 784-5252
pbyrne@swlaw.com
jcarley@swlaw.com

*Attorneys for Plaintiff*
*The Crystals at CityCenter, LLC*

**CLERK OF THE COURT**

## DISTRICT COURT

## CLARK COUNTY, NEVADA

THE CRYSTALS AT CITYCENTER, LLC,
a domestic limited liability company;

　　　　　　Plaintiff,

vs.

ELYSIUM RESORTS, INC., a domestic
corporation; JACKIE ROBINSON, an
individual; and MICHAEL BELLON, an
individual;

　　　　　　Defendants.

CASE NO.: A - 1 1 - 6 3 6 0 6 8 - C
DEPT. NO.: 　　 X X V I

**COMPLAINT**

　　　　Plaintiff, THE CRYSTALS AT CITYCENTER, LLC, a domestic limited liability

company, by its attorneys, SNELL & WILMER L.L.P., files its Complaint against Defendants

ELYSIUM RESORTS, INC., a domestic corporation, JACKIE ROBINSON, an individual, and

MICHAEL BELLON, an individual, and alleges as follows.

# I.    PARTIES, JURISDICTION, AND VENUE

1.    The Crystals at CityCenter, LLC ("Crystals") is a Nevada limited liability company.

2.    Upon information and belief, Elysium Resorts, Inc. ("Elysium") is a Nevada corporation whose business address is 4560 S. Decatur Blvd., Suite 301, Las Vegas, NV 89103.

3.    Upon information and belief, Robinson is an individual residing at 2201 Glenbrook Way, Las Vegas, NV 89117 or at 6325 Harrison Drive #1, Las Vegas, NV 89120.

4.    Upon information and belief, Bellon is an individual residing at 1408 Saintsbury Drive, Las Vegas, NV 89144.

5.    Crystals, Elysium, Robinson, and Bellon negotiated and executed the relevant Lease and Guarantees, as these terms are defined below, in Clark County, Nevada.

6.    The Lease governs the landlord-tenant relationship between Crystals, as landlord, and Elysium, as tenant, regarding certain commercial property located in Clark County, Nevada.

7.    The Lease contains a Nevada choice of law provision.

8.    Therefore, this Court has personal jurisdiction over all Defendants, subject matter jurisdiction over this dispute, and is the appropriate venue to apply Nevada law.

## II.    GENERAL ALLEGATIONS

### A.    The Lease

9.    On or about July 16, 2009, Crystals, as landlord, and Elysium, as tenant, entered into the Lease. *See* Lease, an authentic copy of which is attached as Exhibit 1.

10.    The Lease governed Elysium's tenancy of the property identified as space number 270, located on level 2146, of the Crystals retail area in the development known as City Center. *Id.* at p.D1, ¶1; p.S1, §1.01(a); and at Lease Exhibit A, p.2 (the "Leased Premises").

11.    The Leased Premises was comprised of Four Thousand Six Hundred and Fifty (4,650) square feet of area. *Id.*

12.    Under the Lease, the parties agreed to an original term of ten (10) "Lease Years" expiring December 31 following the ninth (9th) anniversary of the Lease Term Commencement Date. *Id.* at p.D1, ¶3; and at p.S1, §1.02.

-2-

13.     Elysium agreed to pay a "Minimum Rent" of Three Hundred Forty-Four Thousand, Five Hundred Eighteen dollars and Fifty cents ($344,518.50) per year, which was payable in equal monthly installments of Twenty Eight Thousand, Seven Hundred Nine dollars and Eighty Eight cents ($28,709.88), subject to certain increases as defined further in the Lease. *Id.* at p.D1, §2.01; and at p.S2, §2.01.

14.     Elysium agreed to pay an additional "Percentage Rent" calculated off of Elysium's gross sales. *Id.* at p.D1, ¶3 and §2.02(a); and at p.S2, §2.02.

15.     Elysium agreed to pay its proportionate share of the tax obligations. *Id.* at p.D2, §2.05; and at p.S4, §2.05.

16.     Elysium agreed to pay its proportionate share of expenses. *Id.* at p.D1, §8.03; and at p.S13, §8.03.

17.     Elysium also agreed to satisfy certain terms and milestones for the design of, construction of, and opening of Elysium's business, which would be known by the trade name "Philippe Plein." *Id.* at p.D2, §§5.01, 7.01, and 16.01; at p.S7, §5.01 through p.S12, §7.05; at p.S23, §16.01; and at Lease Exhibit B.

18.     Elysium agreed to pay an "Initial Opening Promotional Charge" of Four dollars ($4.00) per square foot of floor area in the Leased Premises. *Id.* at p.D2, ¶15.

19.     Elysium agreed to pay an "Annual Promotional Charge" of Four dollars ($4.00) per square foot of floor area in the Leased Premises, subject to annual adjustment as defined further in the Lease. *Id.* at p.D2, §16.03; and at p.S23, §16.03.

**B.     The Guarantees**

20.     The Lease specifically identifies Robinson and Bellon as Guarantors of the Lease. *Id.* at p.D3, ¶19.

21.     Additionally, Robinson executed an independent Guaranty "absolutely, unconditionally and irrevocably" guaranteeing the "full, faithful and timely payment and performance by Tenant [Elysium] of all of the payments, covenants and other obligations of Tenant under or pursuant to the Lease" dated July 16, 2009. *See* Robinson Guaranty, an authentic copy of which is attached as Exhibit 2.

- 3 -

1    22.     Likewise, Bellon executed an independent Guaranty "absolutely, unconditionally

2  and irrevocably" guaranteeing the "full, faithful and timely payment and performance by Tenant

3  [Elysium] of all of the payments, covenants and other obligations of Tenant under or pursuant to

4  the Lease" dated July 16, 2009. *See* Bellon Guaranty, an authentic copy of which is attached as

5  Exhibit 3.

6  **C.      The First Default**

7    23.     In 2009, Crystals became aware that Elysium's design, construction, and planned

8  opening of the Philippe Plein store were not occurring on schedule under the Lease.

9    24.     On November 18, 2009, Crystals' counsel sent Elysium, and the Guarantors, the

10  first Notice of Default, which explained that Elysium's representatives informed Crystals that

11  Elysium: "is not moving forward with construction of Tenant's Work in the Leased Premises and

12  that Tenant wanted to explore the possibilities of relocating to the enclosed retail mall portion of

13  the project." *See* November 18, 2009 Notice of Default, an authentic copy of which is attached as

14  Exhibit 4.

15    25.     The Notice of Default continued: "[t]his Letter shall constitute notice to Tenant of

16  Tenant's default for such failure" referencing the Lease at its Data Sheet §5.01 and its Exhibit B.

17  *Id.*

18  **D.      The Modification**

19    26.     On or about February 11, 2010, Crystals and Elysium entered into the First

20  Modification of Lease Agreement ("Modification"). *See* Modification, an authentic copy of

21  which is attached as Exhibit 5.

22    27.     The Modification revised some of the original Lease terms, but otherwise ratified

23  the remaining provisions. *Id.* at ¶8.

24    28.     Specifically, the Modification changed the Data Sheet portion of the Lease to

25  redefine the "floor area" to exclude the floor area of storage for purposes of determining charges

26  payable by Elysium under §§2.05, 8.03, and 16.03 of the Lease, and for purposes of determining

27  the construction allowance Crystals owed Elysium under the Lease. *Id.* at ¶1.

28

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

- 4 -

29.    This change reduced the Leased Premises floor area (excluding the portion of the Leased Premises consisting of the storage premises) to Four Thousand One Hundred and Forty Four (4,144) square feet for these purposes. *Id.*

30.    The Modification also changed the "Commencement Date" to June 15, 2010. *Id.* at ¶2.

31.    The Modification also changed the "Minimum Rent" to be Three Hundred Six Thousand, Six Hundred Fifty Six dollars ($306,656.00) per year, which was payable in equal monthly installments of Twenty Five Thousand, Five Hundred Fifty Four dollars and Sixty Seven cents ($25,554.67), subject to certain increases as defined further in the original Lease, and added an obligation for Elysium to pay "Storage Premises Minimum Rent" of Twenty-Eight Thousand Seven Hundred Forty dollars ($28,740.00) per year in monthly installments of Two Thousand Three Hundred Ninety Five dollars ($2,395.00), subject to certain increases as defined further in the original Lease. *Id.* at ¶3.

32.    The Modification also changed how the "Percentage Rent" based on Elysium's gross sales was to be calculated. *Id.* at ¶4.

33.    The Modification also changed certain terms regarding Elysium's permitted use of the Leased Premises. *Id.* at ¶5.

34.    The Modification also required Elysium to immediately contact Crystals to develop a schedule of Elysium's plan submittal and construction related milestone dates. *Id.* at ¶6.

35.    The Modification also replaced certain exhibits. *Id.* at ¶7.

36.    The Modification also included an acknowledgment by Elysium that Crystals was not in default of any of Crystals' obligations under the Lease. *Id.* at ¶10.

37.    Bellon executed the Modification on behalf of Elysium. *Id.* at p.3.

38.    Robinson and Bellon also executed an Affirmation of Guarantors recognizing that their respective Guarantees were binding with respect to the Modification and otherwise remained in full force and effect. *Id.*

**E.    The Subsequent Defaults**

39.    Subsequent to the Modification, Crystals again became aware that Elysium's design, construction, and planned opening of the Philippe Plein store were not occurring on schedule under the Lease, as amended by the Modification.

40.    On April 5, 2010, Crystals' counsel sent Elysium, and the Guarantors, a Second Notice of Default, which explained that Elysium was "in default under the Lease for failure to develop (with Landlord) a plan submittal and construction related milestone schedule, to submit plans to Landlords for Landlord's work, and to commence construction in time for Tenant to open by June 15, 2010." *See* April 5, 2010 Notice of Default, an authentic copy of which is attached as Exhibit 6.

41.    On June 18, 2010, Crystals' counsel sent Elysium, and the Guarantors, a Third Notice of Default, which explained that Elysium was in default due to its failure to "complete Tenant's Work and open for business in the Leased Premises." *See* June 18, 2010 Notice of Default, an authentic copy of which is attached as Exhibit 7.

42.    On October 27, 2010, Crystals sent Elysium its Final Notice of Default, which explained that Elysium was still in default as explained in the June 18, 2010 Notice of Default and that Elysium was further in default for failure "to make payment of rent and charges from and after June 15, 2010." *See* October 27, 2010 Notice of Default, an authentic copy of which is attached as Exhibit 8.

43.    Crystals also sent the October 27, 2010 Notice of Default to the Guarantors Robinson and Bellon to inform them that Crystals "intended to exercise its rights under the Lease including, without limitation, recovery from Tenant and from Tenant's Guarantors of the delinquent amounts currently owing to Landlord plus the entire future rents and charges which Tenant is contractually obligated to pay." *Id.* (emphasis removed).

44.    Despite the repeated Notices, neither Elysium, as tenant under the Lease and Modification, nor Robinson or Bellon, as Guarantors under their independent Guarantees, has cured the outstanding defaults.

### III.    FIRST CLAIM FOR RELIEF

#### Breach of Lease

#### vs. Elysium

45.    Crystals incorporates every allegation contained in the preceding paragraphs.

46.    Crystals and Elysium entered a valid and enforceable contract, the Lease, as amended by the Modification.

47.    Crystals performed all of its obligations under the Lease, as amended by the Modification.

48.    Elysium materially breached the Lease, as amended by the Modification, by committing the defaults detailed above, among other acts and failures to act that may not be specifically listed in this Complaint.

49.    Elysium's breaches damaged Crystals in excess of Ten Thousand dollars ($10,000.00) plus interest, costs, and expenses, all of which Crystals is entitled to under the Lease, as amended by the Modification.

### IV.    SECOND CLAIM FOR RELIEF

#### Breach of Guarantees

#### vs. Robinson and Bellon

50.    Crystals incorporates every allegation contained in the preceding paragraphs.

51.    Crystals and Robinson entered a valid and enforceable contract, the Robinson Guaranty.

52.    Crystals and Bellon entered a valid and enforceable contract, the Bellon Guaranty.

53.    Crystals performed all of its obligations under the respective Guarantees.

54.    Robinson and Bellon materially breached their respective Guarantees by not curing Elysium's defaults as detailed above, among other acts and failures to act that may not be specifically listed in this Complaint.

55.    Robinson and Bellon's breaches damaged Crystals in excess of Ten Thousand dollars ($10,000.00) plus interest, costs, and expenses, all of which Crystals is entitled to under the Lease, as amended by the Modification.

## V.    THIRD CLAIM FOR RELIEF

### Breach of the Implied Covenant of Good Faith and Fair Dealing

#### vs. Elysium

56.    Crystals incorporates every allegation contained in the preceding paragraphs.

57.    Nevada law implies a covenant of good faith and fair dealing in all contracts.

58.    Crystals and Elysium entered a valid and enforceable contract, the Lease, as amended by the Modification.

59.    Crystals performed all of its obligations under the Lease, as amended by the Modification.

60.    Elysium materially breached the implied covenant of good faith and fair dealing by acting or failing to act in a manner that thwarted the purpose of the Lease, as amended by the Modification, even if such actions of failures to act do not constitute material breaches of the express terms of the Lease, as amended by the Modification.

61.    Elysium's breaches damaged Crystals in excess of Ten Thousand dollars ($10,000.00) plus interest, costs, and expenses, all of which Crystals is entitled to under the Lease, as amended by the Modification.

## VI.    FOURTH CLAIM FOR RELIEF

### Breach of the Implied Covenant of Good Faith and Fair Dealing

#### vs. Robinson and Bellon

62.    Crystals incorporates every allegation contained in the preceding paragraphs.

63.    Nevada law implies a covenant of good faith and fair dealing in all contracts.

64.    Crystals and Robinson entered a valid and enforceable contract, the Robinson Guaranty.

65.    Crystals and Bellon entered a valid and enforceable contract, the Bellon Guaranty.

66.    Crystals performed all of its obligations under the respective Guarantees.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

67.     Robinson and Bellon materially breached the implied covenant of good faith and fair dealing by acting or failing to act in a manner that thwarted the purpose of the Guarantees, even if such actions of failures to act do not constitute a material breach of the express terms of the Guarantees.

68.     Robinson and Bellon's breaches damaged Crystals in excess of Ten Thousand dollars ($10,000.00) plus interest, costs, and expenses, all of which Crystals is entitled to under the Lease, as amended by the Modification.

WHEREFORE, Crystals at CityCenter, LLC prays for relief as follows:

1.      For a judgment against all Defendants, jointly and severally, in excess of Ten Thousand dollars ($10,000.00);

2.      For an award of interest, attorneys' fees, and costs;

3.      For such other relief that this Court deems appropriate at the conclusion of this action.

Dated: March ___ 2, 2011.          SNELL & WILMER L.L.P.

By: _____
Patrick Byrne, Esq.
Nevada Bar No. 7636
Justin Carley, Esq.
Nevada Bar No. 9994
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Tel.(702) 784-5200
Fax. (702) 784-5252
pbyrne@swlaw.com
jcarley@swlaw.com

*Attorneys for Plaintiff*
*The Crystals at CityCenter, LLC*

12649780.1

-9-

# EXHIBIT 1

# EXHIBIT 1

# LEASE

ELYSIUM RESORTS, INC.

---

**TENANT**

"PHILIPPE PLEIN"

---

**TRADE NAME**

JACKIE ROBINSON, a married individual
MICHAEL BELLON, an unmarried individual

---

**GUARANTOR**

# CRYSTALS

## LAS VEGAS, CLARK COUNTY, NEVADA

TABLE OF CONTENTS

DATA SHEET ............................................................................................................. D1
EXECUTION/ACKNOWLEDGMENT ................................................................................. E1

ARTICLE I  GRANT AND TERM ........................................................................................ 1
    SECTION 1.01  LEASED PREMISES.............................................................................. 1
    SECTION 1.02  COMMENCEMENT AND ENDING DAY OF TERM......................................... 5
    SECTION 1.03  OPENING.......................................................................................... 7

ARTICLE II  RENT ........................................................................................................ 9
    SECTION 2.01  MINIMUM RENT................................................................................. 9
    SECTION 2.02  PERCENTAGE RENT............................................................................. 10
    SECTION 2.03  GROSS SALES.................................................................................... 13
    SECTION 2.04  RENT ADJUSTMENT............................................................................ 16
    SECTION 2.05  TENANT'S TAX OBLIGATION................................................................. 19
    SECTION 2.06  PAYMENTS....................................................................................... 26

ARTICLE III  RECORDS AND BOOKS OF ACCOUNT ............................................................ 31
    SECTION 3.01  TENANT'S RECORDS........................................................................... 31
    SECTION 3.02  REPORTS BY TENANT......................................................................... 32

ARTICLE IV  EXAMINATION AND AUDIT............................................................................ 34
    SECTION 4.01  RIGHT TO EXAMINE BOOKS................................................................. 34
    SECTION 4.02  AUDIT............................................................................................. 35

ARTICLE V  CONSTRUCTION OF LEASED PREMISES........................................................... 39
    SECTION 5.01  CONSTRUCTION OF LEASED PREMISES................................................... 39
    SECTION 5.02  DELIVERY OF POSSESSION OF LEASED PREMISES FOR TENANT'S WORK...... 42
    SECTION 5.03  LANDLORD'S AND TENANT'S OPTIONAL RIGHT OF CANCELLATION............. 44
    SECTION 5.04  ULTIMATE COMMENCEMENT DATE....................................................... 45

ARTICLE VI  ALTERATIONS, CHANGES AND ADDITIONS...................................................... 46
    SECTION 6.01  INSTALLATION BY TENANT................................................................... 46
    SECTION 6.02  REMOVAL BY TENANT......................................................................... 47
    SECTION 6.03  CHANGES AND ADDITIONS.................................................................. 48

ARTICLE VII  CONDUCT OF BUSINESS BY TENANT ............................................................ 50
    SECTION 7.01  USE OF PREMISES.............................................................................. 50
    SECTION 7.02  OPERATION OF BUSINESS.................................................................... 51
    SECTION 7.03  RADIUS........................................................................................... 63
    SECTION 7.04  STORAGE, OFFICE SPACE.................................................................... 65
    SECTION 7.05  WASTE REMOVAL, RECYCLING AND CARE OF PREMISES.......................... 66

ARTICLE VIII  COMMON AREAS ..................................................................................... 68
    SECTION 8.01  OPERATION AND MAINTENANCE OF COMMON AREAS.............................. 68
    SECTION 8.02  USE OF COMMON AREAS.................................................................... 69
    SECTION 8.03  TENANT'S PROPORTIONATE SHARE OF EXPENSES.................................... 74

ARTICLE IX  SIGNS ..................................................................................................... 81
    SECTION 9.01  SIGNS............................................................................................. 81

ARTICLE X  MAINTENANCE ........................................................................................... 83
    SECTION 10.01  LANDLORD'S OBLIGATIONS FOR MAINTENANCE..................................... 83
    SECTION 10.02  TENANT'S OBLIGATIONS FOR MAINTENANCE........................................ 85

ARTICLE XI  INSURANCE AND INDEMNITY ...................................................................... 92
    SECTION 11.01  INSURANCE.................................................................................... 92
    SECTION 11.02  COVENANT TO HOLD HARMLESS........................................................ 105

ARTICLE XII  UTILITY CHARGES .................................................................................... 107
    SECTION 12.01  UTILITY CHARGES........................................................................... 107

ARTICLE XIII  ESTOPPEL STATEMENT, ATTORNMENT AND SUBORDINATION ......................... 114
    SECTION 13.01  ESTOPPEL STATEMENT..................................................................... 114
    SECTION 13.02  ATTORNMENT................................................................................. 115
    SECTION 13.03  SUBORDINATION............................................................................. 117
    SECTION 13.04  REMEDIES...................................................................................... 118

ARTICLE XIV  ASSIGNMENT AND SUBLETTING................................................................. 119
    SECTION 14.01  NO ASSIGNMENT OR SUBLETTING...................................................... 119

ARTICLE XV  WASTE ................................................................................................... 128
    SECTION 15.01  WASTE OR NUISANCE....................................................................... 128

ARTICLE XVI  TRADE NAME, PROMOTIONAL CHARGE ....................................................... 129
    SECTION 16.01  TRADE NAME.................................................................................. 129
    SECTION 16.02  SOLICITATION OF BUSINESS............................................................... 131
    SECTION 16.03  PROMOTIONAL CHARGE.................................................................... 132

Philippe Plein/Crystals/05/18/09

i

ARTICLE XVII  DESTRUCTION OF LEASED PREMISES ................................................................ 135
    SECTION 17.01  RECONSTRUCTION OF DAMAGED PREMISES ............................................... 135
    SECTION 17.02  MUTUAL WAIVER OF SUBROGATION ............................................................. 139

ARTICLE XVIII  EMINENT DOMAIN ............................................................................................... 142
    SECTION 18.01  TOTAL CONDEMNATION OF LEASED PREMISES ......................................... 142
    SECTION 18.02  PARTIAL CONDEMNATION ............................................................................... 143
    SECTION 18.03  LANDLORD'S AND TENANT'S DAMAGES ....................................................... 147

ARTICLE XIX  DEFAULT ................................................................................................................. 148
    SECTION 19.01  EVENTS OF DEFAULT ....................................................................................... 148
    SECTION 19.02  RIGHT TO RECOVERY ...................................................................................... 156
    SECTION 19.03  EXPENSES ........................................................................................................... 160
    SECTION 19.04  WAIVER OF COUNTERCLAIMS AND TRIAL BY JURY .............................. 161

ARTICLE XX  BANKRUPTCY OR INSOLVENCY ......................................................................... 162
    SECTION 20.01  TENANT'S INTEREST NOT TRANSFERABLE .............................................. 162
    SECTION 20.02  TERMINATION ................................................................................................... 163
    SECTION 20.03  TENANT'S OBLIGATION TO AVOID CREDITORS' PROCEEDINGS ........... 164
    SECTION 20.04  RIGHTS AND OBLIGATIONS UNDER THE BANKRUPTCY CODE ............. 166

ARTICLE XXI  ACCESS BY LANDLORD ....................................................................................... 171
    SECTION 21.01  RIGHT OF ENTRY .............................................................................................. 171

ARTICLE XXII  TENANT'S PROPERTY .......................................................................................... 173
    SECTION 22.01  TAXES ON TENANT'S PROPERTY .................................................................. 173
    SECTION 22.02  LOSS AND DAMAGE ......................................................................................... 175
    SECTION 22.03  NOTICE BY TENANT ......................................................................................... 176

ARTICLE XXIII  HOLDING OVER ................................................................................................... 177
    SECTION 23.01  HOLDING OVER ................................................................................................. 177
    SECTION 23.02  SUCCESSORS ..................................................................................................... 178

ARTICLE XXIV  RULES AND REGULATIONS .............................................................................. 179
    SECTION 24.01  RULES AND REGULATIONS ............................................................................ 179

ARTICLE XXV  QUIET ENJOYMENT ............................................................................................. 180
    SECTION 25.01  LANDLORD'S COVENANT ............................................................................... 180
    SECTION 25.02  TENANT'S COVENANT ..................................................................................... 180

ARTICLE XXVI  SECURITY PROVISION ....................................................................................... 182
    SECTION 26.01  SECURITY .......................................................................................................... 182

ARTICLE XXVII  MISCELLANEOUS .............................................................................................. 188
    SECTION 27.01  WAIVER; ELECTION OF REMEDIES .............................................................. 188
    SECTION 27.02  ENTIRE AGREEMENT ...................................................................................... 192
    SECTION 27.03  INTERPRETATION AND USE OF PRONOUNS .............................................. 194
    SECTION 27.04  DELAYS ............................................................................................................... 195
    SECTION 27.05  NOTICES ............................................................................................................. 197
    SECTION 27.06  CAPTIONS AND SECTION NUMBERS ........................................................... 198
    SECTION 27.07  BROKER'S COMMISSION ................................................................................ 198
    SECTION 27.08  RECORDING ....................................................................................................... 199
    SECTION 27.09  FURNISHING OF FINANCIAL STATEMENTS ............................................... 199
    SECTION 27.10  LANDLORD'S USE OF COMMON AREAS ...................................................... 200
    SECTION 27.11  TRANSFER OF LANDLORD'S INTEREST ....................................................... 201
    SECTION 27.12  FLOOR AREA ..................................................................................................... 202
    SECTION 27.13  INTEREST ON PAST DUE OBLIGATIONS ..................................................... 207
    SECTION 27.14  LIABILITY OF LANDLORD ............................................................................. 207
    SECTION 27.15  ACCORD AND SATISFACTION ....................................................................... 211
    SECTION 27.16  EXECUTION OF LEASE; NO OPTION ............................................................ 212
    SECTION 27.17  GOVERNING LAW ............................................................................................ 212
    SECTION 27.18  SPECIFIC PERFORMANCE OF LANDLORD'S RIGHTS ................................ 214
    SECTION 27.19  CERTAIN RULES OF CONSTRUCTION ......................................................... 214
    SECTION 27.20  SURVIVAL; NONDISCLOSURE; FREE ACT .................................................. 216

ARTICLE XXVIII  SPECIAL PROVISIONS ..................................................................................... 217
    SECTION 28.01  PRIVILEGED LICENSES .................................................................................. 217
    SECTION 28.02  REPUTATION ..................................................................................................... 218
    SECTION 28.03  NO LIABILITY ................................................................................................... 222
    SECTION 28.04  NON-DISCRIMINATION ................................................................................... 224

EXHIBIT A       SITE PLAN; LEASED PREMISES
EXHIBIT B       CONSTRUCTION
EXHIBIT C       CENTRAL CHILLED WATER SUPPLY SYSTEM
OTHER EXHIBITS (if any)
GUARANTY

Philippe Plein/Crystals/05/18/09

ii

CRYSTALS

LAS VEGAS, NEVADA

THIS LEASE (the "Lease") made as of this _16th_ day of _July_, 20_09_, by and between THE CRYSTALS AT CITYCENTER, LLC, the address of which is Attn: Retail Accounts Receivable, 4882 Frank Sinatra Drive, Las Vegas, Nevada 89109 (Landlord), and ELYSIUM RESORTS, INC., the address of which is 4560 S. Decatcur Boulevard, Suite 301, Las Vegas, Nevada 89103 (Tenant). All of the provisions of the Lease, including the Data Sheet, the standard provisions entitled "Standard Form" commencing with Article I of the Lease, and all exhibits are incorporated in full in this preamble as if fully set forth at this point.

DATA SHEET

The following references furnish data to be incorporated in the specified Sections of the Lease and shall be construed to incorporate all of the terms of the entire Section as stated in the said Lease:

(1) **Section 1.01: Leased Premises:** Space Number 270, located on level 2146, having an irregular shape and consisting of approximately four thousand six hundred fifty (4,650) square feet of leasable floor area.

(2) **Section 1.02: Commencement Date:** The "Opening" date as defined in Section 1.03 of the Standard Form.

(3) **Length of Term:** Ten (10) Lease Years. The term "Lease Year" is defined in Section 1.02 of the Standard Form.

In the event Tenant does not achieve "Gross Sales" (as hereinafter defined) of at least Two Million Five Hundred Thousand and 00/100ths Dollars ($2,500,000.00) during the fourth (4th) Lease Year of the Term hereof, then Tenant provided it shall not be in default, shall, for a period of sixty (60) days, and Landlord shall, for a period of one hundred eighty (180) days, after the last date that Tenant is obligated to furnish to Landlord its written report of Gross Sales required pursuant to this Lease, have the option, upon sixty (60) days prior written notice to the other party, of terminating this Lease, provided Tenant shall not have such option if Tenant shall have achieved the above stated Gross Sales figure during any Lease Year prior to such stated Lease Year. In the event that neither party exercises the foregoing options to terminate this Lease within the required time period, then each such option shall, upon expiration of the applicable period, become null and void and be of no further force or effect. In the event Tenant fails to submit a certified report of Gross Sales within the time permitted pursuant to this Lease, then such information as Landlord shall have available to permit Landlord to make a determination as to the amount of Gross Sales achieved by Tenant during the period covered by Landlord's option to terminate shall be the basis for Landlord exercising its termination right and Tenant shall not be permitted to reinstate the Lease after termination for any reason or cause whatsoever, including, but not limited to, the submittal by Tenant of a subsequent sales report either certified or uncertified. The above stated Gross Sales figure shall be reduced by 1/360th to the extent any Lease Year in question is less than three hundred sixty (360) days in length and, at Landlord's sole option, the above stated Gross Sales figure shall be reduced by 1/360th for each day during the above stated time period that Tenant shall not have operated its business in the Leased Premises.

(4) **Section 2.01 and Section 2.02: Name and Address for Rent Payments:** Payments from Tenant shall be made payable to Landlord, and until further notification from Landlord, shall be sent to:

Attn: Retail Accounts Receivable
4882 Frank Sinatra Drive
Las Vegas, Nevada 89109

(5) **Section 2.01: Minimum Rent:** Three Hundred Forty-Four Thousand Five Hundred Eighteen and 50/100ths Dollars ($344,518.50) per annum, payable in equal consecutive monthly installments of Twenty-Eight Thousand Seven Hundred Nine and 88/100ths Dollars ($28,709.88), subject to increase under the provisions of Section 2.04 of the Standard Form.

(6) **Section 2.02(a): Percentage Rent:** Eight percent (8%) (the "percentage rent factor") of Gross Sales made during each Lease Year of the Term hereof in excess of Four Million Three Hundred Six Thousand Four Hundred Eighty-One and 20/100ths Dollars ($4,306,481.20) (the "Breakpoint").

D1

Philippe Piela/Crystals/06/17/09

(7)    **Section 2.05: Tenant's Tax Obligation:** Tenant pays its proportionate share as provided in Section 2.05 of the Standard Form.

(8)    **Section 5.01: Design of Leased Premises:** Tenant agrees to submit to Landlord drawings and specifications for Tenant's Work which reflect a store design, inclusive of quality and value of materials, which is at least equivalent to the highest class of any store design used for any store operating under the trade name herein set forth located anywhere in the world.

**Construction Allowance:** Provided that Tenant shall not be in default under this Lease, then, Landlord shall pay to Tenant, as a construction allowance for the purpose of reimbursing Tenant for its actual expenses paid in the performance of Tenant's Work pursuant to Section 5.01 and Exhibit B, the sum of Sixty and 00/100ths Dollars ($60.00) per square foot of floor area in the Leased Premises. Such construction allowance shall be payable to Tenant in three (3) equal installments as follows: one-third (1/3) within thirty (30) days following Tenant's commencement of construction of Tenant's leasehold improvements and Landlord's receipt of a sworn statement from Tenant's general contractor listing the names, addresses and phone and fax numbers of all subcontractors and materialmen performing such leasehold improvements and notarized unconditional lien waivers from all of Tenant's contractors and materialmen performing such leasehold improvements, one-third (1/3) within thirty (30) days following completion of one-half (1/2) of Tenant's leasehold improvements, and Landlord's receipt of a sworn statement from Tenant's general contractor listing the names, addresses and phone and fax numbers of all subcontractors and materialmen performing such leasehold improvements and notarized unconditional lien waivers from all of Tenant's contractors and materialmen performing such leasehold improvements, and the remainder within thirty (30) days following completion of Tenant's Work, Tenant's opening for business and Landlord's receipt of a certificate of occupancy, a sworn statement from Tenant's general contractor listing the names, addresses and phone and fax numbers of all subcontractors and materialmen performing all of Tenant's Work and notarized unconditional lien waivers from all of Tenant's contractors and materialmen performing all of Tenant's Work. In the event that this Lease is terminated prior to expiration of the stated Term, Tenant shall immediately repay to Landlord an amount equal to the then unamortized portion of the construction allowance paid to Tenant, which amortization shall be on the straight-line basis over the full stated Term, plus interest on such unamortized portion at a rate equal to three (3) percentage points above the prime rate then charged by a plurality of FDIC member banks headquartered in the State, which interest shall accrue from the date of payment of the construction allowance to Tenant through the date of termination of the Lease. The cost of Tenant's leasehold improvements pursuant to Section 1.02 hereof shall be less the amount of such construction allowance.

(9)    **Section 5.01: Drawings Submittal and Construction Milestone Schedule:** If Tenant has not done so prior to execution of this Lease, Tenant shall immediately contact Landlord and develop (with Landlord) a schedule of Tenant's plan submittal and construction related milestone dates which Tenant shall strictly adhere to. In addition to any other rights and remedies which are available to Landlord, Landlord may terminate this Lease if Tenant and Landlord shall not have agreed to such a schedule within seven (7) days after full execution and delivery of this Lease.

(10)    **Section 7.01: Permitted Use:** Furniture store selling furniture made by or for and all bearing the Philippe Plein label. Tenant may also sell home accessories not to exceed twenty percent (20%) of the sales floor area. Accessories doe not have to be under the Philippe Plein brand name.

(11)    **Section 7.03: Radius Area:** Clark County, Nevada.

(12)    **Section 8.03: Tenant's Proportionate Share of Expenses:** Tenant pays its proportionate share as provided in Section 8.03 of the Standard Form.

(13)    **Section 16.01: Trade Name:** "Philippe Plein"

(14)    **Section 16.03: Annual Promotional Charge:** Four and 00/100ths Dollars ($4.00) per square foot of floor area in the Leased Premises. Annual promotional charge to be paid in equal consecutive monthly installments. The annual promotional charge shall be increased on each January 1st following full execution of this Lease by five percent (5%) of the charge previously in effect.

(15)    **Initial Opening Promotional Charge:** Four and 00/100ths Dollars ($4.00) per square foot of floor area in the Leased Premises.

(16)    **Sales Based Advertising:** Two percent (2%) of Gross Sales for each Lease Year.

(17)    **Section 26.01: Security Deposit:** None.

D2

(18)    **Additional Security/Letter of Credit:**  Thirty-One Thousand Three Hundred Thirteen and 33/100ths Dollars ($31,313.33).

(19)    **Guarantor(s):**    Jackie Robinson, a married individual, 6325 Harrison Drive #1, Las Vegas, Nevada 89120

Michael Bellon, an unmarried individual, 1408 Saintbury Drive, Las Vegas, Nevada 89144

**[End of text of Data Sheet]**

Philippe Plein/Crystals/06/17/09

## EXECUTION/ACKNOWLEDGMENT

In confirmation of their agreement to enter into this Lease (including the Preamble, Data Sheet, Standard Form, and all exhibits attached hereto), and intending to be bound hereby, Landlord and Tenant have signed and sealed this Lease as of the day and year first above written on page D1 of this Lease.

In the Presence of:

THE CRYSTALS AT CITYCENTER, LLC

By: _____
    Its: Representative

                                                     LANDLORD

ELYSIUM RESORTS, INC.

By: _____
Print Name: MICHAEL BELLO

Its: DIRECTOR
Print Title _____

And: _____
Print Name: JACKIE ROBINSON

Its: PRESIDENT
Print Title Director

                                                 TENANT

Tenant's Federal Tax Identification Number:

_____

Philippe Fleis/Crystals/06/17/09

### ACKNOWLEDGMENT OF LANDLORD

ACKNOWLEDGMENT OF LANDLORD

STATE OF _Nevada_ )
                 ) ss.
COUNTY OF _Clark_ )

On this _30th_ day of _June_, 20 _09_, before me personally appeared _John M McManus_ to me known to be the person who executed the foregoing Lease and acknowledged before me that he was duly authorized and did execute same on behalf of THE CRYSTALS AT CITYCENTER, LLC.

> NOTARY PUBLIC
> STATE OF NEVADA
> County of Clark
> KATHERINE M. SMITH
> Apt. No 99-33590-1
> ...es June 28, 2010

_Katherine M Smith_
Notary Public, _Clark_ County, _Nevada_
My Commission expires: _6/28/10_

### ACKNOWLEDGMENT OF TENANT ENTITY

STATE OF          )
                 ) ss.
COUNTY OF      )

On this _____ day of _____, 20___, before me personally appeared _____ and _____, to me personally known, who, being by me duly sworn, did each for himself say that he is, respectively, the _____ and _____ of ELYSIUM RESORTS, INC., the entity named in and which executed the within instrument, and that said instrument was signed and sealed in behalf of said entity by authority of its board; and said _____ and _____ acknowledged before me said instrument to be the free act and deed of said entity.

Notary Public, _____ County, _____
My Commission expires:

Philippe Plein/Crystals/07/01/09

STANDARD FORM

### ARTICLE I  GRANT AND TERM

#### SECTION 1.01  LEASED PREMISES.

(a)     Landlord, in consideration of the amounts to be paid and the covenants to be performed by Tenant, does hereby demise and lease unto Tenant, and Tenant hereby rents and hires from Landlord, the premises described in Section 1.01 of the Data Sheet portion of this Lease ("the Leased Premises"). The Leased Premises are located in Crystals (the "Retail Area") portion of the development currently known as "CityCenter" (the "Development"). The Development is situated on approximately seventy-five (75) acres of land in Clark County, Nevada. The Development and the Retail Area and the Leased Premises are approximately depicted in Exhibit A. This Lease is subject to covenants, restrictions and easements of record, the terms and provisions of certain reciprocal easement and/or operating agreements now or hereinafter entered into by Landlord and/or covering the Development and the terms and provisions of any ground or underlying leases now or hereafter covering any portion of the Development. Landlord shall have the right from time to time to expand and include within, and/or to exclude from, the Retail Area any existing or future areas, and the floor area of the Retail Area shall be accordingly adjusted. In addition, Landlord may from time to time expand and include within, and/or exclude from the Development, existing or future areas, provided the Retail Area shall at all times be included within the Development. The approximate location of the premises leased to Tenant hereunder is also shown in Exhibit A. The term "floor area" is defined in Section 27.12. As used in this Lease, the term "State" shall mean the State of Nevada.

Landlord shall have the right, at any time and from time to time prior to delivery of possession of the Leased Premises to Tenant, by written notice to Tenant, to (i) reconfigure the layout of the Leased Premises, provided the new configuration shall have approximately (plus or minus 8% for spaces which have less than 2,000 square feet of leasable floor area; otherwise plus or minus 5%) the same square footage and frontage on the interior public pedestrian corridor as the original Leased Premises, and/or (ii)  relocate the Leased Premises in either direction (from side to side from the outside boundary of the Leased Premises) by not more than forty feet (40'), or to relocate the Leased Premises to any location which is directly across the interior public pedestrian corridor from the original location of the Leased Premises and the area within forty feet (40') of either side of the original location of the Leased Premises, provided the new location shall have approximately the same square footage and frontage on the corridor as the original location of the Leased Premises. Upon any such reconfiguration and/or relocation, the description of the Leased Premises shall be appropriately modified together with any resulting proportional adjustment in the Minimum Rent, the Breakpoint (as defined in Section 2.02) and promotional charges under this Lease based upon any change in size of the floor area of the Leased Premises.

(b)     The exterior walls and the roof of the Leased Premises and the area beneath the Leased Premises are not demised hereunder, and the use thereof, together with the exclusive right to locate, both vertically and horizontally, install, maintain, use, repair and replace pipes, utility lines, ducts, conduits, flues, refrigerant lines, drains, sprinkler mains and valves, access panels, wires and structural elements leading through the Leased Premises serving other parts of the Development, is hereby reserved unto Landlord. No air rights are being granted or conveyed to Tenant under the provisions of this Lease. Landlord reserves an easement in, over, and under the area occupied by the storefront of the Leased Premises, and an easement above Tenant's finished ceiling to the roof, or to the bottom of the floor deck above the Leased Premises, for general access purposes and in connection with the exercise of Landlord's other rights under this Lease.

#### SECTION 1.02  COMMENCEMENT AND ENDING DAY OF TERM.

The length of term of this Lease (the "Term") shall commence upon the earlier of: (a) the date set forth in paragraph (2) of Section 1.02 of the Data Sheet entitled "Commencement Date", or (b) the date on which Tenant opens its store in the Leased Premises for business to the public, (the "Commencement Date"), and shall end on the final day of the last Lease Year of the Term or other specified date as set forth in paragraph (3) of Section 1.02 of the Data Sheet entitled "Length of Term" (the "Expiration Date"), unless sooner terminated as hereinafter provided. Tenant agrees to execute an instrument confirming the Commencement Date and Expiration Date of the Term within twenty (20) days after Landlord's forwarding such instrument to Tenant. This Lease shall be effective upon full execution and delivery of this Lease. Tenant's obligation to pay Minimum Rent, Percentage Rent and charges under Sections 2.05, 8.03 and 16.03 shall not commence until the Commencement Date.

For the purpose of this Lease, the first "Lease Year" shall be a period beginning on the Commencement Date and ending on December 31 next following; after the first Lease Year, the term "Lease Year" shall mean a fiscal year of twelve (12) consecutive calendar months commencing on January 1 of each

Philippe Pitris/Crystals/05/18/09

S1

calendar year, except that the final Lease Year of the Term shall be a period of less than twelve (12) consecutive calendar months in the event that an Expiration Date occurs on a date other than December 31.

In the event Landlord elects to cause an expansion or contraction or redevelopment of, or perform structural changes or alterations to, the Retail Area or the Development, and such expansion, contraction, redevelopment and/or structural changes or alterations directly affect all or any portion of the Leased Premises, then Landlord upon one hundred eighty (180) days' prior notice in writing to Tenant may terminate this Lease. In the event of such termination, within thirty (30) days following the date that Tenant shall have vacated the Leased Premises, Landlord shall pay to the Tenant a sum equal to the then unamortized cost (without interest) to Tenant of Tenant's leasehold improvements untaken under Section 5.01, such amortization to be calculated on the straight-line basis over the full Term, with Landlord's obligation being limited to the balance of such cost remaining as of the date that Tenant shall have so vacated. Tenant shall furnish to Landlord such backup information as Landlord may reasonably require.

### SECTION 1.03  OPENING.

Tenant covenants and agrees to complete its Tenant's Work (as defined in Exhibit B attached hereto) within the Leased Premises in accordance with the provisions of this Lease and to open its store for business to the public not later than the Commencement Date of the Term of this Lease. Due to the unique nature of the Development, the importance of the Retail Area to the Development, and the importance of Tenant's timely completion of Tenant's Work and opening for business on the Commencement Date of the Term of this Lease, in addition to the rights and remedies otherwise available to Landlord, Tenant shall pay to Landlord an additional late opening/late remodel fee (representing an agreed upon liquidated sum for reimbursement to Landlord for payment of additional services incurred by Landlord and damages suffered by Landlord and which is not intended to be punitive) of eighty-five percent (85%) of the monthly Minimum Rent initially payable by Tenant to Landlord for the first day Tenant is late in completing Tenant's Work or opening its business in the Leased Premises plus twenty-five percent (25%) of the monthly Minimum Rent initially payable by Tenant to Landlord for each day thereafter that Tenant is late in completing Tenant's Work or opening for business in the Leased Premises. The "Opening" shall mean the date the Retail Area shall open for business to the public. Notwithstanding the foregoing provisions of this Section 1.03, Landlord hereby notifies Tenant that the scheduled date of the opening of the Retail Area is December 3, 2009, or such other date as Landlord may establish from time to time for the Opening upon prior written notice to Tenant.

### ARTICLE II  RENT

### SECTION 2.01  MINIMUM RENT.

(a)    The Minimum Rent during the Term of this Lease shall be the amount set forth in paragraph (5), Section 2.01 of the Data Sheet as adjusted pursuant to other provisions of this Lease, which amount shall be payable by Tenant in equal consecutive monthly installments, on or before the first day of each month during the Term, in advance, payable as set forth, and at the address set forth, in paragraph (4) of the Data Sheet, or such other place as the Landlord may designate in writing, such payments to be without any prior demand therefor and without any deductions or setoff whatsoever except for abatements expressly permitted by the terms of this Lease.

(b)    Should the Term commence on a day other than the first day of a calendar month or end on a day other than the last day of a calendar month, then the Minimum Rent for such month shall be prorated on a daily basis based upon a thirty (30) day calendar month. Should any Lease Year contain less than twelve (12) calendar months, said annual Minimum Rent shall be prorated on a monthly basis based upon the number of calendar months in such Lease Year.

### SECTION 2.02  PERCENTAGE RENT.

(a)    In addition to the payment of the Minimum Rent, as hereinbefore provided, Tenant shall pay to Landlord for each Lease Year of the Term hereof, as Percentage Rent, an amount equal to the percentage rent factor (as set forth in paragraph (6), Section 2.02(a) of the Data Sheet) multiplied by all Gross Sales (as defined in Section 2.03) during such Lease Year in excess of the amount of Gross Sales for such Lease Year set forth in paragraph (6), Section 2.02(a) of the Data Sheet (hereinafter referred to as the "Breakpoint"). The Breakpoint is an annualized figure and shall be proportionately reduced for any Lease Year which has less than three hundred sixty (360) days. Subsequent to the date upon which Tenant is initially obligated to open for business in the Leased Premises, in addition to any and all other remedies afforded to Landlord under this Lease, the Breakpoint shall be reduced by 1/360th for each day or portion thereof that Tenant does not operate its business pursuant to Section 7.02 hereof.

Philippe Plein/Crystals/05/18/09

S2

OAKLAND.1636720.2

(b)    The Percentage Rent shall be paid in monthly installments computed on all Gross Sales during each calendar month of the Term in excess of one-twelfth (1/12th) of the Breakpoint (the "monthly Breakpoint"). The monthly Breakpoint figure shall be proportionately reduced for any calendar month during the lease Term which has less than thirty (30) days. Such monthly installments shall be payable within fifteen (15) days after the expiration of each month of each Lease Year. In the event that the total of the monthly installments of Percentage Rent for any Lease Year does not equal the Percentage Rent computed on the total amount of Gross Sales for such Lease Year, in accordance with the formula set forth in paragraph (6), Section 2.02(a) of the Data Sheet, then Tenant, at the time it submits the annual statement of Gross Sales required under Section 3.02, shall pay Landlord any deficiency, or Landlord shall credit any overpayment to the next installment of Percentage Rent due from Tenant, as the case may be. In no event, however, shall the aggregate of Minimum Rent and Percentage Rent to be paid by Tenant and retained by Landlord for any Lease Year be less than the Minimum Rent specified herein.

### SECTION 2.03  GROSS SALES.

The term "Gross Sales" is hereby defined to include the entire amount of the actual sales price, whether for cash or otherwise, of all sales of merchandise or services and all other receipts whatsoever of all business conducted in or from the Leased Premises by Tenant, and by all concessionaires (as defined in Section 3.02 hereof), including, without limitation, mail, catalogue or telephone orders received or filled at the Leased Premises, all deposits not refunded to purchasers, and orders taken, although said orders may be filled elsewhere. For purposes of Section 7.03, the term "Gross Sales" shall also mean the entire amount of all sales from any other business or businesses which are referred to in Section 7.03 as being located in the "Radius Area" (as defined in Section 7.03). Merchandise shall include food and beverages to the extent they are being provided from the Leased Premises. A "sale" shall be deemed to have been consummated for the purposes of this Lease, and the entire amount of the sales price shall be included in Gross Sales, at such time that (i) the transaction is initially reflected in the books or records of Tenant or a concessionaire (if a concessionaire makes the sale), or (ii) Tenant or such concessionaire receives all or any portion of the sales price, or (iii) the applicable goods or services are delivered to the customer, whichever first occurs, irrespective of whether payment is made in installments, the sale is for cash or for credit, or otherwise, or all or any portion of the sales price has actually been paid at the time of inclusion in Gross Sales or at any other time. No deduction shall be allowed for direct or indirect discounts, rebates, or other reductions on sales to employees or others, unless generally offered to the public on a uniform basis. In addition, no deduction shall be allowed for uncollected or uncollectible credit accounts, or for trade-ins or other credits on sales to employees or others. The term "Gross Sales" shall not include, however, any sums collected and paid out by Tenant for any sales, use, luxury or excise tax imposed by and accounted for by Tenant to any duly constituted governmental authority, nor shall it include the exchange of merchandise between the stores of Tenant, if any, where such exchange of goods or merchandise is made solely for the convenient operation of the business of Tenant and not for the purpose of consummating a sale which has theretofore been made in or from the Leased Premises and/or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made in or from the Leased Premises, nor shall the term include the amount of returns to shippers or manufacturers, nor proceeds from the sale of trade fixtures. There shall be deductible from Gross Sales the amount of any cash or credit refund made upon any sale in or from the Leased Premises, previously included in "Gross Sales" hereunder, not to exceed the sum so previously included, where the merchandise sold is thereafter returned by the purchaser and accepted by Tenant.

### SECTION 2.04  RENT ADJUSTMENT.

(a)    Notwithstanding any provisions to the contrary contained in this Lease, at the beginning of each Lease Year following the first Lease Year of the Term of this Lease, each of the Minimum Rent amounts payable by Tenant during the Term of this Lease shall be increased as set forth in Paragraphs (i) and (ii) below, subject to further increase under any other applicable provisions of this Lease.

(i)    Minimum Rent for each applicable Lease Year shall be increased by three times the net percentage of increase between the Base Index and the Index published for the first calendar month of such Lease Year (as such terms are defined below) provided such increase shall not exceed three percent (3%) of the Minimum Rent in effect for the immediately preceding Lease Year; and

> Deleted: five percent (5%)

(ii)    Minimum Rent for each applicable Lease Year shall be increased by the amount of Percentage Rent payable for the immediately preceding Lease Year.

(b)    For purposes of the foregoing calculations, the term "Base Index" shall be the Index (as defined in subsection 2.04(c) below), for the month during which the Term commences (or, if the Index is not published for such month, then the Index published for the month closest, but prior, to the Commencement Date). If there is no increase between the Base Index and the Index published for such

Philippe Plein/Crystals/05/18/09

S3

month, or if the Index published for such month is lower than the Base Index, then Minimum Rent shall not be changed under the provisions of Paragraph (i) of subsection (a) at that time. Following any increase in Minimum Rent pursuant to subsection 2.04(a) above, the "Base Index" for future calculations shall be redefined as the Index published for the first calendar month of the Lease Year for which the Minimum Rent has last been increased pursuant to said subsection 2.04(a). The Index for the first calendar month of any given Lease Year, if the Index is not published for such month, shall be the Index published for the month closest, but prior, to the first calendar month of such Lease Year. For the purposes of this Section, the Percentage Rent payable by Tenant for any Lease Year consisting of less than twelve (12) full calendar months shall be calculated by dividing the Percentage Rent payable by Tenant for such Lease Year pursuant to Section 2.02 hereof by the actual number of days in such Lease Year, and by multiplying the resulting quotient by 360. Landlord shall notify Tenant of the increased Minimum Rent for each Lease Year following the determination of same by Landlord, and Tenant shall pay such increased Minimum Rent for the applicable Lease Year in the manner set forth in Section 2.01 hereof.

(c)     The term "Index" as used in this Lease shall be the "Consumer Price Index for All Urban Consumers (1982-84 = 100), U.S. City Average, All Items," as published by the Bureau of Labor Statistics of the United States Department of Labor. If the Index is not published by the Bureau of Labor Statistics or another governmental agency at any time during the Term, or if the Index is otherwise re-named, discontinued or superseded, then the calculations based on the Index shall be made using the most closely comparable statistics on the purchasing power of the consumer dollar as published by a responsible financial authority and selected by Landlord.

### SECTION 2.05 TENANT'S TAX OBLIGATION.

Tenant shall pay to Landlord its proportionate share (i) of all taxes and assessments which may be levied or assessed by any lawful authority during the Term, against the land, buildings and improvements comprising, and (ii) of all other taxes which Landlord becomes obligated to pay with respect to, the Retail Area and "common areas" (as defined in Section 8.02), irrespective of whether such taxes are assessed against real or personal property. As used in this Section 2.05, the term "taxes" shall include, without limitation, any and all real and personal property taxes, general and special assessments, beautification assessments, water and sewer charges, license fees, license taxes, possessory interest taxes and any similar impositions by any governmental authority or agency upon the Retail Area and/or the common areas, the land upon which any of same are located, Landlord's Work, and any improvements, fixtures, equipment or other property of Landlord used in connection with the operation or maintenance of the Development. The term "taxes" shall not include any net income, franchise, capital stock, estate or inheritance taxes, unless same are assessed in lieu of or in substitution for any of the taxes described in the preceding sentences. Tenant's proportionate share of taxes shall be equal to the product obtained by multiplying such taxes and assessments by a fraction, the numerator of which shall be the number of square feet of floor area in the Leased Premises and the denominator of which shall be the total number of square feet of gross leased and occupied floor area of all spaces in the Retail Area. Notwithstanding the foregoing, if a portion of the Retail Area is separately assessed by the taxing authorities and the Leased Premises are contained within such portion, then at Landlord's sole option, the taxes and assessments of which Tenant pays its proportionate share shall be limited to those relating to such separately assessed portion and Tenant's proportionate share of taxes and assessments shall be equal to the product obtained by multiplying such taxes and assessments by a fraction, the numerator of which shall be the number of square feet of floor area in the Leased Premises and the denominator of which shall be the total number of square feet of gross leased and occupied floor area within such separately assessed portion of the Retail Area. In the event that any present or future enactment of the State or any political subdivision thereof or any governmental authority having jurisdiction thereover either: (a) imposes a direct or indirect tax and/or assessment of any kind or nature upon, against or with respect to the rents payable by tenants or occupants in the Retail Area and common areas to Landlord derived from the Retail Area and common areas or with respect to the Landlord's ownership of the land and buildings comprising the Retail Area and common areas, either in addition to or by way of substitution for all or any part of the taxes and assessments levied or assessed against such land and such buildings, including, without limitation, any net profits tax or any comparable tax imposed on any portion of Landlord's revenues from the Retail Area and common areas; and/or (b) imposes a direct or indirect tax or surcharge of any kind or nature, upon, against or with respect to the parking areas or the number of parking spaces in the Retail Area and common areas, then in either or both of such events, Tenant shall be obligated to pay its proportionate share thereof as provided herein.

Tenant hereby acknowledges that Landlord has obtained or may obtain from the applicable taxing authorities one or more tax exemptions, credits or abatements relating to the land and/or buildings and/or improvements comprising all or a portion of the Retail Area and/or common areas. Tenant further acknowledges and agrees that, notwithstanding anything contained in this Lease to the contrary, for purposes of determining Tenant's proportionate share of taxes and assessments pursuant to this Section 2.05, Landlord

Philippe Plein/Crystals/05/18/09

S4

shall include in the total amount of taxes and assessments an amount equal to the taxes and assessments which would have been payable by Landlord in the absence of any such tax exemption, credit or abatement (herein referred to as the "exemption amount"), and Tenant's proportionate share of such taxes and assessments shall be deemed to include its proportionate share of such exemption amount.

Tenant's proportionate share of all of the aforesaid taxes and assessments levied or assessed for or during the Term hereof, as determined by Landlord, shall be paid in monthly installments on or before the first day of each calendar month during the Term, in advance, in an amount estimated by Landlord; provided that Landlord shall have the right to initially determine monthly estimates and to revise the estimates from time to time, and shall have the right to apply such monthly installments to tax bills according to the formula being utilized by Landlord from time to time. Upon receipt of all tax bills and assessment bills attributable to any calendar or fiscal year during the Term hereof, Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's proportionate share of the taxes and assessments for such year. In the event no tax bill is available, Landlord will reasonably compute the amount of such tax. If the total amount paid by Tenant under this Section for any calendar or fiscal year during the Term of this Lease shall be less than the actual amount due from Tenant for such year, as shown on such statement, Tenant shall pay to Landlord the difference between the amount paid by Tenant and the actual amount due, such deficiency to be paid within ten (10) days after written demand by Landlord; and if the total amount paid by Tenant hereunder for any such calendar or fiscal year shall exceed such actual amount due from Tenant for such year, such excess shall be credited against the next installment of taxes and assessments due from Tenant to Landlord hereunder. All amounts due hereunder shall be payable to Landlord in the manner and at the place where the Minimum Rent is payable. In the event Landlord contests any taxes levied or assessed during the Term hereof upon, against or with respect to the Retail Area and/or common areas or any portion thereof or interest therein, or in the event of Landlord's negotiation with respect to assessed valuation for the Retail Area and/or common areas or any portion thereof or interest therein, Tenant shall pay its proportionate share of Landlord's costs, expenses and attorneys' fees in connection therewith calculated on the same basis as set forth above in this Section. For the calendar or fiscal years in which the Term commences and terminates, the provisions of this Section shall apply, and Tenant's liability for its proportionate share of any taxes and assessments for such years shall be subject to a pro rata adjustment based on the number of days of said calendar or fiscal years during which the Term is in effect. A copy of a tax bill or assessment bill submitted by Landlord to Tenant shall at all times be sufficient evidence of the amount of taxes and/or assessments assessed or levied against the property to which such bill relates. Prior to or at the commencement of the Term and from time to time thereafter throughout the Term, Landlord shall notify Tenant in writing of Landlord's estimate of Tenant's monthly installments due hereunder.

#### SECTION 2.06 PAYMENTS.

(a)    The term "Rent" shall be defined in this Lease as (i) Minimum Rent, (ii) Percentage Rent and (iii) all other charges of whatever nature required to be paid by Tenant under this Lease. The Rent described in item (iii) of the preceding sentence ("Additional Rent") shall, unless otherwise specified, be due and payable ten (10) days after demand, without any deductions or setoff whatsoever except for abatements expressly permitted by the terms of this Lease, in the manner and at the place where Minimum Rent is payable. Tenant's failure to pay Rent shall carry with it the consequences set forth under Article XIX hereof. Landlord's rights and remedies pursuant to this subsection shall be in addition to any and all other rights and remedies provided under this Lease or at law. Notwithstanding anything to the contrary contained in this Lease, Landlord's invoices for Rent may be sent to Tenant by e-mail transmission or by regular mail. Tenant shall provide at all times a current e-mail address for Landlord's use. Rent is specifically agreed by Tenant to be a minimum reasonable use and occupancy charge for the Leased Premises. In the event any sums required hereunder to be paid are not received on or before the fifth (5th) day after the same are due, then, for each and every such payment, Tenant shall immediately pay, as Additional Rent, a service charge of ten percent (10%) of the outstanding amount due, which service charge again shall be imposed for each month that such amount shall remain unpaid. In the event of Tenant's failure to pay the foregoing service charge, Landlord may deduct said charge from the deposit set forth in Section 26.01 hereof. If Tenant shall have been late in making payments to Landlord on two (2) or more occasions during a twelve (12) month period, then within ten (10) days after written notice from Landlord to Tenant, Landlord may require Tenant to pay an additional security deposit to Landlord equal to two (2) months' Minimum Rent (at the rate then payable by Tenant) which shall be held by Landlord pursuant to the terms of Section 26.01. The provisions of this subsection (a) shall not be construed to extend the date for payment of any sums required to be paid by Tenant under this Lease or to relieve Tenant of its obligation to pay all such sums at the time or times herein stipulated, and neither the demand for, nor collection by Landlord of, late payment service charges pursuant to this Section shall be construed as a cure of any default in payment by Tenant. It is agreed that the said service charge is a fair and reasonable charge under the circumstances and shall not be construed as interest on a debt payment. In the event any charge imposed hereunder or under any other section of this Lease is either stated to be or construed as interest, then no such interest charge shall be calculated at a rate which is

Philippe Plein/Crystals/05/18/09

S5

higher than the maximum rate which is allowed under the usury laws of the State, which maximum rate of interest shall be substituted for the rate in excess thereof, if any, computed pursuant to this Lease.

(b)    Tenant shall be responsible for and agrees to pay, before delinquency, any sales tax on rents, and any tax or assessment that may be assessed, charged or imposed by law now in effect, or which is hereafter enacted or may go into effect, in connection with the use, occupancy, possession or tenancy of the Leased Premises for each month or portion thereof during the Term (all of the foregoing are hereinafter referred to as "Rent Taxes"). Tenant agrees to pay the Rent Taxes in the manner and in accordance with the requirements of applicable law, rule and regulation, as the same may be amended from time to time. In the event that the applicable taxing authority shall require (or permit and Landlord shall elect to do so) Landlord or Landlord's agent to collect any Rent Taxes for or on behalf of the applicable taxing authority then such Rent Taxes shall be paid by Tenant to Landlord or Landlord's agent monthly with the Minimum Rent payments required hereunder, in accordance with the requirements of the applicable taxing authority and in no event later than monthly within twenty (20) days notice from Landlord to Tenant.

## ARTICLE III  RECORDS AND BOOKS OF ACCOUNT

### SECTION 3.01  TENANT'S RECORDS.

Tenant shall prepare and keep full, complete and proper books and source documents, in accordance with generally accepted accounting principles, of the Gross Sales, whether for cash, credit or otherwise, of each separate department at any time operated in the Leased Premises and of the operations of each "concessionaire" (as defined in Section 3.02 below), if any, and shall require and cause all such parties to prepare and keep books, source documents, records and accounts sufficient to substantiate those kept by Tenant. The books and source documents to be kept by Tenant shall include, without limitation, true copies of all sales tax returns and reports, records of inventories and receipts of merchandise, daily receipts from all sales and other pertinent original sales records and records of any other transactions conducted in or from the Leased Premises by Tenant and any other persons conducting business in or from the Leased Premises. Pertinent original sales records shall include such sales records which would normally be examined by an independent accountant pursuant to accepted auditing standards in performing an audit of Tenant's sales. Tenant shall record at the time of each sale or other transaction, in the presence of the customer, all receipts from such sale or other transaction, whether for cash, credit or otherwise, in an electronic cash register or cash registers, or point of sale computer terminal system, having a cumulative total which shall be sealed. All of the foregoing books, source documents and records shall be retained for a period of at least four (4) years after the expiration of each Lease Year.

### SECTION 3.02  REPORTS BY TENANT.

Tenant shall furnish to Landlord within five (5) days after the end of each calendar month of the Term of this Lease a written statement of Gross Sales covering the preceding month, the statement to be in such form and style and contain such details and breakdown as the Landlord may reasonably require from time to time upon prior notice to Tenant. Failure of Tenant to timely submit monthly reports as aforesaid shall entitle Landlord to estimate Gross Sales based upon prior Gross Sales reports (with a reconciliation upon receipt of the annual report), and Tenant shall be obligated to pay Percentage Rent, as set forth in Section 2.02, on such estimated Gross Sales. Tenant also agrees that it will furnish to Landlord within thirty (30) days after the expiration of each Lease Year a complete statement, certified by an independent certified public accountant, showing in all reasonable detail the amount of such Gross Sales made by Tenant from the Leased Premises during the preceding Lease Year. Tenant shall require and cause all its concessionaires, if any, to furnish statements at the times and in the form and content specified in this Section, relating to their operations within the Leased Premises. All reports of Gross Sales submitted or caused to be submitted by Tenant to Landlord shall be conclusive and binding upon Tenant unless such reports are corrected within two (2) years after the date of issuance. The term "concessionaire" as used in this Lease shall mean and include any and all concessionaires, licensees, franchisees, department operators, subtenants, permittees or others directly or indirectly operating or conducting a business in or from the Leased Premises.

## ARTICLE IV  EXAMINATION AND AUDIT

### SECTION 4.01  RIGHT TO EXAMINE BOOKS.

Notwithstanding the acceptance by Landlord of payments of Percentage Rent, Landlord shall have the right to all Rent actually due hereunder, and the right to examine, make extracts from and copy, at the Leased Premises or (at the option of Tenant) at the corporate headquarters office of Tenant if such office is located in the continental United States, Tenant's and all concessionaires' books, source documents, accounts, records and sales tax reports filed with applicable government agencies in order to verify the amount of Gross Sales in and from the Leased Premises. Tenant shall make all such documents and records available at

Philippe Picis/Crystals/05/18/09

S6

the Leased Premises (or at such corporate headquarters, if elected by Tenant) upon three (3) days' prior written notice from Landlord.

### SECTION 4.02  AUDIT.

At its option, Landlord may at any time, upon three (3) days' prior written notice to Tenant, arrange for an auditor selected by Landlord to conduct a complete audit (including a physical inventory) of the entire records and operations of Tenant and/or any concessionaire concerning business transacted upon or includable in Gross Sales from the Leased Premises during the period covered by any statement issued by Tenant or a concessionaire as above set forth in Article III above.  In connection with such audit, Tenant shall make available to Landlord's auditor at the Leased Premises (or at such corporate headquarters, if elected by Tenant) within three (3) days following Landlord's notice requiring such audit, all of the books, source documents, accounts and records referred to in Section 3.01 of this Lease and any other materials which such auditor deems necessary or desirable for the purpose of making such audit.  Tenant shall promptly pay to Landlord the amount of any deficiency in Percentage Rent payments disclosed by any such audit.  If such audit shall disclose that Tenant's statement of Gross Sales is at variance to the extent of one percent (1%) or more, Landlord may charge to Tenant the amount of any deficiency and the cost of such audit, which shall be paid by Tenant within ten (10) days after Tenant's receipt of Landlord's invoice.  If any such audit shall disclose that Tenant's annual statements of Gross Sales have been understated to the extent of three percent (3%) or more on two (2) or more occasions during the Term, then Landlord, in addition to the foregoing remedy and other remedies available to Landlord, shall have the option, upon at least ten (10) days' notice to Tenant, to declare this Lease terminated and the Term ended, in which event this Lease shall cease and terminate on the date specified in such notice with the same force and effect as though the date set forth in such notice were the date originally set forth herein and fixed for the expiration of the Term, and Tenant shall vacate and surrender the Leased Premises but shall remain liable for all obligations arising during the balance of the original stated Term as provided in this Lease.  In addition to the foregoing, and in addition to all other remedies available to Landlord, in the event Landlord or Landlord's auditor shall schedule a date for an audit of Tenant's records in accordance with this Section, and Tenant shall fail to be available or shall otherwise fail to comply with the requirements for such audit, Tenant shall pay all costs and expenses associated with the scheduled audit.

In addition to all other remedies available to Landlord, in the event that any such audit shall disclose that Tenant's records and other documents as referred to in Articles III and IV hereof and such other materials provided by Tenant to Landlord's auditor are inadequate, in the opinion of Landlord's auditor, to accurately disclose Tenant's Gross Sales, then Landlord shall be entitled to collect as Additional Rent from Tenant an amount equal to fifteen percent (15%) of the highest combination of Minimum Rent plus Percentage Rent payable by Tenant for any of the three (3) preceding Lease Years, provided Tenant shall be permitted a prompt refund with respect to any amount of Additional Rent collected by Landlord from Tenant pursuant to this paragraph when adequate records are provided by Tenant to the satisfaction of Landlord's auditor.  Neither the provisions of this Section 4.02 nor any other provisions in this Lease shall restrict Landlord's rights to discovery in any litigation or arbitration proceeding.

### ARTICLE V  CONSTRUCTION OF LEASED PREMISES

### SECTION 5.01  CONSTRUCTION OF LEASED PREMISES.

Tenant agrees, by the date thirty (30) days prior to the Commencement Date (or forty-five (45) days prior to the Commencement Date for food tenants), at Tenant's sole cost and expense, to provide all work of whatsoever nature in accordance with its obligations set forth in Exhibit B as "Tenant's Work."  All plans and specifications for Tenant's Work shall be subject to the approval of Landlord, which approval may be withheld in Landlord's sole and absolute discretion.  Tenant agrees to prepare and furnish to Landlord drawings and specifications for Tenant's Work in the Leased Premises which are consistent with paragraph (8), Section 5.01 of the Data Sheet, Exhibit B and consistent in Landlord's opinion with Landlord's design and construction criteria relating to the construction of tenant retail space improvements for the Retail Area (the "Construction Criteria").  The Construction Criteria are set forth in "The Crystals Retail & Entertainment District Tenant Design and Construction Manual" (the "Design and Construction Manual") provided by Landlord to Tenant.  Tenant shall cause its contractors to work overtime, double shifts or similar action if necessary for Tenant to complete Tenant's Work thirty (30) days prior to the Commencement Date (forty-five (45) days prior to the Commencement Date for food tenants) and open by the Commencement Date of the Term.  In undertaking Tenant's Work or any construction activities within the Retail Area, Tenant shall comply with all rules and regulations established by Landlord for construction of tenant retail space improvements in the Retail Area.  Tenant shall reimburse Landlord for any additional Landlord security costs incurred by Landlord in connection with Tenant's undertaking work in the Leased Premises outside of normal business hours.  No material deviation from the final set of plans and specifications, once

approved by the Landlord, shall be made by Tenant without Landlord's prior written consent. Approval of the plans and specifications by Landlord shall not constitute the assumption of any responsibility by Landlord or Landlord's architect for their accuracy, efficacy or sufficiency, and Tenant shall be solely responsible for such items. Unless Landlord otherwise directs in writing, Tenant shall not open the Leased Premises for business until all construction has been completed pursuant to the provisions of Exhibit B. Until such time as Tenant's final drawings and specifications have been approved in writing by Landlord, the right of Tenant to enter upon the Leased Premises shall be solely for the purpose of inspection, measurement and obtaining information necessary to prepare architectural drawings and construct its Leased Premises. Landlord shall construct "Landlord's Work" as described in Exhibit B. Within ninety (90) days after the midpoint of the Term, Tenant shall complete a remodeling of the Leased Premises pursuant to plans and/or specification criteria approved by Landlord so that the Leased Premises shall reflect the then most current highest class of retail store design as shall be then utilized for stores operating anywhere in the world under the trade name set forth in paragraph (13), Section 16.01 of the Data Sheet.

## SECTION 5.02  DELIVERY OF POSSESSION OF LEASED PREMISES FOR TENANT'S WORK.

(a)     Tenant shall be permitted to construct Tenant's Work in the Leased Premises and thereafter occupy the Leased Premises in accordance with the provisions of this Lease when possession of the Leased Premises is delivered to Tenant. Possession of the Leased Premises shall be considered delivered to Tenant when Landlord furnishes Tenant with a written notice to such effect following the date that Landlord determines that Landlord's Work in the Leased Premises is completed to the point where Tenant can commence and diligently pursue Tenant Work in the Leased Premises. Any current occupant of the Leased Premises shall be deemed to retain possession of the Leased Premises until that occupant has vacated the Leased Premises, and Landlord will not deliver possession of the Leased Premises to Tenant or make the Leased Premises available to Tenant for any purpose until a date after Landlord regains possession of the Leased Premises from the occupant presently occupying the same.

(b)     Tenant shall be deemed to have accepted the Leased Premises in "as is" condition acknowledging that the Leased Premises are in the condition required by this Lease, unless Tenant shall have notified Landlord of defects or omissions in Landlord's Work in writing within thirty (30) days from date of delivery of possession. Failure of Landlord to deliver possession of the Leased Premises in the manner and condition as provided for in this Lease will not give rise to any claim for damages by Tenant against Landlord, or against Landlord's contractor, or permit Tenant to rescind or (except as provided in Section 5.03) terminate this Lease.

## SECTION 5.03  LANDLORD'S AND TENANT'S OPTIONAL RIGHT OF CANCELLATION.

If possession of the Leased Premises is not delivered to Tenant by December 1, 2011, then, for a period of thirty (30) days following such date, Tenant shall have the option, and for a period of forty-five (45) days following such date, Landlord shall have the option, of canceling and terminating this Lease by not more than sixty (60) days' written notice, one to the other, and, in the event that either party shall exercise such option, this Lease shall terminate with neither party being liable to the other in damages or otherwise, and any money or Letter of Credit deposited pursuant to Section 26.01 hereof shall be returned to Tenant. In the event that neither Tenant nor Landlord gives such written notice of cancellation, then said options shall be null and void and of no further force or effect, and this Lease shall be considered as continuing in full force and effect.

## SECTION 5.04  ULTIMATE COMMENCEMENT DATE.

Notwithstanding anything to the contrary contained herein, if for any reason whatsoever (including without limitation, excusable delay) the Term shall not have commenced prior to the sixth (6th) anniversary of the date of this Lease, then this Lease shall be automatically terminated without further act of either party hereto, and the parties hereto shall be released from all obligations hereunder.

## ARTICLE VI  ALTERATIONS, CHANGES AND ADDITIONS

### SECTION 6.01  INSTALLATION BY TENANT.

Tenant shall not make or cause to be made any alterations, additions or improvements to the Leased Premises (for example, but without limiting the generality of the foregoing, Tenant shall not install or cause to be installed any signs, floor covering, interior or exterior lighting, plumbing fixtures, shades, canopies or awnings, electronic detection devices, antennas, mechanical, electrical, sprinkler or fire alarm or fire protection systems, or make any changes to the storefront) without the prior written approval of Landlord in each instance which approval may be withheld in Landlord's sole and absolute discretion.

Philippe Plein/Crystals/05/18/09

S8

### SECTION 6.02  REMOVAL BY TENANT.

All alterations, additions, trade fixtures and improvements made by Tenant shall be deemed to have attached to the leasehold and to have become the property of Landlord upon such attachment. Upon expiration or earlier termination of the Term, Tenant shall not remove any of such alterations, decorations, additions, trade fixtures or improvements. Landlord may, however, designate by written notice to Tenant those alterations, decorations, additions, improvements, or trade fixtures which shall be removed by Tenant at the expiration or earlier termination of the Lease, and Tenant shall promptly remove the same and repair any damage to the Leased Premises caused by such removal. Landlord shall have the right to padlock or otherwise secure the Leased Premises upon the expiration or earlier termination of the Term of the Lease. Landlord shall also have the right, at any time during the Term, and upon expiration or earlier termination of the Term, to immediately enter the Leased Premises in order to remove any items which shall be determined by Landlord to be a violation of existing health, safety, security or other similar codes or regulations affecting or applicable to the Leased Premises or the Development. Landlord shall provide prior notification to Tenant of such removal, subject to the then existing circumstances such as an emergency.

### SECTION 6.03  CHANGES AND ADDITIONS.

Landlord, for itself and for the underlying lessor, if any, hereby reserves the right at any time, and from time to time, in Landlord's sole and absolute discretion, to make alterations to, and to build additional stories on the building in which the Leased Premises are located, to change, enlarge, reduce, modify, or relocate or reconfigure any buildings, parking areas, improvements, or common areas in or serving the Development and/or the Retail Area, and to sell or lease all or any part of the Development and/or the Retail Area.

In connection with the exercise of Landlord's rights under this Section, Landlord may elect to relocate the Leased Premises upon at least one hundred eighty (180) days prior notice to Tenant to other premises in the Retail Area of approximately (plus or minus 8% for spaces which have less than 2,000 square feet of leasable floor area; otherwise plus or minus 5%) the same square footage and store frontage; in the event of relocation, Tenant shall construct Tenant's Work in the new Leased Premises and reopen for business prior to expiration of such one hundred eighty (180) day period. Within thirty (30) days after Tenant's reopening in the new Leased Premises, Landlord shall reimburse to Tenant the actual, reasonable costs paid by Tenant directly in connection with such relocation. Minimum Rent, the Breakpoint and promotional charges shall be adjusted based on any change in the floor area of the Leased Premises.

### ARTICLE VII  CONDUCT OF BUSINESS BY TENANT

### SECTION 7.01  USE OF PREMISES.

Tenant shall continuously use and occupy the entire Leased Premises during the Term of this Lease, which use and occupancy shall be solely for the purpose of conducting the business specifically set forth in paragraph (10), Section 7.01 of the Data Sheet and for no other purpose or purposes whatsoever. Landlord and Tenant both intend that the products offered for sale from the Leased Premises be of only the highest quality level and shall not be directly duplicative of that offered for sale within other establishments in the Retail Area, except as may be expressly permitted by paragraph (10), Section 7.01 of the Data Sheet, if at all. It is agreed that the use specified in the Data Sheet has been, and is, a material inducement to Landlord in entering into this Lease with Tenant, and that Landlord would not enter into this Lease without this inducement. If any governmental license or permit shall be required for the proper and lawful conduct of Tenant's business or other activity carried on in the Leased Premises or if a failure to procure such a license or permit might or would in any way affect Landlord or the Retail Area or the Development, then Tenant, at Tenant's expense, shall duly procure and thereafter maintain such license or permit and submit the same for inspection by Landlord. Tenant, at Tenant's expense, shall, at all times, comply with the requirements of each such license or permit.

### SECTION 7.02  OPERATION OF BUSINESS.

Tenant shall be open for business and operate continuously, during all days and hours established by Landlord for the Retail Area, in all of the Leased Premises during the entire Term of this Lease, and shall conduct its business at all times consistent with the standards required by this Lease, maintaining at all times a full staff of employees and a full and complete stock of merchandise. Tenant acknowledges and agrees that Landlord may adjust the Retail Area hours from time to time. Tenant acknowledges and agrees that the Retail Area is a unique retail environment where Tenant shall be required to operate, in accordance with the other provisions of this Article VII, its highest class of retail store selling its highest quality of products and employing its highest quality and most expert and attentive means of customer service, and such covenant is a material inducement to Landlord's execution of this Lease and Landlord shall not have entered into this

Philippe Plein/Crystals/05/18/09

S9

Lease without such acknowledgment and agreement by Tenant. The conduct, demeanor and appearance of Tenant's employees shall be consistent with only the highest standards of courtesy and service and Tenant shall take prompt, measurable action to address any complaints from Retail Area customers which are registered with Landlord. No auction, liquidation, going out of business, fire or bankruptcy sales may be conducted or advertised by sign or otherwise in the Leased Premises, and Tenant shall display and sell only current-season merchandise. Tenant shall be obligated to permit returns of merchandise and shall allow cash refunds on such returns, except in connection with special sales and close outs. Tenant shall not offer any goods or services which is inconsistent with the image of a first-class, family-oriented development, nor shall Tenant display or sell any goods containing portrayals which Landlord determines, in its sole discretion, to be lewd, graphically violent or pornographic. Tenant agrees that it will not do any act tending to injure the reputation of the Retail Area or the Development as determined by Landlord. Without limiting the foregoing, the Leased Premises shall not be left unattended at any time during Tenant's required hours of operation. Failure by Tenant to operate during the above hours shall entitle Landlord, in addition to other remedies provided in this Lease, to mandatory injunctive relief, and shall give Landlord the right to erect a storefront barricade in front of the Leased Premises at Tenant's expense, which barricade shall not be removed except upon Landlord's prior written consent and with Tenant paying the cost of such removal. The erection of such a barricade by Landlord shall not be construed as a re-entry by Landlord into the Leased Premises or as an acceptance by Landlord of any surrender of possession of the Leased Premises by Tenant. In the event the maximum hours during which the Retail Area (or any separate part thereof) is legally permitted to be open to the public are regulated by any lawful authority, then Landlord shall be the sole judge of which days and hours shall be Retail Area business days and hours (and the days and hours applicable to any such separate part). Tenant shall install and maintain at all times a display of merchandise in the display windows, if any, of the Leased Premises and shall keep the same well lighted during such hours as Landlord shall designate. Tenant shall change its window displays and the types of merchandise displayed in its display windows at least monthly. Tenant, at Tenant's expense, shall promptly comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all governmental authorities having jurisdiction (including without limitation Title III of the Americans with Disabilities Act of 1990, 42 USC 12101, et seq., and its implementing regulations, 28 C.F.R., part 36, and 49 C.F.R. parts 37 and 38 (the "ADA"), affecting or applicable to the Leased Premises or the cleanliness, safety, occupancy and use of the same, whether or not any such law, ordinance, order, rule, regulation or requirement is substantial, or foreseen or unforeseen, or ordinary or extraordinary, or shall necessitate structural changes or improvements or interfere with the use and enjoyment of the Leased Premises. Without limitation, Tenant shall ensure that at all times it operates its business and the Leased Premises in compliance with the ADA, including, but not limited to, providing its guests and customers with any necessary equipment, auxiliary aids and services required by law for them to have full and equal enjoyment and use of the goods, services, facilities and general operation of the Leased Premises, and by modifying the policies and procedures applicable to the Leased Premises to accommodate individuals with disabilities. Tenant shall not do or permit anything to be done in or about the Leased Premises, or bring anything therein, which will in any way conflict with any law, ordinance, order, rule, regulation or requirement affecting the occupancy or use of the Leased Premises, the Retail Area and/or the Development which is or may hereafter be enacted or promulgated by governmental authorities, or in any way obstruct or interfere with the rights of others, nor shall Tenant use or allow the Leased Premises to be used for any improper, immoral or objectionable purposes as determined by Landlord. Tenant shall not cause or permit the use, generation, release, storage or disposal in or about the Leased Premises, the Retail Area and/or the Development of any substances, materials or wastes subject to regulation under any federal or state or local laws from time to time in effect concerning hazardous, toxic or radioactive materials unless Tenant shall have received Landlord's prior written consent, which Landlord may withhold or at any time revoke in its sole discretion. The covenants of Tenant regarding hazardous, toxic or radioactive materials, as set forth in this Lease, shall survive the expiration or earlier termination of the Term. Tenant shall comply with all federal, state and local laws in effect from time to time prohibiting discrimination or segregation by reason of race, color, creed, age, religion, sex or national origin. Tenant shall not sell or display any paraphernalia used in the preparation or consumption of unlawful or controlled substances. In the event Landlord has approved Tenant's remaining open for business after normal Retail Area hours (and/or any hours applicable to that part of the Retail Area containing the Leased Premises), then such approval shall be conditioned upon Tenant's paying for all additional costs incurred by Landlord as a result thereof. Tenant shall not permit noise or odors in the Leased Premises which are objected to by Landlord and, upon written notice from Landlord, Tenant shall immediately cease and desist from causing such noise or odor, and failing of which Landlord may deem the same a material breach of this Lease. Tenant shall not permit the operation of any coin operated or vending machines or pay telephones on the Leased Premises, other than in the areas reserved solely for the use of Tenant's employees and Tenant shall not permit the operation of any gambling, gaming or betting devices within the Leased Premises, notwithstanding anything contained in this Lease to the contrary. Tenant shall not sell or display any merchandise within three feet (3') of the storefront opening unless such sale or display shall be expressly approved by Landlord, in writing, except that Tenant shall be permitted to display

merchandise in the display windows, if any. Tenant shall not use the areas adjacent to the Leased Premises for business purposes. Tenant shall not store anything in service or exit corridors. Tenant agrees that all receiving and delivery of goods and merchandise, and all removal of merchandise, supplies, equipment, and waste, and all storage shall be made only by way of or in the areas designated from time to time therefor by Landlord. Tenant shall strictly comply with any security measures established by Landlord in connection therewith. Tenant shall not use or permit the use of any portion of the Leased Premises as sleeping quarters, lodging rooms, or for any unlawful purposes. Tenant shall not broadcast or direct any electronic signals into the common areas or the Development. Tenant shall not install any radio or television or other similar device exterior to the Leased Premises and shall not erect any aerial on the roof or exterior walls of any building within the Retail Area or the Development. Tenant shall at all times conduct any work or operations under this Lease in accordance with, and shall at all times strictly adhere to, the requirements of United States immigration laws and regulations, including the Immigration Reform and Control Act and regulations thereunder ("IRCA"), as now existing and as may be amended from time to time, with regard to Tenant's employees on the Leased Premises. Tenant agrees that it shall: (1) verify the identity and employment eligibility for every person employed by Tenant on the Leased Premises in a manner consistent with the provisions of IRCA; and (2) prepare and retain in its employment records a Form I-9 for every such employee in a manner consistent with the IRCA. Landlord shall have the right to periodically request and require that Tenant affirm that it is in compliance with all applicable provisions of United States immigration law, including the IRCA. Nothing contained herein shall be construed as providing or granting Landlord control of any part of the employment relationship between Tenant and its employees. Landlord may direct the use of all pest extermination contractors at the sole cost and expense of Tenant and at such intervals as Landlord may require. Failure of Tenant to employ the pest extermination contractor designated by Landlord shall entitle Landlord to employ such contractor with respect to Tenant's Leased Premises and Tenant shall reimburse Landlord for the cost thereof. Landlord shall have the option to provide pest extermination services for the Retail Area or the Development or any part thereof, in which event Tenant shall pay to Landlord Tenant's proportionate share of the cost of such service, with such proportionate share to be calculated in the manner provided in Section 2.05 of this Lease. Notwithstanding anything contained in this Lease to the contrary, if Tenant fails to open and continuously operate its business in the Leased Premises as required by Article VII of this Lease, or if Tenant violates the provisions of Section 16.01 of this Lease, then, in addition to such other remedies as are available to Landlord at law and equity, Tenant shall pay to Landlord as agreed upon liquidated damages, Additional Rent equal to five percent (5%) of the monthly Minimum Rent then in effect for each day during which Tenant is not open and continuously operating its business in the Leased Premises as required by Article VII or Section 16.01 of this Lease.

Landlord may require Tenant to develop and implement a drug testing program for Tenant's employees employed at the Retail Area pursuant to criteria approved by Landlord in its sole and absolute discretion. Landlord may require Tenant to conduct background checks on any or all employees and/or prospective employees employed at the Leased Premises and Tenant shall take any such background checks into account in making decisions to hire and retain employees.

If Landlord establishes an orientation program for Tenant's new employees to educate new employees about the Development and/or Retail Area, then Tenant shall require Tenant's new employees to attend the program and shall pay to Landlord the reasonable fees charged for so educating Tenant's new employees.

### SECTION 7.03 RADIUS.

In the event Tenant or its parent or subsidiary, or its franchisor or franchisee, or its licensor or licensee, or any person, firm, corporation or other entity who or which controls or is controlled by Tenant, or by any person, firm, corporation or other entity which directly or indirectly controls or is controlled by Tenant, shall, directly or indirectly, either individually or as a partner or stockholder or otherwise, own, operate or become financially interested in any business similar to or in competition with the business described in paragraph (10), Section 7.01 within the area from the Leased Premises which is set forth in paragraph (11), Section 7.03 of the Data Sheet (the "Radius Area"), then, (a) at Landlord's sole option Tenant shall be in default under this Lease, and (b) the Gross Sales (as defined in Section 2.03 of this Lease) of any such business or businesses within the Radius Area shall be included in the Gross Sales made from the Leased Premises (as if such business or businesses were part of the Leased Premises) and the Percentage Rent hereunder shall be computed upon the aggregate of the Gross Sales made from the Leased Premises and by the Gross Sales from any such other business or businesses hereof and the Minimum Rent payable by Tenant during the remainder of the Term of this Lease shall thereafter be increased by thirty percent (30%) while such other business or businesses are open and being operated within the Radius Area. Tenant shall report and maintain records of the Gross Sales of such other business or businesses in the manner provided in Article III hereof. This Section 7.03 shall apply to any such business or businesses open and being operated by Tenant within the Radius Area as of the date of this Lease. If Tenant fails to make payments required

Philippe Plein/Crystals/05/18/09

S11

pursuant to this Section 7.03, Landlord or Landlord's authorized representative or agent shall have the right at all reasonable times during the Term, and for a period of at least four (4) years after the expiration of the Term, to inspect, audit, copy and/or make extracts of the books, source documents, records and accounts pertaining to such other business or businesses conducted within the Radius Area, in accordance with the provisions of Article IV hereof, for the purpose of determining or verifying the Additional Rents due to Landlord pursuant to this Section 7.03. Moreover, in the event Tenant fails to supply to Landlord sales records with respect to any such similar or competing business, Landlord shall have the right to estimate the sales for such businesses based upon Tenant's Gross Sales in the Leased Premises, and the additional Percentage Rent generated from the inclusion of such estimated sales and Tenant's Gross Sales shall be deemed Additional Rent to be paid by Tenant in accordance with the provisions of Section 2.02 and 2.06 of this Lease.

### SECTION 7.04  STORAGE, OFFICE SPACE.

Tenant shall warehouse, store and/or stock in the Leased Premises only such goods, wares and merchandise as Tenant intends to offer for sale at retail at, in, from or upon the Leased Premises.  Tenant shall use for office, clerical or other non-selling purposes only such space in the Leased Premises as is from time to time reasonably required for Tenant's business in the Leased Premises.

### SECTION 7.05  WASTE REMOVAL, RECYCLING AND CARE OF PREMISES.

Tenant acknowledges and agrees that the manner and means of storage and removal of waste from the Leased Premises is of critical importance to Landlord and unless strictly adhered to by Tenant, could negatively impact the image of and operations within the Retail Area or the Development, and benefits granted to Landlord.  Landlord, in its sole and absolute discretion, may from time to time:  (i) establish and designate a waste disposal contractor to dispose of waste from the Leased Premises, and/or (ii) establish and designate a waste recycling company to remove for recycling certain types of waste from the Leased Premises, and/or (iii) require Tenant to store and sort waste in a particular manner, and/or (iv) require Tenant to deliver waste to a particular location designated by Landlord in a particular manner.  The cost of removal, storage and recycling of waste from the Leased Premises shall be payable by Tenant at Tenant's sole cost and expense by rates and charges established from time to time by Landlord.  Landlord agrees that rules and regulations and rates and charges established by Landlord from time to time relating to waste from the Leased Premises shall be uniformly applicable to similar use, and similarly located tenants within the Retail Area.  Tenant, at Tenant's expense, shall at all times keep the Leased Premises (including the service areas adjacent to the Leased Premises, display windows and signs) orderly, neat, safe, clean and free from rubbish and dirt, and vermin, and shall store all trash, garbage and other solid waste within the Leased Premises.

### ARTICLE VIII  COMMON AREAS

### SECTION 8.01  OPERATION AND MAINTENANCE OF COMMON AREAS.

During the Term, Landlord shall cause the areas and facilities defined in Section 8.02 as common areas, to be operated and maintained in a first-class manner.  The particular manner in which such areas and facilities shall be operated and maintained, and the expenditures therefor, shall be at the sole and absolute discretion of Landlord.  Tenant acknowledges that neither Landlord nor Landlord's security personnel are responsible for providing security services for Tenant or for Tenant's agents, employees, contractors, licensees, suppliers, employees, customers or invitees.

### SECTION 8.02  USE OF COMMON AREAS.

The terms "common area" and "common areas," as used in this Lease, shall mean (i) the following areas within the Development to the extent same serve the Retail Area:  parking areas and facilities as determined by Landlord (collectively "parking facilities"), roadways, pedestrian sidewalks and walkways, pedestrian plazas, pedestrian passage areas, driveways, transportation facilities and loading and unloading facilities, truckways, loading docks, delivery areas, landscaped areas, community rooms, office facilities, the enclosed corridors, berms, elevators and escalators and stairs and ramps and vertical transportation facilities not contained within any leased premises, public restrooms and comfort stations, service areas, service and fire and exit corridors, passageways, retention ponds (if applicable), and other areas, amenities, facilities and improvements provided by Landlord, (ii) those areas within the Development and areas adjacent to the Development which from time to time may be provided by the owners of such areas for the convenience and use of Landlord, the occupants of the Retail Area, and their respective concessionaires, agents, employees, customers, invitees and all other licensees and others entitled to the use thereof, and (iii) any other facilities or areas, whether within or outside, but serving, the Retail Area, as may be designated by Landlord from time to time.  The use and occupancy by Tenant of the Leased Premises shall include the use of the common areas in common with Landlord and with all others for whose convenience and use the common areas have

Philippe Plein/Crystals/05/18/09

been or may hereafter be provided by Landlord or by the owners of common areas not within the Retail Area, subject, however, to rules and regulations for the use thereof as prescribed from time to time by Landlord or the owner of such common area, including, without limitation, the right of Landlord to determine the hours and mode of operation of the elevators, escalators and vertical transportation facilities serving the Retail Area, and including the right of Landlord or such owner to impose parking charges, whether by meter or otherwise, with respect to any parking facilities. In no event, however, shall Tenant, its agents or employees, use the common areas for the display or sale of merchandise. Without limiting the generality of the foregoing, Landlord may include in common areas those portions of the Retail Area presently or hereafter sold or leased to department stores or anchor stores, until the building thereon has been opened for business, at which time there shall be withdrawn from the common areas those areas not provided by the owner thereof for common use. Tenant acknowledges and agrees that Landlord shall not be liable or in any way responsible for the acts or omissions of any security personnel providing services for or within the Development notwithstanding anything contained in this Lease to the contrary. Tenant and its employees and agents shall not park their cars and other vehicles in the non-employee parking facilities of the Development. Tenant covenants that it will enforce such parking restriction. Automobile license numbers of employees' and agents' vehicles shall be furnished by Tenant to Landlord monthly or upon Landlord's request. In the event any vehicle is parked by Tenant or by an employee or agent of Tenant in the parking facilities serving the Development, Tenant shall be obligated to pay Landlord the sum of One Thousand Dollars ($1,000) per occurrence for each such vehicle in order to partially compensate Landlord for the loss of Percentage Rent arising from the business lost to Tenant and to other tenants in the Retail Area due to the lack of available parking space in the said parking facilities, and Landlord shall have the right to impound, immobilize, detain or cause the vehicle to be towed to a location designated by Landlord and Tenant shall be obligated to reimburse Landlord for all charges incurred by Landlord in connection therewith. Tenant further agrees to hold harmless Landlord and defend Landlord, its agents and employees against any and all claims of the employee, agent and/or owner of the vehicle towed. Landlord shall have the right to charge users of the parking facilities serving the Development, to establish a system for validating or waiving some or all of such charges and to establish different rates for different uses, occupants or customers, all in Landlord's sole and absolute discretion. Landlord may at any time close temporarily any portion of the common areas to make repairs or changes, to prevent the acquisition of public rights in such area, to discourage non-customer parking, to use areas for attendant or valet parking, and may do such other acts in and to the common areas as in its judgment may be desirable to improve the convenience thereof. Landlord shall at all times have the continuing right to determine and designate the nature and extent of the common areas and of making such changes thereto from time to time which in its opinion are deemed to be desirable, including, (but not limited to) the addition of common areas, the location and relocation of driveways, entrances, exits, automobile parking spaces, the direction and flow of traffic, designation of prohibited areas, landscaped areas, utilities and all other facilities thereof, and the modification of the common areas for the purpose of expanding, re-developing and/or remodeling any portion of the Retail Area and/or Development. It shall be the duty of Tenant to keep all of the common areas free and clear of any obstructions created or permitted by Tenant or resulting from Tenant's operation. Tenant shall not provide, nor shall Tenant authorize any person or entity to provide, valet or attendant parking for Tenant's customers or others; Landlord shall have the right, but shall not be obligated, to provide valet or attendant parking at the Retail Area and/or the Development.

### SECTION 8.03 TENANT'S PROPORTIONATE SHARE OF EXPENSES.

(a)    Tenant agrees to pay to Landlord in the manner hereinafter provided, but not more often than once each calendar month, Tenant's proportionate share of: (1) all costs and expenses of every kind and nature paid or incurred by Landlord in operating, equipping, improving, policing and protecting, lighting, heating, air conditioning, providing sanitation and sewer and other services, insuring (including commercially reasonable self-insurance and the payment of commercially reasonable deductible amounts under insurance policies), repairing, replacing and maintaining (i) the common areas portions of the Retail Area, improvements, facilities, areas and roofs within, beneath, supporting or serving the Retail Area and/or common area and (iii) all other areas, facilities, improvements and buildings, including improvements, offices, parking facilities, transportation facilities, retention areas, and any and all facilities and improvements connecting the Retail Area and/or the Development to off-site buildings or areas, which are used in connection with the maintenance and/or operation of, and whether located within or outside of, but serving, the Retail Area and/or common area; such costs and expenses shall include, but shall not be limited to, the full cost of: illumination and maintenance of Retail Area and common area signs, whether located on or off the Development; holiday and seasonal lighting, decorations and displays; amenities such as seating, gathering, or play areas and facilities; refuse disposal, water, gas, sewage, electricity and other utilities (without limitation), including any and all usage, service, hook-up, connection, availability and/or standby fees or charges pertaining to same, and including all costs associated with the provision, maintenance and operation of any communication service for the Retail Area and/or common area; the operation, maintenance, repair and replacement of all or any part of the parking facilities; snow removal; maintenance,

Philippe Plein/Crystals/05/18/09

S13