operation, repair and replacement of any and all roads (temporary or otherwise) servicing the Retail Area and/or common area, including, without limitation, any landscaping or other work related to such roads; maintenance and operation of any temporary or permanent utility, including a sewage disposal system, within or without the Development, built, operated and/or maintained for the specific purpose of servicing the Retail Area and common area, together with hook up or connection fees and service charges; compliance with laws, rules, regulations and orders of governmental authorities; maintenance for wooded areas, retention ponds, lakes and shoreline areas (if applicable); cleaning, lighting, striping and landscaping; curbs, gutters, sidewalks, drainage and irrigation ditches, conduits, pipes and canals located on or adjacent to the Retail Area and/or Development; premiums and all other costs with respect to liability, casualty, Rent interruption, and property (including without limitation leasehold improvements) insurance, and compliance with insurance requirements; personal property taxes; licensing fees and taxes; audit fees and expenses; supplies; the cost and expense of supplying music to the Retail Area and common area; all costs and expenses of enforcing the rules and regulations established by Landlord for the Retail Area and common areas and handling of claims or other matters arising from the operation of the Retail Area and common areas; cost, lease payment or depreciation of any equipment, improvements or facilities used in the operation or maintenance of the common areas; any commercially reasonable imputed interest as may be applicable to costs paid or incurred by Landlord the full amount of which is not included under this Section 8.03 in the year so paid or incurred; any interest or other expense associated with any loans obtained by Landlord with respect to any cost or expense included or includable hereunder; total compensation and benefits (including premiums for workers' compensation or any other insurance or other retirement or employee benefits, and including all costs incurred in providing such benefits) paid to or on behalf of employees involved in the performance of the work specified in this Section 8.03 or employees otherwise providing services to tenants or customers of the Retail Area; and (2) an amount equal to fifteen percent (15%) of the total of all of the foregoing costs and expenses. The proportionate share to be paid by Tenant shall be that portion of the foregoing costs and expenses which the number of square feet of floor area in the Leased Premises bears to the total number of square feet of gross leased and occupied floor area of all spaces in the Retail Area. The gross leased and occupied floor area in effect for the whole of any Lease Year shall be the average of the gross leased and occupied floor area in effect on the first day of each calendar month in such Lease Year.

(b)    Tenant's proportionate share of such costs and expenses for each Lease Year shall be paid in monthly installments on the first day of each calendar month during the Term, in advance, in an amount estimated by Landlord from time to time. Subsequent to the end of each Lease Year, Landlord shall furnish Tenant with a statement of the actual amount of Tenant's proportionate share of such cost and expenses for such period. If the total amount paid by Tenant under this Section 8.03 for any such year shall be less than the actual amount due from Tenant for such year as shown on such statement, Tenant shall pay to Landlord the difference between the amount paid by Tenant and the actual amount due, such deficiency to be paid within ten (10) days after the furnishing of each such statement, and if the total amount paid by Tenant hereunder for any such year shall exceed such actual amount due from Tenant for such year, such excess shall be credited against the next installment due from Tenant to Landlord under this Section 8.03. Landlord may estimate the annual budget and charge the estimated share to the Tenant on a monthly basis subject to revision by Landlord of the budget from time to time and final annual adjustment based upon actual expenses. Neither the provisions of this Section 8.03, nor any of the other requirements or restrictions imposed upon Tenant under this Lease, shall excuse Tenant from its obligation to comply with laws and ordinances and other governmental requirements as set forth in Sections 7.02 and 10.02 hereof.

## ARTICLE IX SIGNS

### SECTION 9.01 SIGNS.

Tenant shall affix a sign to the exterior surface of the storefront of the Leased Premises and shall maintain said sign in good condition and repair during the entire Term of this Lease. Such sign shall conform to the criteria for signs established by Landlord for retail stores in the Retail Area, and the size, content, design and location thereof shall be subject to the prior written approval of Landlord which approval may be withheld in Landlord's sole and absolute discretion. Except as hereinabove mentioned, but subject to Tenant's obligation to install any signage required for the Leased Premises by governmental laws, ordinances or regulations, Tenant shall not place or cause to be placed, erected or maintained on any exterior door, wall, window or the roof of the Leased Premises, or on the glass of any window or door of the Leased Premises, or on any sidewalk or other location outside the Leased Premises, or within any display window space in the Leased Premises, or within three feet (3') of the front of the storefront opening, whether or not there is a display window space in the Leased Premises, or within any entrance to the Leased Premises, any sign (flashing, moving, hanging, handwritten, or otherwise), decal, placard, decoration, flashing, moving or hanging lights, lettering, or any other advertising matter of any kind or description. If Tenant places or causes to be placed or maintained any of the foregoing in violation of the provisions of this Section 9.01 then, in addition to the rights and remedies available to Landlord at law or equity, Tenant agrees to pay to

Philippe Plein/Crystals/05/18/09

S14

Landlord (as an agreed upon liquidated amount) the sum of One Thousand Dollars ($1,000) per violation and the same may be removed by Landlord or Landlord's representative with one (1) hours' prior notice to Tenant's employee at the Leased Premises and without such removal constituting a breach of this Lease or entitling Tenant to claim damages on account thereof. No symbol, design, name, mark or insignia adopted by Landlord for the Retail Area or the Development shall be used without the prior written approval of Landlord which approval may be withheld in Landlord's sole and absolute discretion. All signs located in the interior of the Leased Premises shall be of the highest level of quality and design so as to be consistent with the highest class of store operated under the trade name set forth in Section 16.01 and shall only be professionally printed so as not to detract from the general appearance of the Leased Premises and the Retail Area.

## ARTICLE X MAINTENANCE

### SECTION 10.01  LANDLORD'S OBLIGATIONS FOR MAINTENANCE.

In addition to its obligations under Section 8.01, Landlord shall keep and maintain the exterior surfaces of the exterior walls of the building in which the Leased Premises are located (exclusive of doors, door frames, door checks, other entrances, windows and window frames which are not part of common areas, and storefronts) in good repair, except that Landlord shall not be responsible for making any such repairs that are occasioned by the act or negligence or misconduct of Tenant, its agents, employees, invitees, licensees or contractors. Landlord may also elect to maintain, at Tenant's sole cost and expense, any windows or portions of windows which are part of Tenant's storefront on the exterior of the building or any windows, or portions of windows which are part of or above Tenant's storefront on the interior mall. Landlord shall not be responsible for making any other improvements or repairs of any kind upon the Leased Premises and appurtenances, except as may be expressly stated elsewhere in this Lease, and nothing contained in this Section 10.01 shall limit Landlord's right to reimbursement from Tenant for maintenance, repair costs and replacement costs conferred elsewhere in this Lease.

### SECTION 10.02  TENANT'S OBLIGATIONS FOR MAINTENANCE.

(a)    Except to the extent Landlord is expressly obligated to repair and maintain as provided in Section 10.01 of this Lease, Tenant, at Tenant's expense, shall keep and maintain in first-class appearance, and periodically renovate and refurbish the Leased Premises, to maintain same in a condition at least equal to that which Tenant is obligated to provide when Tenant initially opens the Leased Premises for business, and in good order, condition and repair as determined by Landlord (including replacement of parts and equipment, if necessary) the Leased Premises and every part thereof and any and all appurtenances thereto wherever located, including, but without limitation, the interior surfaces of the exterior walls, the exterior and interior portion of all doors, door frames, door checks, other entrances, windows (except for those windows or portions of windows which Landlord elects to maintain), window frames, plate glass, storefronts, all plumbing and sewage facilities exclusively serving the Leased Premises, including free flow up to the main sewer line, fixtures, ventilation, heating and air conditioning and electrical systems (to the extent exclusively serving the Leased Premises whether or not located in the Leased Premises), sprinkler systems to the extent exclusively serving the Leased Premises, walls, floors and ceilings, and all other repairs, replacements, renewals and restorations, interior and exterior, ordinary and extraordinary, foreseen and unforeseen, and all other work performed by or on behalf of Tenant pursuant to the exhibits attached hereto or Articles V or VI hereof or otherwise in accordance with the provisions of this Lease.

(b)    Tenant shall keep and maintain the Leased Premises in a clean, sanitary and safe condition in accordance with the laws of the State and in accordance with all directions, rules and regulations of the health officer, fire marshall, building inspector, or other proper officials of the governmental agencies having jurisdiction, and Tenant shall comply with all requirements of law, ordinances and otherwise, affecting the Leased Premises, including without limitation the Americans with Disabilities Act and its implementing regulations, all at the sole cost and expense of Tenant. At the time of the expiration of the Term or sooner termination of this Lease, Tenant shall surrender the Leased Premises in good order, condition and repair.

(c)    Tenant shall keep the Leased Premises and all other parts of the Development free from any and all liens arising out of any work performed, materials furnished or obligations incurred by or for Tenant, and agrees to discharge any such lien (including, without limitation, any construction, mechanic's or materialman's lien) within twenty (20) days after written request therefor by Landlord. If Tenant is legally able to discharge a lien by posting a bond under the provisions of applicable governmental laws, then Tenant may do so. Tenant shall give Landlord at least fifteen (15) days' notice prior to commencing or causing to be commenced any work on the Leased Premises (whether prior or subsequent to the commencement of the lease Term), so that Landlord shall have reasonable opportunity to file and post notices of non-responsibility for Tenant's work. In addition, prior to commencing or causing to be commenced any work on the Leased

Philippe Plein/Crystals/05/12/09

Premises, Tenant shall file a Notice of Commencement (or other similar instrument limiting or proscribing construction or mechanics' lien rights related to Tenant's Work) as provided by applicable statutory provisions and shall deliver a copy of such Notice of Commencement (or similar instrument) to Landlord. Tenant shall reimburse Landlord for any and all costs and expenses which may be incurred by Landlord by reason of the filing of any such liens and/or the removal of same, plus an administrative fee to Landlord of Five Thousand Dollars ($5,000.00), such reimbursement to be made within ten (10) days after written notice from Landlord to Tenant setting forth the amount of such costs and expenses.

(d)     Tenant, at its own expense, shall install and maintain fire extinguishers, other fire protection devices as may be required from time to time by any agency having jurisdiction thereof. Should Landlord's insurance carrier or underwriter require that Tenant's fire protection system be modified, Tenant shall make such modification at its sole expense within thirty (30) days after notice in writing by Landlord. Failure of Tenant to do so shall entitle Landlord to enter the Leased Premises and make such modification at the expense of Tenant. Tenant shall pay all charges billed by Landlord within ten (10) days after invoice. Tenant shall also be liable for any additional insurance premiums assessed to Landlord relating to the Leased Premises.

(e)     (1)     Tenant agrees to operate any heating, ventilating and/or air conditioning system(s) exclusively serving the Leased Premises during regular Retail Area business hours so as to maintain comfort conditions.   Tenant's installation of its heating and ventilating and air conditioning system shall be as set forth in Exhibit B, attached hereto. Tenant shall be fully obligated for its maintenance and repair.

(2)     To the extent the Leased Premises shall be served by a central air conditioning or chilled or condenser water system, Tenant's obligation for connecting to, and all charges for, the central system, as well as Tenant's installation, metering, sub-metering, operation and maintenance of all or any portion of the system shall be pursuant to criteria and obligations established by Landlord. Tenant shall pay Additional Rent to Landlord in connection with such system as provided in Exhibit C attached hereto. Landlord shall not be obligated to Tenant for any damages or cost or expense resulting, directly or indirectly, from any failure or malfunction of the central air conditioning supply system (or central chilled or condenser water system, as applicable) or any  component parts thereof. If Landlord permits Tenant to install a separate supplemental heating, ventilating and air conditioning system, serving the Leased Premises, then Tenant shall install the same in accordance with Landlord's criteria. If Tenant shall install such a system, Tenant shall be fully obligated for its maintenance and repair.

(f)     Tenant expressly waives all rights, to the fullest extent permitted by applicable law, to make repairs at the expense of Landlord as provided for in any statute or law in effect during the Term.

(g)     In the event that Tenant fails, refuses or neglects to commence and complete repairs promptly and adequately, to remove any lien, to pay any cost or expense, to reimburse Landlord, or otherwise to perform any act or fulfill any obligation required of Tenant pursuant to this Section 10.02, Landlord may, upon three (3) days' prior written notice to Tenant (except in the event of an emergency in which event no notice shall be required), but shall not be required to, make or complete any such repairs, remove such lien (without inquiring into the validity thereof), pay such cost or perform such act or the like, but at the sole cost and expense of, Tenant, and Tenant shall reimburse Landlord for all costs and expenses of Landlord thereby incurred within ten (10) days after receipt by Tenant from Landlord of a statement setting forth the actual amount of the costs and expenses incurred by Landlord in fulfilling Tenant's obligations under this Section 10.02. Landlord's rights and remedies pursuant to this subsection (g) shall be in addition to any and all other rights and remedies provided under this Lease or at law.

## ARTICLE XI INSURANCE AND INDEMNITY

### SECTION 11.01 INSURANCE.

(a)     Tenant shall obtain and keep in full force and effect prior to commencement of Tenant's Work and until completion thereof and during the Lease Term commercial general liability, commercial automobile liability, and property coverage on a special causes of loss basis (all risk), covering personal property and business interruption insurance policies. The commercial general liability insurance policy shall include blanket contractual liability coverage recognizing this Lease and products, completed operations, independent contractors, fire legal damage, and owner's protective liability coverage. Tenant will maintain limits of not less than Ten Million Dollars ($10,000,000.00) combined single limit per occurrence for bodily injury (including death), personal injury, and property damage, and limits of not less than One Million Dollars ($1,000,000.00) for fire legal damage. This limit may be obtained through one or more policies. Tenant will furnish commercial automobile liability insurance coverage for damage due to bodily injury or death of any person, or property damage arising out of the ownership, maintenance, or use of any motor vehicles whether owned, non-

Philippe Pléin/Crystals/05/18/09

OAKLAND.1656720.2

owned, hired, or leased; Tenant will maintain limits of not less than One Million Dollars ($1,000,000.00) combined single limit per accident for bodily injury and property damage. Tenant also agrees to obtain and keep in full force and effect a standard property policy protecting against all risks of physical loss or damage including, without limitation, sprinkler leakage coverage and plate glass insurance covering all plate glass in the Leased Premises (including store fronts), in amounts not less than actual replacement cost, covering all of Tenant's leasehold improvements, merchandise, goods, trade fixtures, furnishing, wall covering, floor covering, carpeting, drapes, equipment and all items of personal property of Tenant, and any and all property of others while in the care, custody or control of Tenant, located on or within the Leased Premises and all materials stored at the site of Tenant's Work and all materials, equipment, supplies and temporary structures of all kinds incidental to Tenant's Work, and equipment, all while forming a part of or contained in such improvements or temporary structures, or while on the Leased Premises, all to the actual replacement cost thereof at all times and on a completed value basis. Tenant shall also purchase business interruption insurance insuring the payment of rent hereunder including those amounts due under Article II of this Lease. Tenant further agrees to procure and maintain workers' compensation insurance in accordance with the laws of the State of Nevada including employers' liability insurance with a single limit of liability of not less than One Million Dollars ($1,000,000.00) for each accident or illness.

(b)    Tenant is to name Landlord, Landlord's parent company, subsidiaries and affiliates, and Landlord's managing agent, and their respective directors, officers and employees as additional insureds on all such policies, except for workers' compensation insurance. Without the prior written consent of Landlord, any company's retention (deductible or SIR) under such aforementioned policy or policies shall be no greater than Twenty-Five Thousand Dollars ($25,000.00). Landlord shall grant Landlord's consent to a higher retention if it determines, in Landlord's reasonable judgment, that a higher retention is prudent based upon (A) Tenant's use of the Leased Premises, (B) the use and nature of the Leased Premises, (C) applicable insurance rates and premiums, (D) whether Landlord believes, in Landlord's reasonable judgment, that such an increase could have an adverse or detrimental affect upon Landlord's operation of, or ability to obtain insurance for, the Retail Area and/or the Development and (E) such other factors as Landlord from time to time reasonably deems to be appropriate.

(c)    All such insurance shall be in a form and content satisfactory to Landlord and issued by a carrier licensed to transact business in the State of Nevada with a current A.M. Best Company rating of at least A - VII. The minimum coverage limits of the commercial general liability, commercial automobile liability and, employers liability insurance policies may be reviewed by Landlord from time to time, and adjusted as deemed appropriate by Landlord as follows: the adjusted minimum coverage limits of such policies shall be the minimum coverage limits of such policies for the Lease Year immediately preceding the Lease Year for which such adjustment is being made multiplied by a fraction, the numerator of which shall be the Index (as defined in Section 2.04) for the month which is three (3) months prior to the first month of the Lease Year for which such adjustment is being made and the denominator of which shall be the Base Index (defined in Section 2.04). Landlord shall, within a reasonable time thereafter, give Tenant notice of any adjustment to the principal amounts of such policies. Tenant shall thereafter promptly deliver to Landlord certificates of insurance evidencing such coverage in such adjusted amounts.

(d)    Tenant shall require all of Tenant's contractors and subcontractors engaged in the performance of Tenant's Work to effect and maintain and deliver to Tenant and Landlord certificates evidencing the existence of, and covering Landlord, Tenant and Tenant's contractors, prior to commencement of Tenant's Work and until completion thereof, of the workers' compensation insurance, employer's liability insurance, commercial general liability insurance and commercial automobile liability insurance policies in the amounts and as described above. Tenant's, Tenant's contractors' and subcontractors', insurance is primary with respect to Landlord; any other insurance maintained by Landlord, Landlord's parent company, subsidiaries and affiliates is excess and non-contributing. Failure of Tenant, Tenant's contractors or subcontractors to take out and/or maintain the required insurance shall not relieve Tenant from any liability under this Lease, nor shall the insurance requirements be construed to conflict with or otherwise limit the obligations of Tenant under Section 11.02.

(e)    Not later than fourteen (14) days before Tenant commences Tenant's Work, Tenant shall furnish to Landlord certificates of insurance evidencing that the required insurance and workers' compensation coverage are in full force and effect. All deductibles and self-insured retentions shall be fully disclosed on the certificates and shall provide Landlord with at least thirty (30) days prior written notice of cancellation or modification of policy limits or coverage. Such certificates shall be delivered to MGM MIRAGE, Risk Management Division, 3260 Industrial Road, Las Vegas, Nevada 89109-1132 or such other address as Landlord shall provide to Tenant upon prior written notice.

(f)    In the event that Tenant fails to procure, maintain and/or pay for, at the times and for the durations specified in this Section 11.01, any insurance required by this Section, or fails to carry insurance required by law or governmental regulation, then in addition to the rights and remedies otherwise available to

Philippe Pleio/Crystals/05/18/09

S17

Landlord, Landlord may (but without obligation to do so) at any time or from time to time, and with five (5) days' prior written notice to Tenant, procure such insurance and pay the premiums therefor, in which event Tenant shall repay to Landlord all sums so paid by Landlord together with interest thereon as provided elsewhere herein and any costs or expenses incurred by Landlord in connection therewith, within ten (10) days following Landlord's written demand to Tenant for such payment.

(g)    Tenant shall not carry any stock of goods or do anything in or about the Leased Premises which will in any way tend to increase the insurance rates on the Retail Area, the Development, the Leased Premises and/or the building of which they are a part and/or the contents thereof or which violate any rules, regulations or requirements of Landlord's insurance provider or underwriter. If anything done, omitted to be done or suffered to be done by Tenant in, upon or about the Leased Premises shall cause the rates of any insurance effected or carried by Landlord on the Leased Premises or other property to be increased beyond the regular rate from time to time applicable to the Leased Premises for use for the purpose permitted under this Lease, or such other property for the use or uses made thereof, Tenant will pay the amount of such increase promptly upon Landlord's demand and Landlord shall have the right to correct any such condition at Tenant's expense. If Tenant installs any electrical equipment that overloads the lines in the Leased Premises, Tenant shall at its own expense make whatever changes are necessary to comply with the requirements of the insurance underwriters and governmental authorities having jurisdiction. In the event that this Lease so permits and Tenant engages in the preparation of food or packaged foods or engages in the use, sale or storage of flammable or combustible material, Tenant shall install chemical extinguishing devices (such as Ansul) approved by Underwriters Laboratories and Factory Mutual Insurance Company and the installation thereof must be approved by the appropriate local authority. Tenant shall keep such devices under service as required by such organizations. If gas is used in the Leased Premises, Tenant shall install automatic gas cut-off devices.

(h)    Landlord, Landlord's agents and employees, shall not be liable for, and Tenant waives all claims for damage, including but not limited to consequential damages, to person, property or otherwise sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence in or upon any part of the Retail Area and/or the Development including, but not limited to, claims for damage resulting from: (a) any equipment or appurtenances becoming out of repair; (b) Landlord's failure to keep any part of the Retail Area and/or Development in repair; (c) injury done or caused by wind, water, or other natural element; (d) any defect in or failure of plumbing, heating or air conditioning equipment, electric wiring or installation thereof, gas, water, and steam pipes, roof, walls, stairs, porches, escalators, elevators, railings or walks; (e) broken glass; (f) the backing up of any sewer pipe or downspout; (g) the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about the Leased Premises; (h) the escape of steam or hot water; (i) water, snow or ice upon the Leased Premises; (j) the falling of any fixture, plaster or stucco; (k) damage to or loss by theft or otherwise of property of Tenant or others; (l) acts or omissions of persons in the Leased Premises, other tenants in the Retail Area and/or Development, occupants of nearby properties, or any other persons; and (m) any act or omission of occupants of adjacent or contiguous property, or of Landlord, Landlord's agents or employees. All property of Tenant kept in the Leased Premises shall be so kept at Tenant's risk only and Tenant shall save Landlord harmless from claims arising out of damage to the same, including subrogation claims by Tenant's insurance carrier.

(i)    Landlord makes no representation or warranty to Tenant that the amount of insurance to be carried by Tenant under the terms of the Lease is adequate to fully protect Tenant's interests. If Tenant believes that the amount of any such insurance is insufficient, Tenant is encouraged to obtain, at its sole cost and expense, such additional insurance as Tenant may deem desirable or adequate. Tenant acknowledges that Landlord shall not, by the fact of approving, disapproving, waiving, accepting, or obtaining any insurance, incur any liability for or with respect to the amount of insurance carried, the form or legal sufficiency of such insurance, the solvency of any insurance companies or the payment or defense of any lawsuit in connection with such insurance coverage, and Tenant hereby expressly assumes full responsibility therefor and all liabilities, if any, with respect thereto.

(j)    During the Term of this Lease, Landlord shall carry, or cause to be carried, fire and extended coverage property insurance covering the Retail Area buildings, and commercial general liability insurance covering the common areas within the Retail Area, in amounts and coverages as Landlord deems appropriate in Landlord's sole and absolute discretion.

### SECTION 11.02  COVENANT TO HOLD HARMLESS.

Tenant covenants to defend and indemnify Landlord, the underlying lessor, if any, and their respective officers, directors, stockholders, beneficiaries, partners, representatives, agents and employees, and save them harmless (except to the extent of loss or damage resulting from the negligence of Landlord and not required to be insured against by Tenant pursuant to this Article XI) from and against any and all claims, actions, damages, liability, cost and expense, including reasonable attorneys' fees, in connection with

Philipps Plein/Crystals/05/18/09

S18

all losses, including loss of life, personal injury and/or damage to property, arising from or out of any occurrence in, upon or at the Leased Premises or the occupancy or use by Tenant of the Leased Premises or any part thereof, or arising from or out of Tenant's failure to comply with any provision of this Lease or occasioned wholly or in part by any act or omission of Tenant, its concessionaires, agents, contractors, suppliers, employees, servants, customers or licensees. As used in this Section, "claims" includes any and all obligations, debts, covenants, conditions, representations, and any and all demands, causes of action, and claims, of every type, kind, nature or character, direct or indirect, known or unknown, absolute or contingent, determined or speculative, at law, in equity or otherwise. Landlord shall have the right to select and engage its own attorneys in connection with any of the provisions of this Section 11.02 or any other provision of this Lease, including, without limitation, any defense of Landlord or intervention by Landlord, notwithstanding any contrary provisions or court decisions of the State. The foregoing provisions of this Section 11.02 shall survive the expiration or earlier termination of the Term of this Lease.

## ARTICLE XII UTILITY CHARGES

### SECTION 12.01 UTILITY CHARGES.

(a)    Tenant shall be solely responsible for and shall promptly pay all necessary fees, deposits and charges, including use and/or connection fees, hook-up fees, standby fees, and/or penalties for discontinued or interrupted service, and the like, for water, gas, heat, electricity, conditioned cold air supply or chilled water supply, telephone, cable, internet, sewer and sanitation, solid waste disposal and any other service or utility used in or upon or furnished to the Leased Premises, irrespective of whether Landlord has paid for these services in advance, or otherwise. Landlord, at its sole option, may elect to furnish any or all of the above services without a separate utility charge therefor to Tenant, by metering or otherwise, in which event the Rent shall be increased to reflect the value of such service(s). Alternatively, Landlord, at its sole option, may provide for any or all of such services on a separate-charge basis, and in such event Tenant shall purchase such service(s) from Landlord, and within ten (10) days after Landlord bills Tenant for any such service Tenant shall pay Landlord such rates, charges and fees, upon terms and conditions as Landlord may establish; provided that, if the rates, charges or fees for any such service are regulated by a public agency, the rates, charges and/or fees to Tenant shall not exceed those computed using the rate schedules which would be applicable if Tenant were at the time a direct customer of the applicable public utility entity (without regard to discounts). If the cost of any such service for any month has not been made known to Landlord at the time of billing, Landlord shall have the right to estimate the amount thereof, and to base its billing to Tenant upon said estimated amount, and Landlord may adjust such billing when the actual amount is made known to Landlord. Landlord shall also have the right to periodically estimate the monthly amount required to be paid by Tenant to Landlord with respect to any or all of such services provided by Landlord and such estimated monthly amount or amounts shall be paid by Tenant on the first day of each calendar month, in advance, at the place and in the manner specified for payments of Minimum Rent hereunder. Landlord shall have the right to change such estimated amount or amounts at any time and from time to time, by notice to Tenant. If the total of the estimated monthly payments made by Tenant for any Lease Year or calendar year shall be less than the actual amount due from Tenant pursuant to the provisions of this Section 12.01, Tenant shall pay to Landlord the difference between the amount paid by Tenant and the actual amount due within ten (10) days after submission to Tenant of Landlord's statement and invoice therefor; and if the total of the estimated payments made by Tenant for any such year shall exceed the actual amount due from Tenant, the excess amount paid shall be credited against the next payment due from Tenant to Landlord under this Section 12.01. Landlord, at its sole option, may require Tenant to install separate, appropriate meters for measuring Tenant's consumption of utilities, and may require Tenant to remove any or all such meters upon Landlord's discontinuing the service in question to Tenant. In connection with the provision of any utility service to the Leased Premises, Landlord may additionally charge Tenant an administrative charge not to exceed the administrative charge permitted by law.

(b)    In the event Landlord furnishes a utility service without a meter, Landlord shall (and to the extent permitted by applicable regulations) cause a survey of Tenant's usage of the utility to be made by a consultant selected by Landlord. The consultant shall render a report to Landlord and Tenant showing an estimate of utility charges to Tenant based upon the amount of the utility which Tenant will consume, and the value or cost thereof, and Tenant shall pay Landlord for such utility on such estimated basis within ten (10) days after delivery of Landlord's statement. After the making of the initial survey referred to above, Tenant shall not without prior written notice to Landlord make any alterations in or additions to the equipment and/or appliances in the Leased Premises which relate to the utility service being provided by Landlord.

(c)    Any furnishing by Landlord of electric current to the Leased Premises shall be limited to the extent of the capacity of Landlord's existing feeders, switches, risers, wiring installations and other electrical system serving the Leased Premises (the "electric distribution system"). Tenant agrees that Tenant's use of

Philippe Plein/Crystals/05/18/09

S19

electrical current will at no time exceed the capacity of the electric distribution system, and that Tenant will not make any alteration or addition to the electric distribution system without Landlord's prior written consent in each instance.

(d)     At any time during the Term hereof, Landlord may, upon the thirty (30) days' prior written notice to Tenant, discontinue furnishing any utility being furnished by Landlord to the Leased Premises without thereby affecting this Lease in any manner or otherwise incurring any liability to Tenant.

(e)     If at any time after the date hereof, the electrical energy rates (or other utility rates) as filed by the public utility corporation then serving the Retail Area shall be reduced or increased, or any tax shall be imposed thereon (or subsequently increased or decreased), then the charges payable by Tenant shall be adjusted as of the first day of the month next following the effective date of such rate change to reflect the resulting reduction or increase in the value of the electric current (or other utility service) provided by Landlord to Tenant.

(f)     Landlord shall not be liable to Tenant for any loss, damage or expense which Tenant may sustain if the quality or character of utilities used upon or furnished to the Leased Premises are no longer available or suitable for Tenant's requirements, or if said utilities are interrupted as a result of actions by the public utility companies or any other cause and no such change, interruption, or cessation of service shall constitute an eviction of Tenant.

(g)     Any obligation of Landlord to furnish light, heat, conditioned air, or power or any utility service shall be conditioned upon the availability of adequate energy sources. Landlord shall have the right to reduce heat, lighting, air conditioning or other utility services within the Retail Area, including without limitation, the Leased Premises and the common areas, as required by any mandatory or voluntary fuel or energy saving allocation, or any similar statute, regulation, order or program without such action diminishing Tenant's obligations hereunder.

### ARTICLE XIII  ESTOPPEL STATEMENT, ATTORNMENT AND SUBORDINATION

#### SECTION 13.01  ESTOPPEL STATEMENT.

Tenant shall, without charge, at any time and from time to time, within twenty (20) days after receipt by Tenant of written request therefor from Landlord or from any mortgagee under any mortgage or any beneficiary under any deed of trust on the real property on which the building containing the Leased Premises is located or of which the Leased Premises are a part, deliver, in recordable form, a duly executed and acknowledged certificate or statement to the party requesting said certificate or statement or to any other person, firm or corporation designated by Landlord, certifying: (a) that this Lease is unmodified and in full force and effect, or, if there has been any modification, that the same is in full force and effect as modified, and stating any such modification; (b) the date of commencement of the Term; (c) that Rent is paid currently without any off-set or defense thereto; (d) the dates to which the Rent and other charges payable hereunder by Tenant have been paid, and the amount of Rent and other charges, if any, paid in advance; (e) whether or not there is then existing any claim of Landlord's default hereunder and, if so, specifying the nature thereof; and (f) any other matters relating to the status of the Lease as shall be requested by Landlord or any such mortgagee or beneficiary from time to time. Any such certificate or statement by Tenant may, at the election of the requesting party, include Tenant's undertaking not to pay Rents or other charges for more than a specified period in advance of the due dates therefor set forth herein.

#### SECTION 13.02  ATTORNMENT.

In the event any proceedings are brought for the foreclosure of, or in the event of the conveyance by deed in lieu of foreclosure of, or in the event of exercise of the power of sale under, any mortgage and/or deed of trust made by Landlord covering the Leased Premises, or in the event Landlord sells, conveys or otherwise transfers its interest in the Retail Area or any portion thereof containing the Leased Premises, this Lease shall remain in full force and effect and Tenant hereby attorns to, and covenants and agrees to execute an instrument in writing reasonably satisfactory to the new owner whereby Tenant attorns to such successor in interest and recognizes such successor as the Landlord under this Lease provided such successor in interest shall in turn thereafter recognize Tenant's rights as the Tenant under this Lease. Payment by or performance of this Lease by any person, firm or corporation claiming an interest in this Lease or the Leased Premises by, through or under Tenant without Landlord's consent in writing, shall not constitute an attornment or create any interest in this Lease or the Leased Premises.

## SECTION 13.03 SUBORDINATION.

Tenant agrees that this Lease shall, at the request of Landlord, be subordinate to any underlying or ground lease and to any mortgages or deeds of trust that are now, or may hereafter be, placed upon the Leased Premises, and to the interest thereon, and all renewals, replacements and extensions thereof, provided that the lessor under any such underlying or ground lease or the mortgagees or beneficiaries named in said mortgages or trust deeds shall agree to recognize the interest of Tenant under this Lease in the event of foreclosure, if Tenant is not then in default; such provisions are self operative and may be undertaken unilaterally by Landlord or by any such lessor, mortgagee or beneficiary. Tenant also agrees that any underlying or ground lessor or mortgagee or beneficiary may elect to have this Lease constitute a prior lien to its underlying or ground lease or mortgage or deed of trust, and in the event of such election and upon notification by such underlying or ground lessor or such mortgagee or beneficiary to Tenant to that effect, this Lease shall be deemed prior in lien to such underlying or ground lease or mortgage or deed of trust, whether this Lease is dated prior to or subsequent to the date of said underlying or ground lease or mortgage or deed of trust; such provisions are self operative and may be undertaken unilaterally by any such lessor, mortgagee or beneficiary upon written notice delivered to Tenant. Tenant agrees that upon the request of Landlord, or any mortgagee or beneficiary, Tenant shall execute whatever instruments may be required by Landlord or by any mortgagee or beneficiary to carry out the intent of this Section 13.03.

## SECTION 13.04 REMEDIES.

In addition to the rights and remedies available to Landlord, for each day beyond the referenced twenty (20) day period that Tenant shall fail to execute any of the certificates, statements or instruments referenced above in this Article XIII, Tenant shall pay to Landlord One Thousand and 00/100ths Dollars ($1,000.00) in order to partially compensate Landlord for the administrative costs and other damages arising from Tenant's failure. Such per diem amount shall be immediately due and payable as Additional Rent under this Lease.

## ARTICLE XIV  ASSIGNMENT AND SUBLETTING.

## SECTION 14.01  NO ASSIGNMENT OR SUBLETTING.

Notwithstanding any provision herein to the contrary or reference herein to concessionaires or subtenants or otherwise, Tenant agrees not to assign or in any manner transfer this Lease or any estate or interest therein, and not to lease or sublet the Leased Premises or any part or parts thereof or any right or privilege appurtenant thereto, and not to allow anyone to conduct business at, upon or from the Leased Premises (whether as concessionaire, franchisee, licensee, permittee, subtenant, department operator or otherwise), or to come in, by, through or under it, in all cases either by voluntary or involuntary act of Tenant or by operation of law or otherwise. Without limiting any of the other provisions contained in this Section 14.01, the restrictions of this Section 14.01 shall apply to any merger, consolidation or other reorganization of Tenant or of Tenant's Guarantor or of any corporate entity which directly or indirectly controls Tenant, and any such merger, consolidation or other reorganization shall be deemed to be an assignment of this Lease within the meaning of this Section 14.01. The sale, issuance or transfer of any voting capital stock of Tenant or Tenant's Guarantor or any voting capital stock of any corporate entity which directly or indirectly controls Tenant (if any one of such entities, Tenant or Tenant's Guarantor or any such controlling corporate entity, is a corporation the stock of which is not traded on the New York Stock Exchange or the American Stock Exchange), or any interests in any noncorporate entity which directly or indirectly controls Tenant or Tenant's Guarantor which results in a change in the direct or indirect voting control (or a change in the identity of any person, persons, entity or entities with the power to vote or control at least fifty percent (50%) of the voting shares of any class of stock) of Tenant, or Tenant's Guarantor, or any corporate or noncorporate entity which directly or indirectly controls Tenant or Tenant's Guarantor shall be deemed to be an assignment of this Lease within the meaning of this Section 14.01. In addition, the transfer of control of more than twenty-five percent (25%) of the value of Tenant's assets or the transfer of control of more than twenty-five percent (25%) of the number of Tenant's stores, in one transaction or a series of transactions, shall constitute an assignment of this Lease within the meaning of this Section 14.01. If Tenant is a partnership, trust or an unincorporated association, then the sale, issuance or transfer of a controlling interest therein, or the transfer of a majority interest in or a change in the voting control of any partnership, trust, unincorporated association, or corporation which directly or indirectly controls Tenant, or the transfer of any portion of any general partnership or managing interest in Tenant or in any such entity, or any change or conversion of Tenant or of any such entity to a limited liability company, a limited liability partnership, or any other entity which possesses the characteristics of limited liability, shall be deemed to be a prohibited assignment of this Lease within the meaning of this Section 14.01. Any such prohibited act by Tenant or Tenant's Guarantor (or any attempt at same), either voluntarily or involuntarily or by operation of law or otherwise, shall, at Landlord's option, terminate this Lease without relieving Tenant of any of its obligations hereunder for the

Phillppe Plxie/Crystals/05/18/09

S21

balance of the stated Term, and any such act shall be null and void. The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation thereof, or the termination thereof by Landlord pursuant to any provision contained herein, shall not work a merger and shall, at the option of Landlord, terminate all or any existing franchises, concessions, licenses, permits, subleases, subtenancies, departmental operating arrangements or the like, or may, at the option of Landlord, operate as an assignment to Landlord of the same.    Nothing contained elsewhere in this Lease shall authorize Tenant to enter into any franchise, concession, license, permit, subtenancy, departmental operating arrangement or the like, except pursuant to the provisions of this Section 14.01.  Landlord has entered into this Lease with Tenant in order to obtain for the benefit of the entire Development the unique attraction of Tenant's trade name set forth in paragraph (13), Section 16.01 of the Data Sheet and the unique merchandising mix and product line associated with Tenant's business as described in paragraph (10), Section 7.01 of the Data Sheet, and Landlord has specifically relied on the identity and special skill of the Tenant in its ability to conduct the specific business identified in paragraph (10), Section 7.01 of the Data Sheet, and the foregoing prohibition on assignment or subletting or the like is expressly agreed to by Tenant as a material consideration and inducement to Landlord to lease to Tenant.  Tenant hereby acknowledges that the foregoing provisions of this Section 14.01 constitute a freely negotiated restraint on alienation.

Without limiting any of the foregoing provisions, neither Tenant nor any other person having an interest in the possession, use, occupancy or utilization of the Leased Premises shall enter into any lease, sublease, license, concession or other agreement for use, occupancy or utilization of space in the Leased Premises which provides for rent or other payment for such use, occupancy or utilization based in whole or in part on the net income or profits derived by any person from the property leased, used, occupied or utilized (other than an amount based on a fixed percentage or percentages of receipts or sales), and any such purported lease, sublease, license, concession or other agreement shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use, occupancy or utilization of any part of the Leased Premises.

Notwithstanding the foregoing, if Tenant's Gross Sales during any Lease Year expiring after the second (2nd) anniversary of the Commencement Date are less than Two Million Five Hundred Thousand and 00/100ths Dollars ($2,500,000.00), then during the next ensuing Lease Year, Landlord shall not unreasonably withhold, delay or condition its consent (x) to Tenant's assigning this Lease, and (y) to a corresponding change in the permitted use provisions of Section 7.01 and the Trade Name provisions of Section 16.01, provided that:  (1) Tenant shall not at the time of such assignment be in default under any of the terms, covenants and conditions of this Lease beyond any applicable grace or cure period provided by this Lease, (2) such assignee (and any person or entity acquiring a controlling interest in Tenant's ownership interests) shall agree in writing to perform all of the unperformed terms, covenants and conditions of this Lease (whether accruing prior to, on, or after the effective date of the assignment), (3) Tenant and Tenant's Guarantor shall agree in writing to at all times remain primarily obligated for the performance of the terms, covenants and conditions of this Lease, (4) such assignee shall have demonstrated experience in the operation of first class luxury retail stores of the type described in Section 7.01 of the Data Sheet, (5) such assignee shall own and operate a chain of national, international or regional first-class luxury retail stores of a quality comparable to the highest standards of retail stores operating in the Retail Area, (6) such assignee shall have a commercially reasonable net worth taking into account all factors and in no event less than Ten Million Dollars ($10,000,000) and (7) prior to the effective date of the assignment, Tenant shall have supplied Landlord with all back-up information reasonably required by Landlord to establish that all of the foregoing conditions have been satisfied, provided however, if it shall be reasonable for Landlord to consent to such an assignment, Landlord shall nonetheless have the option of terminating this Lease rather than consenting to such assignment if Landlord makes such election to terminate within thirty (30) days after Landlord's receipt of Tenant's notice of the proposed assignment and Landlord's receipt of all reasonable backup information concerning the prospective assignee and its prospective permitted use.  Such Two Million Five Hundred Thousand and 00/100ths Dollar ($2,500,000.00) figure shall be proportionately decreased for any Lease Year during which Tenant shall not have operated its business on at least three hundred sixty (360) days.  If Landlord elects to so terminate this Lease, then this Lease shall terminate on the date sixty (60) days after delivery to Tenant of Landlord's notice of termination and each party shall be relieved of all liability under this Lease accruing from and after the effective date of termination.

Landlord shall assess a charge to Tenant of Five Thousand and 00/100ths Dollars ($5,000.00) for any request made by Tenant to review or approve a proposed assignment or transfer where such assignment or transfer is prohibited or permitted by the terms of this Lease.

OAKLAND.1636720.2

Philippe Plein/Crystals/03/18/09

## ARTICLE XV  WASTE

### SECTION 15.01  WASTE OR NUISANCE.

Tenant shall not commit or suffer to be committed any waste upon the Leased Premises and shall not place a load upon any floor of the Leased Premises which exceeds the floor load per square foot which such floor was designed to carry. Tenant shall not commit or suffer to be committed any nuisance or other act or thing which may disturb the quiet enjoyment of any other occupant or tenant of the Retail Area and/or the Development. Tenant agrees that business machines and mechanical equipment used by Tenant which cause vibration or noise that may be transmitted to the building or buildings comprising the Retail Area and/or the Development or to the Leased Premises, to such a degree as to be reasonably objectionable to Landlord or to any occupant, shall be placed and maintained by Tenant at its expense in settings of cork, rubber or spring-type vibration isolators sufficient to eliminate such vibrations or noise. Tenant shall take such action as Landlord reasonably deems necessary to prevent or terminate any such nuisance or waste arising out of Tenant's business, including, without limitation, any nuisance created by employees, agents, contractors, invitees or licensees of Tenant.

## ARTICLE XVI  TRADE NAME, PROMOTIONAL CHARGE

### SECTION 16.01  TRADE NAME.

Tenant agrees (a) to operate its business in the Leased Premises under the name specifically set forth in paragraph (13), Section 16.01 of the Data Sheet (the "Trade Name"); (b) not to change the Trade Name or character of the business operated in the Leased Premises; and (c) to refer to the Retail Area and Development by the name established by Landlord for the Retail Area and Development in designating the location of the Leased Premises in all advertising and in all other references to the location of the Leased Premises. If the name of any other retail center is mentioned as a store location for another store operating under the Trade Name in any advertising media (whether local, regional, national or international), then Tenant shall be obligated to also mention the name of the Retail Area and Development in the same advertising media with equal prominence. Tenant acknowledges and agrees that the use of the Trade Name has important and considerable name recognition and customer goodwill and that the continued use of the Trade Name by Tenant for Tenant's operations within the Leased Premises is a material consideration and inducement to Landlord's execution of this Lease. Landlord shall have the right to include the Trade Name and Tenant's logo, and images of the Leased Premises, Tenant's merchandise and Tenant's signage, in any public relations, promotional or advertising materials, media or information relating to the Retail Area and/or the Development.

### SECTION 16.02  SOLICITATION OF BUSINESS.

Tenant and Tenant's employees and/or agents shall not solicit business in the parking areas or other common areas, or any part of the Retail Area and/or the Development other than in the Leased Premises, nor shall Tenant distribute any handbills or other advertising matter in the parking area, other common areas, or any part of the Development other than in the Leased Premises. Tenant shall not give samples or approach customers outside the Leased Premises for purposes of soliciting sales. Moreover, and generally, Tenant shall not give away any promotional items which could create a nuisance or require Landlord to incur additional common area expenses.

### SECTION 16.03  PROMOTIONAL CHARGE.

Landlord shall provide, establish or cause to be provided a program or association of advertising, marketing and/or promotional events which, in Landlord's sole judgment, will serve to promote the Retail Area and/or the Development. Landlord shall be compensated, out of promotional charges collected by Landlord during each year for promotional services provided, in an amount equal to twenty-five percent (25%) of the promotional charges so collected, on a non-cumulative basis. Landlord shall not be obligated to expend more than is actually collected. Any promotional services and personnel so provided shall be under the exclusive control and supervision of Landlord, who shall have the sole authority to employ and discharge personnel and to establish a budget. Tenant agrees to pay to Landlord, as Tenant's share of the cost of said advertising and promotional program, an annual promotional charge which originally shall equal the amount as shown in paragraph (14), Section 16.03 of the Data Sheet, which annual promotional charge shall, at Landlord's option, be payable by Tenant in equal monthly installments at the time and in the manner set forth for Minimum Rent payments in this Lease. However, such annual promotional charge payable by Tenant will be adjusted commencing January 1st immediately succeeding full execution of this Lease and annually thereafter, by a percentage equal to the percentage increase set forth in paragraph (14), Section 16.03 of the Data Sheet. Tenant also agrees to pay to Landlord, within ten (10) days after demand therefor, an initial opening promotional charge in the amount set forth in paragraph (15), Section 16.03 of the Data Sheet, in

Philipps Plein/Crystals/05/18/09

S23

addition to such other charges. All recurring charges (other than the initial opening promotional charge) payable under this Section 16.03 shall be due in monthly installments on the first day of each month during the Term of this Lease, and all such items, and the initial assessment, shall be paid without deduction or offset.

In addition to Tenant's obligations as set forth above in this Section 16.03, Tenant shall spend each Lease Year during the Term, on advertising its business in the Leased Premises (and listing the store location as being in the Retail Area and Development by name) in newspapers or magazines of general circulation, radio, direct mail or television, an amount which shall not be less than 2% of Tenant's Gross Sales from the Leased Premises. Within thirty (30) days after the end of each Lease Year, Tenant shall furnish to Landlord, together with the annual Gross Sales statement furnished pursuant to the provisions of Section 3.02 above for such Lease Year, a statement certified by an officer of Tenant showing the amount spent by Tenant pursuant to the requirements of this paragraph for advertising its business in the Leased Premises for such Lease Year. In the event it is indicated from such statement or from an audit of such statement that Tenant has expended for such advertising less than 2% of Tenant's Gross Sales, Tenant shall pay the difference between the amount actually expended for such advertising and 2% of such Gross Sales to the Landlord within thirty (30) days after submission of the annual statement to be furnished pursuant to these provisions.

## ARTICLE XVII  DESTRUCTION OF LEASED PREMISES

### SECTION 17.01  RECONSTRUCTION OF DAMAGED PREMISES.

In the event the Leased Premises shall be partially or totally destroyed by fire or other casualty insurable under the property insurance policy carried by Landlord covering buildings in the Retail Area so as to become partially or totally untenantable, then the damage to the Leased Premises shall be promptly repaired as set forth below (unless Landlord shall elect to terminate this Lease as hereinafter provided), and the Minimum Rent and other charges payable by Tenant to Landlord (to the extent such charges are based upon the square foot area of the Leased Premises) shall be abated in proportion to the floor area of the Leased Premises rendered untenantable, and the Breakpoint above which Percentage Rent is computed and payable shall likewise be proportionately reduced, until such time that Tenant either reopens in the Leased Premises or is obligated to reopen in the Leased Premises. Landlord shall perform the repairs to Landlord's Work in the Leased Premises and Tenant shall perform the repairs to Tenant's Work in the Leased Premises. Payment of full Minimum Rent and all other charges so abated shall commence and Tenant shall be obligated to reopen for business on the sixtieth (60th) day following the date that Landlord has substantially completed Landlord's Work for the Leased Premises. In making repairs, restoration or reconstruction of Tenant's Work, Tenant, at its expense, shall comply with all laws, ordinances, and governmental rules or regulations, and shall perform all work or cause such work to be performed with due diligence and in a first-class manner. All permits required in connection with Tenant's repairs, restoration and reconstruction shall be obtained by Tenant at Tenant's sole cost and expense.    Landlord's Work shall consist of items which Landlord shall have constructed as part of Landlord's Work for the Leased Premises under Exhibit B and any items which Landlord is obligated to repair and maintain for the Leased Premises. The party required hereunder to repair the damage to the Leased Premises shall reconstruct such Leased Premises in accordance with the working drawings originally approved by Landlord. In no event shall Landlord be required to repair or replace Tenant's merchandise, trade fixtures, furnishings or equipment. If (i) more than thirty-five percent (35%) of the floor area of the Retail Area shall be damaged or destroyed by fire or other casualty, or (ii) during the last two (2) years of the Term more than twenty-five percent (25%) of the floor area of the Leased Premises or of the building in which the Leased Premises are located or of the Retail Area shall be damaged or destroyed by fire or other casualty, or (iii) all or any part of the Retail Area or the Leased Premises are damaged or destroyed at any time by the occurrence of any risk not insured under the insurance carried by Landlord, then Landlord, at its sole option, may terminate this Lease by giving written notice to Tenant of Landlord's election so to terminate, such notice to be given within one hundred eighty (180) days after the occurrence of such damage or destruction. If this Lease is not terminated, Tenant, at Tenant's sole cost, shall repair or replace Tenant's merchandise, trade fixtures, furnishings and equipment in a manner and to at least a condition equal to that prior to the damage or destruction thereof.

To the fullest extent permitted by applicable law, Tenant hereby waives any statutory rights of termination, right to quit and surrender the Leased Premises or (except as provided above) right to abate Rent which may arise by reason of any partial or total destruction of the Leased Premises which Landlord is obligated to restore or may restore under any of the provisions of the Lease.

Tenant shall not be entitled to any offset, abatement (except as provided above) or reduction in Rent, nor shall Tenant be entitled to any compensation or damages from Landlord for loss of the use of the whole or any part of the Leased Premises, the Retail Area, or the Development, Tenant's personal property or any inconvenience or annoyance caused by such damage, repair, or reconstruction.

Philippe Plein/Crystals/05/18/09

S24

OAKLAND:1636720.2

## SECTION 17.02 MUTUAL WAIVER OF SUBROGATION.

Landlord and Tenant each hereby waive any and all rights of recovery against the other or against the Related Parties (as hereinafter defined) of the other, on account of loss or damage occasioned to such waiving party or its property or any property of others under its control to the extent that such loss or damage arises from any risk generally covered by insurance required to be maintained under the Lease, whether or not such an insurance policy is maintained or there are insurance proceeds sufficient to cover the loss. Tenant shall, upon obtaining the policies of insurance required under the Lease, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in the Lease and obtain from its carriers an endorsement waiving any right of subrogation in favor of the insurer. As used in this Lease, the term "Related Parties", with respect to Landlord or Tenant, shall mean and refer to the "Affiliates" of Landlord or Tenant (as the case may be), as well as the officers, directors, shareholders, partners, members, employees, agents, attorneys, successors, personal representatives, heirs, executors, or assigns of Landlord or Tenant (as the case may be). As used in this Lease, the term "Affiliates", with respect to Landlord or Tenant, shall mean and refer to any entity which, as of the Commencement Date or at any other time during the Term, is controlled by, controls or is under common control with the applicable entity, or which, as of the Commencement Date, or at any other time during the Term, owns or is owned by an entity which is controlled by, controls or under common control with the applicable entity. The term "control" or any derivative thereof, when used herein, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the applicable entity, whether through ownership of voting securities, partnership, membership or other ownership interests, by contract or otherwise; provided, however, that, without limiting the generality of the foregoing (1) any person or entity which owns, directly or indirectly, securities representing twenty percent (20%) or more of the value or voting power of a corporation or fifty percent (50%) or more of the partnership, membership or other ownership interests (based upon value or vote) of any other entity is deemed to control such corporation or other entity, (2) a general partner shall always be deemed to control any partnership of which it is a general partner, and (3) a managing member of a limited liability company shall always be deemed to control any limited liability company of which it is a managing member.

## ARTICLE XVIII  EMINENT DOMAIN

### SECTION 18.01  TOTAL CONDEMNATION OF LEASED PREMISES.

If the whole of the Leased Premises shall be taken by any public authority under the power of eminent domain or sold to public authority under threat or in lieu of such a taking, then the Term shall cease as of the day possession shall be taken by such public authority, and the Rent shall be paid up to that day with a proportionate refund by Landlord of such Rent and other charges as may have been paid in advance for a period subsequent to the date of the taking.

### SECTION 18.02  PARTIAL CONDEMNATION.

(a)  (i)  If less than the whole but more than twenty percent (20%) of the Leased Premises (or any portion of the Leased Premises the taking of which renders the entire Leased Premises untenantable) or more than fifty percent (50%) of the common areas shall be so taken under eminent domain, or sold to public authority under threat or in lieu of such a taking, Tenant shall have the right either to terminate this Lease and declare the same null and void as of the day possession is taken by public authority, or, subject to Landlord's right of termination as set forth in subsection 18.02(b) of this Article, to continue in the possession of the remainder of the Leased Premises, upon notifying Landlord in writing within ten (10) days after such taking of Tenant's intention. In the event Tenant elects to remain in possession, all of the terms herein provided shall continue in effect, except that, as of the day possession of such percentage of the Leased Premises is taken by public authority, the Minimum Rent and other charges payable by Tenant to Landlord (to the extent that such charges are based upon the square foot area of the Leased Premises) shall be reduced in proportion to the floor area of the Leased Premises taken and the Breakpoint above which Percentage Rent is computed and payable shall likewise be proportionately reduced; thereafter, Landlord shall, at its own cost and expense, make all necessary repairs or alterations to the basic building, so as to constitute the remaining Leased Premises a complete architectural unit, and Tenant, at Tenant's sole cost, shall similarly act with respect to Tenant's improvements, trade fixtures, furnishings and equipment.

(ii)  If this Lease is not terminated under subsections 18.02(a) (i) or (b), the lease Term shall cease only on the part of the Leased Premises so taken, as of the day possession shall be taken by such public authority, and Tenant shall pay Rent and other charges up to that day, with appropriate credit by Landlord (toward the next installment of such Rent or charges due from Tenant) of such Rent or charges as may have been paid in advance for a period subsequent to the date of the taking; thereafter, the Minimum Rent and other charges payable to Landlord (to the extent that such charges are based upon the square foot

Phillippe Plaza/Crystals/05/18/09

S25

area of the Leased Premises) shall be reduced in proportion to the amount of the Leased Premises taken and the Breakpoint above which Percentage Rent is computed and payable shall likewise be proportionately reduced. Landlord shall, at its expense, make all necessary repairs or alterations to the basic building, so as to constitute the remaining Leased Premises a complete architectural unit, and Tenant, at Tenant's sole cost, shall similarly act with respect to Tenant's improvements, trade fixtures, furnishings and equipment.

(b)     If more than fifty percent (50%) of the building in which the Leased Premises are located, or more than fifty percent (50%) of the Leased Premises, or more than fifty percent (50%) of the Retail Area or of the common areas, shall be taken under power of eminent domain, or sold to public authority under the threat or in lieu of such a taking, Landlord may, by written notice to Tenant delivered on or before the tenth (10th) day following the date of surrendering possession to the public authority, terminate this Lease as of the day possession is taken by public authority. The Rent and other charges shall be paid up to the day possession is taken by public authority, with an appropriate refund by Landlord of such Rent as may have been paid in advance for a period subsequent to that date.

(c)     If the temporary use of the whole or any part of the Leased Premises shall be taken by any lawful power or authority, by the exercise of the right of condemnation or eminent domain, or by agreement between Tenant and those authorized to exercise such right, Tenant shall give prompt notice thereof to Landlord, and the lease Term shall not be reduced or affected in any way. Tenant shall continue to pay in full the Rent required to be paid hereunder, without reduction or abatement, and Tenant shall be entitled to receive for itself any award or payment made for such use.

(d)     Tenant hereby waives any statutory and common law rights of termination which may arise by reason of any condemnation, taking or eminent domain.

### SECTION 18.03  LANDLORD'S AND TENANT'S DAMAGES.

All damages awarded for such taking under the power of eminent domain or sale under threat or in lieu of such a taking, whether for the whole or a part of the Leased Premises, shall belong to and be the property of Landlord, irrespective of whether such damages shall be awarded as compensation for diminution in value to the leasehold or to the fee of the Leased Premises, and Tenant shall have no claim against either Landlord or the condemning authority with respect thereto; provided, however, that Landlord shall not be entitled to any award specifically designated as compensation for, depreciation to, and cost of removal of, Tenant's stock and trade fixtures, nor (subject to the rights of Landlord's mortgagee[s]) to any award specifically designated as compensation to Tenant for relocation expenses (to the extent the award for relocation expenses would not reduce the award which would otherwise have been received by Landlord in the absence of any award to Tenant for relocation expenses).

### ARTICLE XIX  DEFAULT

### SECTION 19.01  EVENTS OF DEFAULT.

(a)     Each of the following shall constitute a default or breach ("Event of Default") by Tenant under this Lease which shall afford Landlord the rights and remedies set forth below:

(i)     If Tenant fails to pay any Rent or any other sums payable pursuant to this Lease on the date due, whether or not the same shall have been demanded, and such failure continues for a period of five (5) days after such amount is due;

(ii)     Tenant's failure to initially open for business by the date required by the provisions of Section 1.03 or to continuously operate its business pursuant to Section 7.02 for the purpose specified in Section 7.01;

(iii)     Any assignment of this Lease in violation of Section 14.01;

(iv)     If Tenant shall vacate or abandon the Leased Premises;

(v)     If Tenant fails to observe or perform any of the other covenants or agreements contained in this Lease to be observed or performed by Tenant, but such failure, is of a type that can be cured or corrected by Tenant, shall not be an Event of Default unless such failure continues for thirty (30) days after written notice of such failure shall have first been given by Landlord to Tenant (or if more than thirty (30) days shall be required because of the nature of the failure, if Tenant shall fail to commence the curing of such failure within such thirty (30) day period and proceed to cure diligently thereafter); or

Philippe Plein/Crystals/05/18/09

(vi)    If Tenant or any Guarantor shall become bankrupt, go into receivership, or make an assignment for the benefit of creditors, or take or have taken against Tenant or any Guarantor of this Lease any proceedings of any kind under any provision of any Federal or State bankruptcy law.

To the extent permitted by the applicable laws of the State, if this Section 19.01 provides for a time period for cure of Tenant's defaults under this Lease (each such time period granted by this Section 19.01 a "Lease Cure Period") and if there is a time period for cure of the same default prescribed by the applicable laws of the State (each such time period prescribed by the applicable laws of the State shall be a "Legal Cure Period"), and the Lease Cure Period is shorter than the Legal Cure Period, then the Lease Cure Period shall be in lieu of and included within and not in addition to the Legal Cure Period. Similarly, if the Legal Cure Period is shorter than the Lease Cure Period, then the Legal Cure Period shall be included within and not in addition to the Lease Cure Period.

(b)    Upon the occurrence of an Event of Default, Landlord may exercise any of the following rights without further notice or demand of any kind to Tenant or any other person, except as required by the applicable laws of the State:

(i)    Termination of Lease. The right of Landlord to terminate this Lease and Tenant's right to possession of the Leased Premises, and to reenter the Leased Premises, take possession thereof and remove all persons therefrom, following which Tenant shall have no further claim thereon or hereunder;

(ii)    Reentry of the Leased Premises. The right of Landlord, without terminating this Lease and Tenant's right to possession of the Leased Premises, to reenter the Leased Premises and occupy the whole or any part thereof for and on account of Tenant and to collect any unpaid Rents and other charges which have become payable or which may thereafter become payable;

(iii)    Termination after Reentry. The right of Landlord, even though it may have reentered the Leased Premises, to elect thereafter to terminate this Lease and Tenant's right to possession of the Leased Premises;

(iv)    Continued Enforcement of Lease. The right of Landlord to continue to enforce all Landlord's rights and remedies under this Lease, including the right to recover Rent as it becomes due under this Lease; and

(v)    Right to Cure Default. Landlord may, but shall not be obligated to, pay such amount or perform such obligation to cure an Event of Default. Any sums so expended by Landlord shall be immediately due and payable and shall bear interest from the date of expenditure until paid at the interest rate in Section 27.13 of this Lease. The exercise of rights by Landlord shall not constitute a waiver of any default by Tenant or of any of Landlord's other rights or remedies.

The rights and remedies given to Landlord are cumulative, not alternative, and shall be additional and supplemental to all other rights or remedies which Landlord may have under any applicable statutes, ordinances or regulations or at law or equity.

(c)    In addition to the remedies set forth herein for such failure by Tenant, Landlord shall have the further remedy of erecting a barricade at the storefront of the Leased Premises at such time as possession of the Leased Premises is deemed lawfully vested in Landlord, without Landlord in any manner becoming liable for any loss or damage which may be occasioned thereby. Notwithstanding the foregoing provisions of this Section 19.01, in the event Tenant shall fail to perform or shall default in the performance of any term, covenant or condition of this Lease on two (2) or more separate occasions during any twelve-month period, then, even though such failures or defaults may have been cured by Tenant, any further failure or default of the same kind by Tenant during such twelve-month period shall be deemed a default without the ability for cure by Tenant. During the continuance of any failure of performance or any default by Tenant in the performance of any term, covenant or condition of this Lease, Tenant shall not be entitled to exercise any rights or options, or to receive any funds or proceeds being held under or pursuant to this Lease, notwithstanding any contrary provisions contained herein. In the event of lawful re-entry by Landlord, Landlord may remove all persons and property from the Leased Premises and such property may be stored in a public warehouse or elsewhere at the cost of, and for the account of Tenant, without notice or resort to legal process and without Landlord being deemed guilty of trespass, or becoming liable for any loss or damage which may be occasioned thereby. In addition, and to the extent permitted by law, in the event of re-entry by Landlord, Landlord may, but shall not be required to, padlock or otherwise secure the entrances to the Leased Premises without prior notice or resort to legal process and without being deemed guilty of trespass or becoming liable for any loss or damage; all costs and expenses incurred by Landlord in securing the entrances to the Leased Premises shall be borne by Tenant and shall be payable to Landlord on ten (10) days' written notice; and any such padlocking or securing of the Leased Premises shall not constitute or be

Philippe Plein/Crystals/05/18/09

S27

deemed as an election on Landlord's part to terminate this Lease unless a written notice of such intention shall be given to Tenant or unless the termination of this Lease is decreed by a court of competent jurisdiction. In the event Tenant shall not remove its property from the Leased Premises within ten (10) days after Tenant has vacated the Leased Premises, then such property shall be deemed abandoned by Tenant and Landlord may dispose of the same without liability to Tenant.

### SECTION 19.02 RIGHT TO RECOVERY.

Should Landlord terminate this Lease and Tenant's right to possession of the Leased Premises pursuant to an Event of Default, Landlord may recover from Tenant as damages all of the following:

(i)    Delinquent Rent. The worth at the time of award of any unpaid Rent that had been earned at the time of such termination;

(ii)    Rent After Termination Until Judgment. The worth at the time of award of the amount by which the unpaid Rent that would have been earned after termination until the time of award exceeds such Rent loss Tenant proves could have been reasonably avoided;

(iii)    Rent After Judgment. The worth at the time of award of the amount by which the unpaid Rent for the balance of the lease Term after the time of award exceeds the amount of such Rent loss that Tenant proves could be reasonably avoided;

(iv)    Other Compensation. Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including any costs or expense incurred by Landlord in (i) retaking possession of the Leased Premises, including reasonable attorney fees therefor, (ii) maintaining or preserving the Leased Premises after such default, (iii) preparing the Leased Premises for reletting to a new tenant, including repairs or alterations to the Leased Premises for such reletting, (iv) leasing commissions, and (v) any other costs necessary or appropriate to relet the Leased Premises; and

(v)    Additional or Alternative Amounts. At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable statutes, ordinances, regulations, and at law.

As used in this Section 19.02 above, the "worth at the time of award" shall be computed by allowing interest at the interest rate set forth in Section 27.13. As used in this Section 19.02 above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank at the time of award plus one percent (1%). All Rent other than Minimum Rent shall, for the purposes of calculating any amount due, be computed on the basis of the average monthly amount thereof accruing during the immediately preceding sixty (60) month period, except that, if it becomes necessary to compute such Rent before such a sixty (60) month period has occurred, then such Rent shall be computed on the basis of the average monthly amount hereof accruing during such shorter period.

No re-entry or taking possession of the Leased Premises by Landlord shall be construed as an election on its part to terminate this Lease unless a written notice of such intention is given to Tenant or unless the termination thereof is decreed by a court of competent jurisdiction. Notwithstanding any such reletting without termination, at any time after Landlord's exercise of its re-entry rights without termination of this Lease, Landlord may at any time elect to terminate this Lease for such previous breach. In determining the Rent which would be payable under this Lease by Tenant subsequent to default, the Percentage Rent for each year of the unexpired portion of the Term shall be equal to the average Percentage Rent payable by Tenant from the commencement of the Term to the time of default, or during the preceding three (3) full Lease Years, whichever period is shorter. The terms "entry" and "re-entry" are not limited to their technical meanings. Nothing contained in this Lease shall be construed to limit or prejudice the right of Landlord to prove for and obtain as damages by reason of the termination of this Lease or re-entry of the Leased Premises for the default of Tenant under this Lease an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved, whether or not such amount shall be greater than any of the sums referred to in this Section 19.02.

### SECTION 19.03 EXPENSES.

In case suit shall be brought for recovery of possession of the Leased Premises, for the recovery of Rent or any other amount due under the provisions of this Lease, or because of the breach of any other covenant herein contained on the part of Tenant to be kept and performed, and a breach shall be established, Tenant shall pay to Landlord all expenses incurred therefor, including reasonable attorneys' fees. Any

Philippe Piniov/Crystals/05/18/09

S28

amounts payable by Tenant to Landlord pursuant to this Section 19.03 or Section 11.02 of this Lease may be included in any subsequent monthly Rent bill to Tenant, and the failure of Tenant to promptly pay same shall entitle Landlord to all remedies for failure to pay Rent as available under this Lease or at law or in equity.

### SECTION 19.04 WAIVER OF COUNTERCLAIMS AND TRIAL BY JURY.

To the fullest extent permitted by applicable law, Landlord and Tenant waive their right to trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other (except for personal injury or property damage) on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use of or occupancy of said Leased Premises, and any emergency statutory or any other statutory remedy. Tenant shall not interpose any non-compulsory counterclaim or counterclaims or claims for set-off, recoupment or deduction of Rent in a summary proceeding for nonpayment of Rent or other action or summary proceeding based on termination, holdover or other default in which Landlord seeks repossession of the Leased Premises from Tenant.

### ARTICLE XX BANKRUPTCY OR INSOLVENCY

### SECTION 20.01 TENANT'S INTEREST NOT TRANSFERABLE.

Neither Tenant's interest in this Lease, nor any estate hereby created in Tenant nor any interest herein or therein, shall pass to any trustee, except as may specifically be provided pursuant to the Bankruptcy Code (11 USC § 101 et. seq.), or to any receiver or assignee for the benefit of creditors or otherwise by operation of law.

### SECTION 20.02 TERMINATION.

In the event the interest or estate created in Tenant hereby shall be taken in execution or by other process of law, or if Tenant or Tenant's Guarantor, if any, or Tenant's executors, administrators, or assigns, if any, shall be adjudicated insolvent or bankrupt pursuant to the provisions of any state law or an order for the relief of such entity shall be entered pursuant to the Bankruptcy Code, or if a receiver or trustee of the property of Tenant or Tenant's Guarantor, if any, shall be appointed by reason of the insolvency or inability of Tenant or Tenant's Guarantor, if any, to pay its debts, or if any assignment shall be made of the property of Tenant or Tenant's Guarantor, if any, for the benefit of creditors, then and in any such events, this Lease and all rights of Tenant hereunder shall automatically cease and terminate with the same force and effect as though the date of such event were the date originally established herein and fixed for the expiration of the Term, and Tenant shall vacate and surrender the Leased Premises but shall remain liable as herein provided. Notwithstanding the foregoing provisions of this Section 20.02, in the event that such termination shall result solely from the bankruptcy or insolvency of, or such other described event relating to, Tenant's Guarantor, Landlord shall have the option to reinstate all of the provisions of this Lease (including, without limitation, the obligation of Tenant to continuously operate pursuant to Article VII hereof) upon written notice to Tenant.

### SECTION 20.03 TENANT'S OBLIGATION TO AVOID CREDITORS' PROCEEDINGS.

Tenant or Tenant's Guarantor, if any, shall not cause or give cause for the appointment of a trustee or receiver of the assets of Tenant or Tenant's Guarantor, if any, and shall not make any assignment for the benefit of creditors, or become or be adjudicated insolvent. The allowance of any petition under any insolvency law except under the Bankruptcy Code or the appointment of a trustee or receiver of Tenant or Tenant's Guarantor, if any, or of the assets of either of them, shall be conclusive evidence that Tenant caused, or gave cause, therefor, unless such allowance of the petition, or the appointment of a trustee or receiver, is vacated within thirty (30) days after such allowance or appointment. Any act described in this Section 20.03 shall be deemed a material breach of Tenant's obligations hereunder, and this Lease shall thereupon automatically terminate in the same manner and with the same force and effect as set forth in Section 20.02 hereof. Landlord does, in addition, reserve any and all other remedies provided in this Lease or in law. Notwithstanding the foregoing provisions of Section 20.02, in the event that such termination shall result solely from the bankruptcy or insolvency of, or such other described event relating to, Tenant's Guarantor, Landlord shall have the option to reinstate all of the provisions of this Lease (including, without limitation, the obligation of Tenant to continuously operate pursuant to Article VII hereof) upon written notice to Tenant.

### SECTION 20.04 RIGHTS AND OBLIGATIONS UNDER THE BANKRUPTCY CODE.

(a)     Upon the filing of a petition by or against Tenant under the Bankruptcy Code, Tenant, as debtor and as debtor in possession, and any trustee who may be appointed agree as follows: (i) to perform each and every obligation of Tenant under this Lease including, but not limited to, the manner of "operation"

Philippe Plein/Crystals/05/18/09

S29

as provided in Section 7.02 of this Lease until such time as this Lease is either rejected or assumed by order of the United States Bankruptcy Court; (ii) to pay monthly in advance on the first day of each month, as reasonable compensation for use and occupancy of the Leased Premises, an amount equal to all Minimum Rent and other charges otherwise due pursuant to this Lease and to pay Percentage Rent monthly at the percentage set forth in this Lease for the Lease Year in which such month falls on all sales during such month in excess of one twelfth (1/12th) of the Breakpoint for such Lease Year, with payment of all such Percentage Rent to be made by the tenth (10th) day of the succeeding month; (iii) to reject or assume this Lease within sixty (60) days of the appointment of such trustee under Chapter 7 of the Bankruptcy Code or within sixty (60) days (or such shorter term as Landlord, in its sole discretion, may deem reasonable, so long as notice of such period is given) of the filing of a petition under any other Chapter; provided that no extension of either of the foregoing periods by or on behalf of Tenant shall be permitted; (iv) to give Landlord at least forty-five (45) days' prior written notice of any proceeding relating to any assumption of this Lease; (v) to give at least thirty (30) days' prior written notice of any abandonment of the Leased Premises, with any such abandonment to be deemed a rejection of this Lease and an abandonment of any property not previously removed from the Leased Premises; (vi) to do all other things of benefit to Landlord otherwise required under the Bankruptcy Code; (vii) to be deemed to have rejected this Lease in the event of the failure to comply with any of the above; and (viii) to have consented to the entry of an order by an appropriate United States Bankruptcy Court providing all of the above, waiving notice and hearing of the entry of same.

(b)    No default of this Lease by Tenant, either prior to or subsequent to the filing of such a petition, shall be deemed to have been waived unless expressly done so in writing by Landlord.

(c)    It is understood and agreed that this is a Lease of real property in a shopping center and that, therefore, Section 365(b)(3) of the Bankruptcy Code is applicable to any proposed assumption of this Lease in a bankruptcy case.

(d)    Included within and in addition to any other conditions or obligations imposed upon Tenant or its successor in the event of assumption and/or assignment are the following: (i) the cure of any monetary defaults and the reimbursement of pecuniary loss (including, without limitation, any reasonable attorneys' fees, costs or expenses paid or incurred by Landlord in connection with this matter) immediately upon entry of a court order providing for assumption and/or assignment; (ii) the deposit of an additional sum equal to three (3) months' Rent to be held pursuant to the terms of Section 26.01 of this Lease (notwithstanding any alteration or modification of the terms of said Section); (iii) the use of the Leased Premises as set forth in Section 7.01 of this Lease and the quality, quantity and/or lines of merchandise of any goods or services required to be offered for sale are unchanged; (iv) the payment of any sums which may then be due or which may thereafter become due pursuant to the provisions of Section 2.04 of this Lease; (v) the debtor, debtor in possession, trustee, or assignee of such entity demonstrates in writing that it has sufficient background including, but not limited to, substantial retailing experience in shopping centers of comparable size and financial ability to operate a retail establishment out of the Leased Premises in the manner contemplated in this Lease, and meets all other reasonable criteria of Landlord as did Tenant upon execution of this Lease; (vi) the prior written consent of any mortgagee to which this Lease has been assigned as collateral security; and (vii) the Leased Premises, at all times, remains a single store and no physical changes of any kind may be made to the Leased Premises unless in compliance with the applicable provisions of this Lease. Without limitation of the foregoing, any assignee of Tenant's rights and obligations under this Lease shall be liable for any and all adjustments to charges under this Lease (including, without limitation, charges under Sections 2.05 and 8.03) which shall occur during the year in which such assignee assumes the obligations.

(e)    Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such assignee shall, upon demand, execute and deliver to Landlord an instrument confirming such assumption, which instrument shall be in a form satisfactory to Landlord.

(f)    Landlord shall specifically be entitled to recover reasonable attorneys' fees, costs and expenses in accordance with 11 U.S.C. Section 503 as a result of Landlord's participation in any bankruptcy proceedings.

## ARTICLE XXI  ACCESS BY LANDLORD

### SECTION 21.01  RIGHT OF ENTRY.

Landlord or Landlord's agents shall have the right to enter the Leased Premises at all reasonable times, upon prior oral notice to the individual apparently then in charge at the Leased Premises, to examine

Philippe Plein/Crystals/05/18/09

S30

the same and to show them to prospective purchasers or mortgagees. Landlord or Landlord's agents shall have the further right, upon three (3) days' prior written notice to Tenant (except in the event of an emergency in which event no notice shall be required), to enter the Leased Premises to make such repairs, alterations, improvements or additions as Landlord may deem necessary or desirable, irrespective of whether the work shall be for the Leased Premises or for other premises or facilities, and Landlord shall be allowed to take all material into and upon the Leased Premises that may be required therefor without the same constituting an eviction of Tenant in whole or in part, and the Rent and other charges reserved shall in no wise abate while said repairs, alterations, improvements, or additions are being made, by reason of loss or interruption of business of Tenant, or otherwise. Landlord may, at any time during the last fifteen (15) months of the lease Term (or at any time that Tenant shall be in default hereunder), exhibit the Leased Premises to prospective tenants. If an excavation shall be made upon land adjacent to the Leased Premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to enter upon the Leased Premises for the purpose of doing such work as said person shall deem necessary to preserve the wall or the building of which Leased Premises form a part from injury or damage and to support the same by proper foundations without any claim for damages or indemnity against Landlord, or diminution or abatement of Rent.

## ARTICLE XXII  TENANT'S PROPERTY

### SECTION 22.01  TAXES ON TENANT'S PROPERTY.

Tenant shall be responsible for, and shall pay, prior to delinquency, any and all taxes, assessments, levies, fees and other governmental charges of every kind or nature levied or assessed by municipal, county, state, federal or other taxing or assessing authority upon, against or with respect to (i) the Leased Premises or any leasehold interest, (ii) all furniture, fixtures, equipment and any personal property of any kind owned by Tenant or any previous tenant and occupant, and which is placed, installed or located in, within, upon or about the Leased Premises, (iii) all alterations, additions or improvements of whatsoever kind or nature, if any, made to and contained within the Leased Premises, by Tenant or any previous tenant or occupant, and (iv) Rent or other charges payable by Tenant, irrespective of whether any of the terms described in clauses (i) through (iv) above are assessed against real or personal property, and irrespective of whether any of such items are assessed to or against Landlord or Tenant. If at any time during the Term of this Lease any of such taxes are not levied and assessed separately and directly to Tenant (for example, if the same are levied or assessed to Landlord, or upon or against the building containing the Leased Premises and/or the land underlying said building), Tenant shall pay to Landlord Tenant's share thereof as reasonably determined by Landlord.

### SECTION 22.02  LOSS AND DAMAGE.

Landlord shall not be responsible or liable to Tenant for any loss or damage that may be occasioned by or through the acts or omissions of persons occupying adjoining premises or any part of the premises adjacent to or connected with the premises hereby leased or any part of the building of which the Leased Premises are a part, or any other area in the Retail Area or the Development, or for any loss or damage resulting to Tenant or its property from bursting, stoppage or leaking of water, gas, sewer or steam pipes, or (without limiting the foregoing) for any damages or loss of property within the Leased Premises from any cause whatsoever.

### SECTION 22.03  NOTICE BY TENANT.

Tenant shall give prompt notice to Landlord in case of any damage to or destruction of all or any part of the Leased Premises or of defects therein or in alterations, decorations, additions or improvements, including, without limitation, any fixtures or equipment. Tenant shall give prompt notice to Landlord if any person in the Leased Premises appears intoxicated, or of any altercation or fight in the Leased Premises, or if Tenant is preparing to eject or forcibly remove an individual from the Leased Premises, or of any injuries to persons in, or criminal or police reports made with respect to, the Leased Premises, and (at Landlord's request) Tenant shall promptly provide Landlord with copies of any medical, criminal, police or other reports or documentation related to any such incident and available to Tenant. Copies of any such notice or reports or documentation which is required to be sent to Landlord shall be simultaneously delivered by Tenant to MGM MIRAGE, Risk Management Division, 3260 Industrial Road, Las Vegas, Nevada 89109-1132 or such other address as Landlord shall provide to Tenant upon written notice.

S31

Philippe Plein/Crystals/05/18/09

OAKLAND.1636720.2

## ARTICLE XXIII  HOLDING OVER

### SECTION 23.01  HOLDING OVER.

Any holding over after the expiration of the Term hereof with the consent of the Landlord, shall be construed to be a tenancy from month to month at a monthly Minimum Rent of not less than one-sixth (1/6) the annual Minimum Rent effective for the final Lease Year or partial Lease Year preceding expiration of the Term (subject to further adjustment pursuant to the various provisions of this Lease, including, without limitation, Section 2.04 of this Lease), together with an amount estimated by Landlord for the monthly additional charges payable pursuant to this Lease, and shall otherwise be on the same terms and conditions (including, without limitation, payment of Percentage Rent) as herein specified so far as applicable, subject to any changes in any of the foregoing terms or conditions as may be submitted by Landlord to Tenant upon at least thirty (30) days' prior written notice. Any holding over without Landlord's consent shall constitute an Event of Default and shall entitle Landlord to the rights and remedies provided in Article XIX of this Lease and at law or equity.

### SECTION 23.02  SUCCESSORS.

All rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several respective heirs, executors, administrators, successors, and assigns of the said parties; and if there shall be more than one person or entity comprising Tenant, they shall all be bound jointly and severally by the terms, covenants and agreements herein. No rights, however, shall inure to the benefit of any assignee of Tenant unless the assignment shall be expressly permitted under this Lease.

## ARTICLE XXIV  RULES AND REGULATIONS

### SECTION 24.01  RULES AND REGULATIONS.

Tenant agrees to comply with and observe all rules and regulations established by Landlord from time to time, and with the requirements of any operations manual provided to Tenant, provided any such rules, regulations and/or requirements shall apply and shall be applied uniformly to all or substantially all similar use and similarly located tenants of the Retail Area. Tenant's failure to keep and observe said rules and regulations shall constitute a breach of the terms of this Lease in the same manner as if the rules and regulations were contained herein as covenants.  In the case of any conflict between said rules and regulations and this Lease, this Lease shall be controlling.

## ARTICLE XXV  QUIET ENJOYMENT

### SECTION 25.01  LANDLORD'S COVENANT.

Upon payment by Tenant of the Rent, and upon the observance and performance of all covenants, terms and conditions on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the Leased Premises for the Term hereby demised without hindrance or interruption by Landlord or any other person or persons lawfully or equitably claiming by, through or under Landlord, subject, nevertheless, to the terms and conditions of this Lease and any mortgage, deed of trust or underlying lease to which this Lease is subordinate.

### SECTION 25.02  TENANT'S COVENANT.

Tenant hereby acknowledges and agrees that Landlord has specifically relied upon the identity, skill, product line, and trade name of Tenant in entering into this Lease with Tenant. Tenant recognizes that its use of the Leased Premises in accordance with the use clause set forth in the Data Sheet and its compliance with the particular provisions of Article VII hereof, regarding the conduct and continuous operation of Tenant's business in the Leased Premises throughout the Term, forms a material consideration and inducement to Landlord, and Tenant specifically covenants that it will strictly adhere to these provisions.  Any ambiguities in Article VII or in the use clause set forth in the Data Sheet shall not be construed against Tenant or against Landlord, as a matter of law.  Tenant further acknowledges and agrees that any indebtedness from Tenant to Landlord existing as of the date of this Lease shall be deemed Additional Rent hereunder, and Tenant's commitment and obligation to pay all such indebtedness as Additional Rent under this Lease has formed an additional necessary consideration to Landlord in entering into this Lease and in hereby granting Tenant the right to use the Leased Premises as set forth herein.  Tenant hereby warrants to Landlord that Tenant has been duly organized, is validly existing, and is in good standing under the laws of its state of formation or incorporation and is qualified to do business in the State, and that all necessary action on the part of Tenant has been taken to authorize the execution, delivery and performance of this Lease and of the other

Philippe Plein/Crystals/05/18/09

S32

documents, instruments and agreements, if any, provided for herein, and that the persons who have executed this Lease on behalf of Tenant are duly authorized to do so.

## ARTICLE XXVI  SECURITY PROVISION

### SECTION 26.01  SECURITY.

The amount set forth in paragraph (17), Section 26.01 of the Data Sheet as a security deposit is payable by Tenant, upon the execution of this Lease by Tenant, in the manner and at the place where Minimum Rent is payable.  Landlord is to retain said amount as security for the faithful performance of all covenants, conditions and agreements of this Lease.  Such amount is occasionally referred to herein as the "security."  Landlord may, at its option, apply the security to remedy defaults in the payment of any Rent or other charge hereunder, to repair damages to the Leased Premises caused by Tenant, or to clean the Leased Premises upon the expiration or termination of this Lease; in no event however, shall Landlord be obligated so to apply the security.  Landlord's right to bring a special proceeding to recover or otherwise to obtain possession of the Leased Premises before or after Landlord's declaration of the termination of this Lease for nonpayment of Rent or for any other reason shall not in any event be affected by reason of the fact that Landlord holds such security.  Such security, if not applied toward the payment of Rent in arrears or toward the payment of damages suffered by Landlord by reason of Tenant's breach of the covenants, conditions and agreements of this Lease, is to be returned to Tenant without interest, except as provided by law, when this Lease is terminated according to its terms, but in no event is such security to be returned until Tenant has vacated the Leased Premises and delivered possession thereof to Landlord.  In the event that Landlord repossesses itself of the Leased Premises, whether by special proceeding or re-entry or otherwise, because of Tenant's default or failure to carry out the covenants, conditions and agreements of this Lease, Landlord may apply such security upon all damages suffered to the date of said repossession and may retain the security to apply upon such damages as may be suffered or shall accrue thereafter by reason of Tenant's default or breach.  In the event any bankruptcy, insolvency, reorganization or other creditor-debtor proceedings shall be instituted by or against Tenant, or its successors or assigns, or any guarantor of Tenant hereunder, such security shall be deemed to be applied first to the payment of any Rent and/or other charges due Landlord for all periods prior to the institution of such proceedings, and the balance, if any, of such security may be retained by Landlord in partial liquidation of Landlord's damages.  Landlord shall not be obligated to keep such security as a separate fund but may commingle the security with its own funds.  In the event Landlord applies the security in whole or in part, Tenant shall, upon demand by Landlord, immediately deposit sufficient funds to maintain the security in the initial amount.  Failure of Tenant to deposit such additional security shall entitle Landlord to avail itself of the remedies provided in this Lease for nonpayment of Rent by Tenant.  The acceptance by Landlord of the security deposit submitted by Tenant shall not render this Lease effective unless and until Landlord shall have executed and actually delivered to Tenant a fully-executed copy of this Lease.

**LETTER OF CREDIT.**  Tenant shall provide to Landlord prior to the date of Landlord's execution of this Lease, as security for the performance of Tenant's obligations under this Lease, in addition to any Guaranty attached hereto, an irrevocable Letter of Credit from a FDIC or FSLIC member commercial bank of substantial financial standing (the "Issuer") in the amount set forth in paragraph (18) of the Data Sheet from which Landlord may draw in the event of any default by Tenant under the terms of this Lease.  Such Letter of Credit must be in writing, signed by the Issuer, made payable to the order of Landlord, and must provide that, effective upon the date of issuance of the Letter of Credit, the Issuer shall, upon written notice signed on behalf of Landlord that Tenant has defaulted under the terms of this Lease, immediately remit whatever amounts are specified in said notice, up to and including the full face amount of the Letter of Credit.  Such Letter of Credit shall, by its terms, be fully effective during a one (1) year period following the date of issuance.  Tenant shall arrange for such Letter of Credit to be renewed, or replaced by an equivalent Letter of Credit, to provide continuing identical security to Landlord during each subsequent one (1) year period and during any remaining period under the Lease Term and during any holdover period or other extension of the Term of the Lease.  Each such renewal or replacement of the Letter of Credit shall be for the full face amount set forth in paragraph (18) of the Data Sheet regardless of previous draws against any prior Letter of Credit.  No later than sixty (60) days prior to the termination date of each Letter of Credit, or renewal term thereof, Tenant shall provide written notice (and supporting documentary evidence signed by the Issuer) to Landlord that the then effective Letter of Credit has been so renewed or so replaced for the succeeding time period.  The failure of Tenant to timely renew the Letter of Credit or to maintain the Letter of Credit as herein specified or the Issuer's refusal or failure to permit Landlord to draw against the Letter of Credit shall be a default under the terms of this Lease beyond any applicable grace or cure period.  It is specifically agreed and understood that, in the event that Landlord has not received from Tenant a Letter of Credit, in form and substance acceptable to Landlord, and in accordance with the provisions of this Section 26.01, within ten (10) days of the date of Landlord's execution of this Lease, then this Lease shall be, at the sole option of Landlord, null and void and of no further force and effect.

Philippe Plein/Crystals/05/13/09

S33

## ARTICLE XXVII  MISCELLANEOUS

### SECTION 27.01  WAIVER; ELECTION OF REMEDIES.

The subsequent acceptance of Rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent. In particular, but without limitation, if Tenant assigns or transfers its interest in this Lease contrary to the terms of this Lease, any acceptance by Landlord of such assignee's or transferee's payment shall not be deemed to be a waiver of the restrictions set forth in Section 14.01 hereof. In the event that Tenant shall be at any time in default of both monetary and nonmonetary terms, covenants or conditions of this Lease, any acceptance by Landlord of any payment rendered by Tenant shall not have the effect of curing Tenant's nonmonetary defaults and shall not have the effect of curing any monetary default other than the particular amount owing for which such payment is specifically accepted by Landlord. Following notice of termination or any other remedy exercised by Landlord with respect to any monetary default of Tenant, such default shall not be deemed cured by the payment of Rent owing by Tenant for the current period only, and Landlord may apply such payments to current Rent only without any effect upon Tenant's existing indebtedness and continuing monetary default, notwithstanding any contrary instructions by or on behalf of Tenant, which instructions shall be null and void and of no effect. In addition, after the service of notice or the commencement of a suit, or after final judgment for the possession of the Leased Premises, Landlord may receive and collect Rent due from Tenant, and the payment of Rent by Tenant shall not waive or affect said notice or suit or judgment. One or more waivers of any covenant or condition by Landlord shall not be construed as a waiver of a subsequent breach of the same covenant or condition, and the consent or approval by Landlord to or of any act by Tenant requiring Landlord's consent or approval shall not be deemed to render unnecessary Landlord's consent or approval to or of any subsequent similar act by Tenant. The failure of Landlord to insist upon a strict performance of any term, condition or covenant contained in this Lease shall not be deemed a waiver of any rights or remedies that Landlord may have and shall not be deemed a waiver of any subsequent breach or default in the terms, conditions or covenants herein contained, and any such failure shall not be construed as creating a custom of Landlord's accepting other than strict performance or as modifying in any way the terms, covenants or conditions of this Lease. No breach by Tenant of a covenant or condition of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing signed by Landlord. No act or thing done by Landlord or Landlord's agents shall be deemed an acceptance of surrender of the Leased Premises and no agreement to accept such surrender shall be valid unless in writing signed by Landlord. In addition to any and all other remedies available to Landlord, Landlord may obtain an injunction to restrain any breach or threatened breach of any term, covenant or condition of this Lease. The rights and remedies of Landlord under this Lease or under any specific section, subsection or clause hereof shall be cumulative and in addition to any and all other rights and remedies which Landlord has or may have elsewhere under this Lease or at law or equity, whether or not such section, subsection or clause expressly so states. Nothing contained in this Lease shall be construed to confer upon any person or entity other than Landlord or Tenant any rights, benefits or causes of action, except to the extent specifically otherwise provided in this Lease and except to the extent provided for the benefit of any mortgagee, deed-of-trust beneficiary, ground lessor or trustee for the Retail Area.

### SECTION 27.02  ENTIRE AGREEMENT.

The exhibits attached hereto form a part of this Lease and shall be given full force and effect, as fully as if set forth at length herein. This Lease and said exhibits so attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Leased Premises, and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them other than as are herein set forth. Tenant has not relied upon any representation of Landlord or its agents, other than any items contained in this Lease, as an inducement to enter into this Lease. No alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by each party. Landlord reserves the sole and absolute right to effect such other occupancies and uses in the Retail Area and/or the Development as Landlord, in the exercise of its sole and absolute business judgment, shall determine to best promote the Retail Area and/or the interest of the Retail Area and/or the Development. Tenant does not rely on the fact, nor does Landlord represent, that there shall be any specified occupants or number of occupants of space in the Development after the date of execution of this Lease. Landlord may allow or cause additional structures and facilities to be constructed within or adjacent to the Retail Area and/or the Development or elsewhere, including motion picture theaters, hotels, motels, retail shops, office buildings, restaurants and bars, including any business operations which might be competitive with that of Tenant's business. Tenant expressly acknowledges Landlord's absolute right to own, operate, lease, franchise or otherwise be affiliated with the foregoing.

S34

Philippe Plein/Crystals/05/18/09

### SECTION 27.03  INTERPRETATION AND USE OF PRONOUNS.

Nothing contained herein shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of Rent, nor any other provision contained herein, nor any acts of the parties herein shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant. Whenever herein the singular number is used the same shall include the plural, and the masculine gender shall include the feminine and neuter genders.

### SECTION 27.04  DELAYS.

In the event that either party hereto shall be delayed in the performance of its initial construction or maintenance and/or repair obligations by reason of the elements, war, riot, strikes, lockouts, labor troubles, inability to procure materials or shall at any time be so delayed by reason of failure of power, restrictive governmental laws or reasons of a similar nature not the fault of the party delayed in performing work or doing acts required under the terms of this Lease, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. The provisions of this Section 27.04 shall not operate to delay Tenant's obligations to open by the date Tenant is required to initially open in the Leased Premises if the particular reason for the delay has not operated to delay other tenants from opening or operating within the Retail Area. The provisions of this Section 27.04 shall not operate to excuse Tenant from payment of Minimum Rent, Percentage Rent or any other payments required by the terms of this Lease; provided, however, that the obligation of Tenant to open for business pursuant to Section 1.03 hereof may be delayed pursuant to the provisions of this Section 27.04. Except as expressly provided in this Lease, no such delay, occurrence or situation during the Term shall permit Tenant to abandon the Leased Premises or surrender the Lease or shall relieve Tenant from its liability to pay the full Rent and other charges herein provided for or from any of its other obligations hereunder, and Tenant waives any rights now or hereafter conferred upon it by laws of public authorities or otherwise to abandon the Leased Premises, to surrender the Lease or to any abatement, diminution, reduction or suspension of Rent on account of any such event, happening, occurrence or situation.

### SECTION 27.05  NOTICES.

Unless specifically stated to the contrary in this Lease, any notice, demand, request or other instrument which may be or is required to be given under this Lease or by law shall be sent by overnight courier or by United States certified mail, return receipt requested, postage prepaid, and shall be deemed to have been given as of the day following receipt of same; and shall be addressed (a) if to Landlord, at the address set forth for Landlord on Page D1 of this Lease or at such other address as Landlord may designate by written notice, and with a copy to Landlord's mortgagee if Landlord so designates upon written notice to Tenant, together with copies thereof to such other parties designated by Landlord, and (b) if to Tenant, at the Leased Premises or the address set forth for Tenant on Page D1 of this Lease, or such other address as Tenant shall designate by written notice. Invoices to Tenant may be sent by Landlord via e-mail transmission and Tenant shall provide Landlord with an e-mail address for such purposes. At Landlord's request, a copy of all notices to Landlord shall also be sent by Tenant via e-mail transmission. All notices given from Landlord to Tenant, including, without limitation, notices of default and/or termination of Tenant's interests under this Lease, may be given by Landlord's attorney acting as agent on behalf of Landlord.

### SECTION 27.06  CAPTIONS AND SECTION NUMBERS.

The captions, section numbers, article numbers, and index appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or intent of such sections or articles of this Lease, nor in any way affect this Lease.

### SECTION 27.07  BROKER'S COMMISSION.

Except for The Taubman Company, whose fee shall be paid by Landlord, each party represents and warrants to the other party that the warrantor has dealt with no brokers and that there are no claims for brokerage commissions or finder's fees, nor will there be any such claim, arising from any act or omission of the warrantor in connection with this Lease, and the warrantor agrees to indemnify the other party and hold it harmless from all liabilities arising from any such claim, including, without limitation, the cost of attorneys' fees in connection therewith. Such agreement shall survive the termination of this Lease.

Philippe Pitris/Crystals/05/18/09

### SECTION 27.08 RECORDING.

Tenant shall not record this Lease or any memorandum, affidavit or other notice of this Lease.

### SECTION 27.09 FURNISHING OF FINANCIAL STATEMENTS.

Upon Landlord's written request, Tenant shall promptly furnish Landlord, from time to time, with financial statements reflecting Tenant's current financial condition, and Tenant's current business licenses, and written evidence of then current ownership of managing and controlling interests in Tenant and in any entities which directly or indirectly control or manage Tenant, which financial statements and written evidence shall be certified as being true and correct by the chief financial officer or partner and by the chief executive officer or partner of Tenant.

### SECTION 27.10 LANDLORD'S USE OF COMMON AREAS.

Landlord reserves the right, from time to time, to utilize portions of the common areas for shows, performances, rides and entertainment, displays, automobile and other product shows, the leasing or licensing of permanent and temporary kiosks or carts, or such other uses which in Landlord's sole and absolute judgment tend to attract the public. Further, Landlord reserves the right to utilize the common areas for advertising or educational purposes. Any revenues derived by Landlord from the use of the common areas, whether from usage fees or otherwise, shall not be applied as a deduction against any cost or expense required to be paid by Tenant under this Lease.

### SECTION 27.11 TRANSFER OF LANDLORD'S INTEREST.

In the event of any transfer or transfers of Landlord's interest in the Leased Premises, including a so-called sale-leaseback, the transferor shall be automatically relieved of any and all obligations on the part of Landlord accruing from and after the date of such transfer, provided that (a) the interest of the transferor, as Landlord, in any funds then in the hands of Landlord in which Tenant has an interest shall be turned over, subject to such interest, to the then transferee; and (b) notice of such sale, transfer or lease shall be delivered to Tenant as required by law; and (c) provided; however, that subject to the rights of the Landlord's mortgagee, the said transferee (other than a mortgagee of Landlord or the Retail Area and/or the Development) shall assume all of the unperformed terms, covenants and conditions of Landlord under this Lease arising after the date of such transfer. Upon the termination of any such lease in a sale-leaseback transaction prior to termination of this Lease, the former lessee thereunder shall become and remain liable as Landlord hereunder until a further transfer. No holder of a mortgage or deed of trust, or underlying lessor on an underlying lease, to which this Lease is or may be subordinate, and no lessor under a so-called sale-leaseback shall be responsible in connection with the security deposited hereunder, unless such mortgagee, holder of such deed of trust, underlying lessor or lessor shall have actually received the security deposited hereunder.

### SECTION 27.12 FLOOR AREA.

(a)      The term "floor area" as used in this Lease means, with respect to any leasable area in the Retail Area, the aggregate number of square feet of floor space of all floor levels therein, including any mezzanine, basement or balcony space (to the extent reflected as floor area in the applicable leases), measured from (i) the outside faces of all perimeter walls thereof other than any party wall separating such Leased Premises from other leasable premises, (ii) the center line of any such party wall, (iii) the outside face of any interior wall, and (iv) the building and/or leaseline adjacent to any entrance to such premises.  There shall be no deduction for columns (except for an automated people mover structural support column), stairs, elevators, chases, ducts, shafts, or other interior construction or equipment.  In the event Landlord determines that the square foot area of the Leased Premises is at variance with the square foot area stated in this Lease, from time to time during the lease Term, Landlord (in Landlord's sole and absolute discretion) may elect to measure the floor area of the Leased Premises and/or of the Retail Area. If after any such measurement the actual square footage is found to deviate from the amounts set forth in paragraph (1), Section 1.01 of the Data Sheet (with respect to the floor area of the Leased Premises) or established by Landlord for the floor area of the Retail Area, then the actual square footage derived from such measurement shall be deemed to be the substituted for the figure previously utilized and Landlord may, at its option, make proportional adjustments in Minimum Rent, the Breakpoint, promotional charges and other applicable charges payable by Tenant under this Lease.  Landlord may require that any terms that are revised based upon a change in the floor area of the Leased Premises and/or Retail Area, shall be confirmed by Tenant in a written modification to the Lease executed promptly by Landlord and Tenant.

(b)      For any purpose of this Lease, in determining the gross leasable floor area or the gross leased and occupied floor area of the Retail Area, there shall be excluded therefrom, at the sole option of Landlord,
Philippe Pitio/Crystals/05/13/09

S36

the leasable area of 15,000 square feet or more occupied by a single entity (which, for purposes of this Lease, shall be defined as a "department store" or "anchor store"), the floor area of two spaces (collectively not to exceed 24,000 square feet in leasable floor area), any floor area located on the third level of the Retail Area, the floor area of any premises leased for the operation of a post-office type or packaging or delivery facility or other public/consumer-service or governmental facility, any area used for the office or hotel purposes, any area occupied by a full service restaurant and/or catering facility, the floor area of any space without direct customer access from the enclosed interior public pedestrian corridors, and the total floor area utilized by Landlord for the operation of a skating rink or other recreational area, child care center, museum or public gallery, auditorium or theater, community room, library, project offices, and related rooms, common areas and project areas, which shall be deemed amenities to the Retail Area. If the Retail Area is being constructed and/or opened in phases, then the Retail Area shall not include any floor area which has not been completed in compliance with applicable governmental laws, ordinances and regulations and opened to the public. The term "gross leased and occupied floor area" shall include only such areas as are leased and occupied by tenants subsequent to the dates of commencement of the terms of their respective leases. At Landlord's sole option, for any purpose of this Lease, areas shall not be considered occupied to the extent that Landlord shall not be receiving full proportionate share contributions for the same. No deduction or exclusion from floor area shall be made by reason of columns, ducts, stairs, elevators, escalators, shafts, or other interior construction or equipment. The gross leased and occupied floor area in effect for the whole of any Lease Year shall be the average of the gross leased and occupied floor area in effect on the first day of each calendar month in such Lease Year.

### SECTION 27.13 INTEREST ON PAST DUE OBLIGATIONS.

Any amount due from Tenant to Landlord hereunder which is not paid when due (including, without limitation, amounts due as reimbursement to Landlord for costs incurred by Landlord in performing obligations of Tenant hereunder upon Tenant's failure to so perform) shall bear interest at the rate of four (4) percentage points over the prime rate of interest as published in the Money Rates column of The Wall Street Journal (but only up to and not to exceed the rate then allowed under the usury laws of the State) from the date due until paid, unless otherwise specifically provided herein, but the payment of such interest shall not excuse or cure any default by Tenant under this Lease.

### SECTION 27.14 LIABILITY OF LANDLORD.

If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and such failure shall continue for thirty (30) days after written notice of default is delivered to Landlord by Tenant (provided such thirty (30) day period shall be extended if Landlord shall have commenced the cure and shall be diligently pursuing the cure) then Landlord shall be in default under this Lease, and if as a consequence of such default Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levied thereon against the right, title and interest of Landlord in the Retail Area and out of net income from such property received by Landlord, or out of the consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title and interest in the Retail Area, subject, nevertheless, to the rights of Landlord's mortgagee, and neither Landlord, nor the individuals or entities which are owners of Landlord shall be liable for any deficiency. If Landlord is identified in this Lease as a Trustee, Tenant hereby recognizes that Landlord is executing this Lease as Trustee under an express trust, and it is expressly understood and agreed by and between the parties hereto, anything herein to the contrary notwithstanding, that each and all of the representations, covenants, undertakings and agreements herein made on the part of the Landlord while in form purporting (except as herein otherwise expressed) to be the representations, covenants, undertakings, and agreements of the Landlord are nevertheless each and every one of them, made and intended not as personal representations, covenants, undertakings and agreements by the Landlord or for the purpose or with the intention of binding said Landlord personally but are made and intended for the purpose of binding only that portion of the trust property specifically leased hereunder, and this Lease is executed and delivered by said Landlord not in its own right, but solely in the exercise of the powers conferred upon it as such Trustee; that no duty shall rest upon Landlord to sequester the trust estate or the Rents, issues and profits arising therefrom, or the proceeds arising from any sale or other disposition thereof; and that no personal liability or personal responsibility is assumed by nor shall at any time be asserted or enforceable against Trustee, or any successor trustee, or any of the beneficiaries under said trust, on account of this Lease or on account of any representation, covenant, undertaking or agreement of the said Landlord in this Lease contained, either expressed or implied, all such personal liability, if any, being expressly waived and released by the Tenant herein and by all persons claiming by, through or under said Tenant. Notwithstanding anything to the contrary contained in this Lease, nothing in this Lease shall impose any obligations on Landlord to be responsible or liable for, and Tenant hereby releases Landlord from, any and all liability for consequential damages (including, but not limited to, lost profits).

Philippe Plein/Crystals/05/18/09

S37

OAKLAND.16367202

### SECTION 27.15  ACCORD AND SATISFACTION.

Payment by Tenant or receipt by Landlord of a lesser amount than the Rent or other charges herein stipulated may be, at Landlord's sole option, deemed to be on account of the earliest due stipulated Rent or other charges, or deemed to be on account of Rent owing for the current period only, notwithstanding any instructions by or on behalf of Tenant to the contrary, which instructions shall be null and void, and no endorsement or statement on any check or any letter accompanying any check payment as Rent or other charges shall be deemed an accord and satisfaction, and Landlord shall accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or other charges or pursue any other remedy in this Lease or in law or in equity against Tenant.

### SECTION 27.16  EXECUTION OF LEASE; NO OPTION.

The submission of this Lease to Tenant shall be for examination purposes only, and does not and shall not constitute a reservation of or option for Tenant to lease, or otherwise create any interest of Tenant in the Leased Premises or any other premises situated in the Retail Area. Execution of this Lease by Tenant shall be irrevocable for a period of twenty (20) days after Tenant's execution. The return to Landlord of Tenant-executed copies of this Lease shall not be binding upon Landlord, notwithstanding any preparation or anticipatory reliance or expenditures by Tenant or any time interval, until Landlord has in fact executed and actually delivered a fully-executed copy of this Lease to Tenant.

### SECTION 27.17  GOVERNING LAW.

This Lease shall be governed by and construed in accordance with the laws of the State of Nevada. If any provision of this Lease or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease shall not be affected thereby and each remaining provision of the Lease shall be valid and enforceable to the full extent permitted by the law. Tenant appoints the following persons at the following locations as agent to receive service of process, writs, notices, summonses, or other legal documents in any suit, action or proceeding which Landlord may commence against Tenant: any officer, partner or other principal of Tenant, or any person in charge, at the Tenant's address as set forth in the preamble at the top of Page D1 of this Lease. Where permitted by law or local court rule, Tenant consents to service of such process by United States mail, in the manner specified in the applicable law or court rule.

### SECTION 27.18  SPECIFIC PERFORMANCE OF LANDLORD'S RIGHTS.

Landlord shall have the right to obtain specific performance of any and all of the covenants or obligations of Tenant under this Lease, and nothing contained in this Lease shall be construed as or shall have the effect of abridging such right.

### SECTION 27.19  CERTAIN RULES OF CONSTRUCTION.

Time is of the essence in this Lease. Notwithstanding the fact that certain references elsewhere in this Lease to acts required to be performed by Tenant hereunder omit to state that such acts shall be performed at Tenant's sole cost and expense, unless the context clearly implies to the contrary, each and every act to be performed or obligations to be fulfilled by Tenant pursuant to this Lease shall be performed or fulfilled at Tenant's sole cost and expense. Any Event of Default or any breach or default by Tenant of its obligations under this Lease which continues beyond any applicable grace or cure period in this Lease shall be deemed material. Tenant shall be fully responsible and liable for the observance and compliance by concessionaires with all the terms and conditions of this Lease, which terms and conditions shall be applicable to concessionaires as fully as if such concessionaires were the Tenant hereunder; any failure by a concessionaire fully to observe and comply with the terms and conditions of this Lease shall constitute a default hereunder by Tenant. Nothing contained in the preceding sentence shall constitute a consent by Landlord to any concession, subletting or other arrangement proscribed by Section 14.01. All provisions of this Lease have been freely negotiated by and between the parties. Unless this Lease expressly states otherwise, wherever reference is made to Landlord's approval or consent, the parties agree that Landlord may withhold its approval and/or consent in Landlord's sole and absolute discretion.

### SECTION 27.20  SURVIVAL; NONDISCLOSURE; FREE ACT.

The obligations of Tenant for payment of Rent and charges under this Lease shall survive the expiration or earlier termination of the Term of this Lease. Tenant covenants that neither Tenant nor any attorney or other representative for Tenant shall disclose the contents of this Lease to any other person or entity. Tenant shall be fully responsible for the actions of its attorneys and representatives. By its execution of this Lease, Tenant acknowledges and agrees that it has read this Lease, understands the contents hereof,

Philippe Plein/Crystals/05/18/09

S38

OAKLAND:1636720.2

and is signing this Lease as its own free act and deed, and as the free act and deed of the representatives signing on Tenant's behalf, without any persuasion or coercion by any person or entity, and with full advice of counsel.

## ARTICLE XXVIII  SPECIAL PROVISIONS

### SECTION 28.01  PRIVILEGED LICENSES.

Tenant acknowledges that Landlord and/or its Affiliates (as defined in Section 17.02 above of this Lease) are businesses that are, or may be, subject to, and exist because of, privileged licenses issued by governmental authorities. Further Tenant:

(a)    Acknowledges its understanding that it is illegal for a denied gaming license applicant or a revoked gaming licensee, or a business organization under such a person's control, to enter or attempt to enter into a contract with Landlord, its parent company, subsidiaries or any affiliate, without the prior approval of the Nevada Gaming Commission; and

(b)    Affirms that Tenant is not such a person (defined in (a) above), and is not under the control of such a person.

### SECTION 28.02  REPUTATION.

Tenant acknowledges that Landlord and its Affiliates have a reputation for offering high-quality entertainment and/or services to the public, and that it and its Affiliates are subject to regulation and licensing, and desire to maintain their reputation and receive positive publicity. Tenant therefore agrees that throughout the Term, it and its officers, directors, shareholders, employees and agents will not conduct themselves in a manner which is contrary to the best interests of Landlord, nor in any manner that adversely affects or is detrimental to Landlord, its parent company, or its Affiliates, and will not directly or indirectly make any oral, written or recorded private or public statement or comment that is disparaging, critical, defamatory or otherwise not in the best interests of Landlord. If any time (i) Tenant or any person associated in any way with Tenant is denied a license, found unsuitable, or is denied or otherwise unable to obtain any other Approval (as defined in this Section) with respect to the Leased Premises, or the Development, by the Nevada Gaming Commission or any other agency or subdivision of the State of Nevada, or any other agency or subdivision thereof or any other government regulating gaming (collectively "Gaming Authorities"), is required by any Gaming Authority to apply for an Approval and does not apply within any required time limit, as the same may be extended by such Gaming Authority, withdraws any application for Approval other than upon a determination by the applicable Gaming Authority that such Approval is not required, and if the result of the foregoing has or would have an adverse effect on Landlord or does or would materially delay obtaining any approval; or (ii) any Gaming Authority commences or threatens to commence any suit or proceeding against Landlord or any Affiliate of Landlord or to terminate or deny any Approval of Landlord or any Affiliate of Landlord as a result of Tenant or any person associated with Tenant (all of the foregoing events described in (i) and (ii) above are collectively referred to as a "Denial"), Landlord may terminate this Lease by written notice to Tenant; provided, however, that if Landlord exercises its right to terminate this Lease pursuant to this Section solely as the result of an association of Tenant or any person associated with Tenant which is not the subject of a Denial, this Lease shall not terminate if Tenant ends such association within fifteen (15) days of such notice of termination or within such longer period of time, if any, as the Gaming Authority gives for terminating such association. Tenant and all such persons associated with Tenant shall promptly, and in all events within any time limit established by law, regulation or such Gaming Authority, furnish each Gaming Authority any information requested by such Gaming Authority and shall otherwise fully cooperate with all Gaming Authorities. A person shall be deemed associated with Tenant if that person directly or indirectly owns any equity interest in Tenant, any equity interest in such person is directly or indirectly owned by Tenant, any equity interest in such person is directly or indirectly owned by a person directly or indirectly having any equity interest in Tenant (all of the foregoing are hereinafter referred to as "Tenant Affiliates"), such person is employed by Tenant or a Tenant Affiliate, is an officer, director or agent of Tenant or a Tenant Affiliate, has any contractual relationship with Tenant or a Tenant Affiliate, furnishes services or property to Tenant or a Tenant Affiliate, or has the power to exercise a significant influence over Tenant or a Tenant Affiliate. Tenant represents to Landlord that neither Tenant, nor, to the best of Tenant's knowledge, any person associated with Tenant is unwilling to file all necessary applications to obtain whatever Approvals may be required of such persons in connection with this Lease. To the best of Tenant's knowledge, neither Tenant nor any person associated with Tenant has ever engaged in any conduct or practices which any of the foregoing persons should reasonably believe would cause such person or entity to be denied any Approval. The term "Affiliate" of any specified person means any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person or any officer, director, trustee or general partner of either of such persons. For the purposes of this definition, "control" (including, with correlative meanings, the terms

Philippe Price/Crystals/03/18/09

S39

OAKLAND.1636730.2

"controlled by" and "under common control with"), as used with respect to any person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such person, whether through the ownership of voting securities or by agreement or otherwise. "Approval" means any license, finding of suitability or any other approval or permit by or from the Gaming Authorities.

### SECTION 28.03  NO LIABILITY.

Tenant agrees that in the event there is any default or alleged default by Landlord under this Lease, or Tenant has or may have any claim arising from or relating to the services provided under this Lease, Tenant shall not commence any lawsuit or otherwise seek to impose any liability whatsoever against Kirk Kerkorian or Tracinda Corporation; (iii) Tenant agrees that neither Kirk Kerkorian nor Tracinda Corporation shall have any liability whatsoever with respect to this Lease, the services provided or the Development; (iv)  Tenant agrees that it shall not permit any party claiming through it, to assert a claim or impose any liability against either Kirk Kerkorian or Tracinda Corporation, either collectively or individually, as to any matter or thing arising out of or relating to this Lease or any alleged breach or default by Landlord; (v) Tenant agrees that neither Kirk Kerkorian nor Tracinda Corporation, individually or collectively, is a party to this Lease or is liable for any alleged breach or default of this Lease by Landlord; and (vi) Tenant hereby waives any and all of the foregoing claims, as well as any right to assert any such claim, now existing or arising in the future.

### SECTION 28.04  NON-DISCRIMINATION.

Tenant covenants by and for itself, its successors and assigns, and all persons claiming under or through it, and this Lease is made and accepted upon and subject to the following conditions:  that there shall be no discrimination against or segregation of any person or group of persons on account of sex, marital status, race, color, religion, creed, national origin or ancestry, in the leasing, subleasing, transferring, use, or enjoyment of the Leased Premises nor shall Tenant itself, or any person claiming under or through it establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy, of tenants, lessees, sublessees, subtenants or vendees in the Leased Premises.

[End of Standard Form; signature and acknowledgment pages for the Lease<br>appear immediately following the Data Sheet.]

S40

Philippe Plein/Crystals/05/18/09

# EXHIBIT A



The Crystals is located along Las Vegas Boulevard between CityCenter Place and Harmon Avenue. The Crystals is part of the greater CityCenter development including Aria Resort & Casino, Vdara Condo-Hotel, Mandarin Oriental Hotel and Residences, The Harmon Hotel, Spa & Residences and Veer Towers.

The Crystals Retail and Entertainment District

A  Veer Tower East & Veer Tower West  
   Murphy/Jahn Architects

B  Mandarin Oriental Hotel and Residences  
   Kohn Pedersen Fox Associates

C  Aria Resort & Casino  
   Pelli Clarke Pelli Architects

D  Vdara Condo-Hotel  
   RV Architecture, LLC

E  The Harmon Hotel, Spa & Residences  
   Foster & Partners

**Leased Premises**



# CRYSTALS

## EXHIBIT B
### CONSTRUCTION

### SECTION I.  LANDLORD'S WORK

A.    A complex of building shells and common area improvements of exterior and interior design and materials as determined by Landlord substantially as shown in Exhibit A.

B.    If any partitions are required to separate the Leased Premises from adjacent spaces (whether adjacent leased spaces, adjacent public spaces or otherwise), Landlord shall install metal stud framing only except at exterior wall locations. Such stud framing shall extend from the floor slab of the Leased Premises to the underside of the floor or roof structure. As described in Section III below, Tenant shall install gypsum board on the stud framing to underside of structure as required for the fire resistant separation applicable to the location of the partition in question.

C.    If Tenant shall be unable to complete the construction of the storefront of the Leased Premises by October 3, 2009, Landlord shall provide, for Tenant's use during construction and demolition, a temporary barricade at the storefront lease line. Tenant shall reimburse Landlord $75.00 per lineal foot of storefront lease line for any such temporary barricade provided by Landlord. Tenant shall remove the storefront barricade upon completion of Tenant's Work and when Tenant is prepared to open for business as approved by Landlord. Tenant shall immediately repair any damage caused to the Leased Premises and common areas by the removal of the barricade.

D.    1.    The following list of items will be provided by Landlord for the fee set forth in the schedule below.

          1.    Sanitary sewer stub to be in close proximity to the Leased Premises.
          2.    Plumbing vent stub to be in close proximity to the Leased Premises.
          3.    Domestic cold water and stub at the Leased Premises.
          4.    Basic fire protection sprinkler grid (heads turned up) within the Leased Premises for Tenant's modification.
          5.    Toilet exhaust vertical duct stub and toilet exhaust fan by Landlord. Horizontal duct run and tie in by Tenant.
          6.    Central electric utility submeter and breaker in distribution area with empty conduit and pull string (only) to the Leased Premises from the distribution area. Tenant to install wire and transformer per Landlord standards.
          7.    Central telephone company connection point at distribution area with empty conduit and pull string (only) to the Leased Premises.
          8.    Demising walls studs only as described above.
          9.    Landlord shall supply and install the glazing on the storefronts on the exterior of the building (if applicable); otherwise, Tenant shall supply and install glazing on all interior storefronts.
          10.   Heated water piping for HVAC in select spaces, designated by Landlord, only.
          11.   Heated water piping for food and beverage select spaces, designated by Landlord, only.
          12.   Capped code minimum outside air ventilation duct to Tenant space.
          13.   One fire protection speaker/strobe per level per code including pipe and wire.
          14.   Review of plans and specifications for Tenant's Work.
          15.   At Landlord's sole election, three sides of the grease vertical shaft for all exhaust associated with food tenants only as determined by Landlord will be provided. Tenant to install ductwork and close shaft per Landlord's standards.
          16.   Gas manifold (only) (food tenants only).
          17.   Grease waste service stub (food tenants only).

    2.    Fee Schedule For Tenants Other than Food Tenants, Other than Stores of 15,000 Square Feet or More, and Other than Stores with the following locations:  100, 101, 102, 103, 110, 111, 112, 156, 180, 182, 200, 201, 202, 203, 210, 256, 290, 300, 301, 302, 303 and 310:

| Floor Area of Leased Premises | Applicable Rate |
|---|---|
| 1 through 1,500 sq. ft. | $33/psf |
| 1,501 through 3,500 sq. ft. | $25/psf |
| 3,501 sq. ft through 14,999 sq. ft. | $23/psf |

Exhibit B, page 1
Philippe Pleils/Crystals/03/18/09

DOCID
OAKLAND.1636720.2

Fee Schedule For Food Tenant and Stores with the following locations:  100, 101, 102, 103, 110, 111, 112, 156, 180, 182, 200, 201, 202, 203, 210, 256, 290, 300, 301, 302, 303 and 310:

| Floor Area of Leased Premises | Applicable Rate |
|---|---|
| 1 through 1,500 sq. ft. | $39/psf |
| 1,501 through 3,500 sq. ft. | $34/psf |
| 3,501 sq. ft through 14,999 sq. ft. | $29/psf |
| Fee Schedule For Tenants of 15,000 Square Feet or More: | $42/psf |

In addition, a fee of Twenty-Five Thousand and 00/100ths Dollars ($25,000.00) shall be charged to Tenant for Landlord's purchase and installation of glazing if the leased premises has store frontage on the exterior of the building.

> **Deleted:** $221 per square foot of exterior storefront curtain wall surface on the exterior of the building

E.    See Exhibit C for information regarding installation of the Central Chilled Water Supply System.

## SECTION II. TENANT'S WORK

Tenant's Work shall, at a minimum, conform to the criteria, procedures, and schedules below.  In addition, Tenant shall at all times comply with applicable governmental requirements and the requirements of Landlord's insurance provider or underwriter.

A.    Field Conditions

Prior to the commencement of its construction, Tenant shall survey the site to inspect, verify and coordinate all existing conditions within the Leased Premises.  Such survey shall include the location of existing Retail Area utilities which are to remain, placement of wall stud framing defining the Leased Premises, and identification of various improvements made by previous occupant(s), if any, which are to remain, be relocated or removed and the determination of the extent of demolition or repair to be performed by Tenant.  Tenant shall advise Landlord promptly of any discrepancies with respect to drawings for the Leased Premises provided by Landlord to Tenant.

If existing conditions necessitate changes to Tenant's drawings and specifications for Tenant's Work, then Tenant shall promptly incorporate such changes into Tenant's drawings and specifications and promptly submit the revised drawings and/or specifications to Landlord for review and/or approval.  Tenant shall verify conditions pertaining to the Leased Premises from time to time after commencement of construction of its Leased Premises.

Promptly following the installation by Landlord of wall stud framing defining the Leased Premises, Tenant shall verify the accuracy of said installation and shall immediately advise Landlord of any discrepancies. Failure to so notify Landlord shall be deemed as acceptance by Tenant of said installation and layout.

Tenant shall coordinate its work with the work of others or with existing conditions occurring above or below the Leased Premises and shall make changes from time to time as required to accommodate such work or conditions.

B.    Drawings and Specifications

As described in Section IV below.

C.    Architectural and Finishing Work

1.    Storefront work.

2.    All required partitioning, fire separations and doors, service exit door, door jambs, hardware, vestibule, ceiling work, floor coverings, commercial grade finish hardware, and painting and finishing work, per Landlord's standards.

3.    Toilet and restroom facilities for public use (food tenants and other Landlord-designated spaces only) in compliance with code. Tenant to run horizontal duct and tie in.

4.    Sign(s) and sign panel backgrounds.  To include back of house corridor signage per Landlord standards.

5.    Floors:

a.    Concrete topping to achieve a finished floor elevation at the same elevation as the corridor and (where applicable) floor insulation, per Landlord's standards.  Repairs as may be required to accommodate extension of underground utilities.

Exhibit B, page 2
Philippe Picio/Crystals/05/18/09

DOCID
OAKLAND.1636720.2

6.    Food and beverage tenants to complete vertical shaft per code, upon installation of exhaust ductwork.

Landlord approval is required prior to closing.

D.    Structural

1.    Any Landlord approved alterations and/or additions and reinforcements to Landlord's structure required to accommodate Tenant's Work must be designed by, and must be set forth in plans and specifications prepared by, a certified State licensed structural engineer at Tenant's expense, and such plans and specifications, and the manner of performance of such work, shall also be subject to prior written approval of Landlord and Landlord's structural engineer. Tenant shall pay to Landlord the fees (at the rates set forth in Section IV.B.4. of this Exhibit B) charged by Landlord's structural engineer for review and approval of such plans and specifications within ten (10) days after invoicing.

E.    Mechanical

1.    All plumbing, heating, ventilating, and air conditioning systems within or directly related to Tenant's leased premises, proceeding from the points of connection to utilities as listed above, or modifications to existing mechanical systems. Also see Exhibit C for information regarding the Central Chilled Water Supply System. All equipment exclusively serving the Leased Premises shall be located within the Leased Premises except for any grease vertical exhaust and fan and pollution control equipment/scrubber to be installed by Tenant if Tenant is a food operation.

Tenant is responsible to supply and install all horizontal and vertical ductwork for grease exhaust, make up air, dishwasher exhaust, and all associated exhaust fans.

Horizontal toilet exhaust to be supplied and installed by Tenant.

F.    Electrical

1.    All electrical and telephone systems within or directly related to the Leased Premises proceeding from points of connection to utilities as listed under Landlord's Work. Tenant to supply and install all wiring and transformers.

G.    Fire Protection

1.    A complete modification of the fire protection sprinkler system, installed by Landlord as part of Landlord's Work. Isolation valve by Tenant per Landlord's standards. All such modification work shall be performed, at Tenant's sole cost and expense, by a qualified sprinkler contractor designated by Landlord and in accordance with the CityCenter Fire Life Safety Master Plan. Landlord's approval of the foregoing shall not constitute the assumption of any responsibility by Landlord for the accuracy or sufficiency thereof, and Tenant shall be solely responsible therefor.

## SECTION III.  CONSTRUCTION CRITERIA -- TENANT'S WORK.

The requirements, Construction Criteria (defined below) and/or other standards and specifications as set forth below represent minimum standards for the preparation of working drawings, construction and finish of the Leased Premises by Tenant. In addition, Tenant shall at all times comply with applicable governmental requirements and the requirements of Landlord's insurance provider or underwriter.

A.    Standard Retail Area Construction Criteria

1.    Tenant's Work shall, at a minimum, comply with all Landlord's written construction criteria relating to the construction of tenant retail space improvements for the Retail Area (the "Construction Criteria") which Construction Criteria is contained in the "CityCenter Retail & Entertainment District Tenant Design and Construction Manual" (the "Design and Construction Manual") provided by Landlord to Tenant. Such Construction Criteria shall be adhered to by Tenant in the performance of all aspects of Tenant's Work. The Design and Construction Manual contains charges to Tenant for costs in connection with the performance of work (including without limitation sprinkler and utility shut down fees); such charges shall be payable by Tenant to Landlord within twenty (20) days after written demand except as otherwise provided in the Design and Construction Manual.

B.    Design Loads

1.    Structural loading imposed by any of Tenant's Work on a temporary or permanent basis shall not exceed the allowable live load of 100 lbs. per square foot.

C.    Architectural, Structural

1.    Storefront:

a.    Electronic surveillance or other shoplifting detection devices and security systems shall be incorporated and integrated within Tenant's storefront. Free-standing "boxes" or "columns" or other exposed equipment or decals shall be prohibited.

2.    Ceilings:

The use of exposed wood or other combustible material above ceilings or in any other attic spaces is prohibited.

3.    Walls:

Layers of 5/8" Firecode (UL listed) gypsum board shall be used on all party walls to meet fire resistant separation requirements.

Sound insulation may be required by Landlord for uses which could emit sounds into other leased or occupied spaces.

4.    Floors:

a.    Toilet rooms and kitchens shall have waterproofed floors and door thresholds per Landlord's standards.

5.    Service exit door, jamb, rear door signage and hardware per Landlord's standards.  Vestibule by Tenant per Landlord's standards.

6.    Rubbish Storage:

a.    Food and beverage service Tenants shall provide separate waste storage room(s) within Leased Premises.

b.    Floor area of room(s) to be waterproofed with membrane per Landlord's standards.

D.    Mechanical

1.    Plumbing:

a.    Plumbing fixtures and accessories shall be of highest commercial quality and shall be of water conserving type.

b.    Floor drains shall be provided in toilet rooms and kitchens and/or food service areas.

2.    Heating, Ventilating and Air Conditioning:

If Tenant is approved to install facilities to supplement Landlord's central supply system, said systems, shall be installed in complete compliance with criteria established by Landlord for such purposes.

3.    Fire Protection:

Complete modification of basic Landlord-provided fire protection sprinkler system, and Tenant's installation of, fire hose cabinets, fire extinguishers and other equipment within the Leased Premises, all in accordance with Landlord's insurance underwriters' Fire Rating Inspection Bureau, and Code requirements. Since the entire fire protection system for the Retail Area and Development is an inter-related, centrally controlled installation, Tenant shall cause the fire protection system for the Leased Premises to be designed and modified, by a Landlord designated sprinkler contractor acceptable to Landlord, in accordance with Landlord's requirements and shall submit shop drawings, specifications and hydraulic calculations for the sprinkler system to the local jurisdictions having authority and Landlord's Insurance Underwriters' Fire Rating Inspection Bureau for approval.  Landlord's approval of the foregoing shall not constitute the assumption of any responsibility by Landlord for the accuracy of sufficiency thereof, and Tenant shall be solely responsible therefore.   Said work shall be accomplished without interrupting fire protection service within the remainder of Retail Area.

4.    Tenant shall supply and install submeters per Landlord's standards.

E.    Electrical

1.    Tenant shall furnish and install a complete electrical service including (without limitation) transformer, within the Leased Premises and shall furnish and install wiring within existing conduit leading from Landlord's point of connection to the Leased Premises. Power available shall be subject to capacities determined in Landlord's sole and absolute discretion.   The installation of any

Exhibit B, page 4
Philippe Pkin/Crystals/05/18/09

supplemental facilities by Tenant shall be in compliance with criteria established by Landlord in Landlord's sole and absolute discretion.

2. Connections to all lighting devices in Tenant's public areas shall be concealed.

3. Emergency lighting.

4. Circuits serving display lighting and signage shall be controlled by a time switch. Hours for display lighting and signage shall be established by Landlord.

5. Audio systems installed by Tenant shall be designed such that sound shall be contained within the Leased Premises.

6. Tenant shall install fire alarm and occupant notification systems. Tenant shall employ a contractor which is recommended by Landlord.

F. Tenant's Permanent Sign

1. General:

Tenant shall submit its sign drawings and specifications, including samples of materials and colors, for Landlord's approval, prior to fabrication of Tenant's sign. Such drawings shall show location of sign on storefront elevation drawing and shall clearly indicate color, materials, attachment devices, dimensions and construction details.

2. The service door of the Leased Premises shall be identified with a sign per Section II above.

## SECTION IV.  PROCEDURE, SCHEDULES AND OBLIGATIONS FOR THE COMPLETION OF PLANS AND SPECIFICATIONS BY TENANT.

A. Drawings Package

1. Landlord shall furnish Tenant with drawings giving space information for the Leased Premises (the "drawings package"); provided that Landlord shall not be responsible for the accuracy, efficacy or sufficiency of the drawings package and Tenant shall be solely responsible for all technical and other examinations of the Leased Premises and shall be exclusively responsible with respect to verification of actual field conditions and actual field measurements and a full review of all technical and engineering requirements with respect to the Leased Premises and Tenant's construction thereon.

B. Drawings and Specifications

1. The drawings for Tenant's Work shall be prepared by Tenant and submitted to Landlord for Landlord's approval in three separate phases. Schematic design drawings shall first be submitted by Tenant to Landlord for Landlord approval. Design development drawings shall be submitted to Landlord for Landlord approval after Landlord's approval of Tenant's schematic design drawings. Working drawings and specifications shall be submitted to Landlord for Landlord approval after Landlord's approval of Tenant's design development drawings. Each and every drawings submittal to Landlord shall comply with the Construction Criteria. Notwithstanding anything contained in this Lease and its exhibits to the contrary, Tenant's initial submission of schematic design drawings shall be provided by Tenant to Landlord no later than the date twenty (20) days after full execution and delivery of this Lease and Tenant's final submission of working drawings and specifications shall be submitted to Landlord within seventy-five (75) days after full execution and delivery of this Lease.

2. After review of drawings or specifications from Tenant, Landlord shall return to Tenant at least one (1) set of drawings or specifications with Landlord's modifications and/or approval.

3. If any drawings or specifications are returned to Landlord with modifications, but not bearing Landlord's approval, then such drawings and specifications shall be revised by Tenant to address Landlord's modifications and then resubmitted to Landlord for approval, all within ten (10) days after Tenant's receipt of the drawings modified by Landlord.

4. Tenant shall pay to Landlord the following fees which are applicable for review of Tenant's plans and specifications for Tenant's Work within twenty (20) days after written demand:

    (i) initial review of plans and specifications: $6,500;

    (ii) second review: no charge provided any Landlord comments from initial review have been incorporated, otherwise refer to (iii) below;